**Nos. 11-35914 & 11-35931**
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

**SEATTLE MIDEAST AWARENESS CAMPAIGN**
Appellant,

v.

**KING COUNTY**
Appellee.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WASHINGTON
CASE NO. 11-CV-00094-RAJ (HON. RICHARD A. JONES)
_____

**Opening Brief of Appellant Seattle Mideast Awareness Campaign**

VENKAT BALASUBRAMANI
Focal PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
Telephone: (206) 529-4827

JEFFREY C. GRANT
Skellenger Bender, P.S.
1301 5th Ave # 3401
Seattle, WA 98101
Telephone: (206) 623-6501

Cooperating Attorneys for ACLU of
Washington Foundation

SARAH A. DUNNE
Legal Director

M. ROSE SPIDELL
LA ROND MARIE BAKER
Attorneys
ACLU of Washington Foundation
901 5th Avenue, Suite 630
Seattle, WA 98164-2008
Telephone: (206) 624-2184

Attorneys for Seattle Mideast
Awareness Campaign

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Seattle Mideast Awareness Campaign ("SeaMAC") is a non-profit corporation with no parent corporation.  No publicly held or other company owns 10% or more of the stock of SeaMAC.

# <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................. ii

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ................................................. 4

ISSUES PRESENTED FOR REVIEW ............................................. 4

STATEMENT OF THE CASE ..................................................... 5

STATEMENT OF FACTS ......................................................... 7

I.    FOR A QUARTER OF A CENTURY, KING COUNTY RAN
      CONTROVERSIAL ADS ON ITS BUSES .................................... 7

II.   KING COUNTY REVIEWED AND APPROVED SEAMAC'S MESSAGE
      TO RUN IN ITS BUS ADVERTISING FORUM ............................... 9

III.  IN RESPONSE TO PUBLIC OUTCRY, KING COUNTY REVERSED
      COURSE AND CENSORED SEAMAC'S AD ................................. 10

      A.    The County Received a Flood of Messages from an Organized
            Campaign Opposing SeaMAC's Message ........................... 11

      B.    The County Implemented a 'Mid-Range' Response Plan to Deal
            with any Potential Disruption Caused by Opponents of
            SeaMAC's Ad .................................................... 13

      C.    King County Censored SeaMAC's Ad, Citing to the "Civility
            Clauses," Contained in Sections 6.4(D) and (E) of its
            Advertising Policy .............................................. 14

            1.   King County failed to investigate "threatening"
                 communications. ............................................ 14

            2.   Law enforcement recommendations to King County were
                 equivocal and based on generalized concerns. ............... 16

            3.   King County relied on the risk posed by alleged terrorist
                 threats despite law enforcement conclusions to the
                 contrary. ................................................. 16

            4.   King County relied on the volume of the messages to
                 conclude that there was a threat of disruption. ............ 17

D.    King County Also Justified its Decision to Censor SeaMAC Based on the Submission of Counter Ads Which Would "Escalate the Debate" ........................................ 18

STANDARD OF REVIEW ........................................................ 19

SUMMARY OF ARGUMENT ................................................... 20

ARGUMENT ............................................................................ 22

I.    THE DISTRICT COURT ERRED IN ITS APPLICATION OF FIRST AMENDMENT PRINCIPLES REGARDING THE SCOPE OF THE FORUM .......................................................................... 22

    A.    First Amendment Principles Applicable to Government-Created Forums ................................................................. 23

    B.    Factual Disputes Regarding King County's Acceptance of a Broad Range of Advertising Preclude a Finding that no Designated Public Forum was Created ............................... 27

    C.    The First Amendment Does not Permit a Heckler's Veto, Whether in a Public or a Non-public Forum ...................... 29

        1.    A heckler's veto is impermissible even in a limited public forum. ....................................................................... 31

        2.    Section 6.4(E) invited a heckler's veto. .................... 33

    D.    A Policy May not Exclude Controversial Material From a Forum by Public Referendum .......................................... 35

        1.    The First Amendment does not allow reliance on "community standards" without neutral and objective criteria. ...................................................................... 36

        2.    Section 6.4(D) lacked neutral criteria and created an impermissible risk of viewpoint discrimination. ....... 37

II.    THE DISTRICT COURT APPLIED THE INCORRECT SUMMARY JUDGMENT STANDARD TO RESOLVE FACTUAL DISPUTES ......... 39

    A.    The District Court Improperly Employed a Deferential Reasonableness Standard in Reviewing the *Facts* Underlying the County's Decision to Reject SeaMAC's Ad ...................... 40

        1.    Deference to the County's interpretation of the facts was inappropriate because the County excluded a political

message otherwise permitted in the forum by reference to non-neutral, subjective standards................................................41

    2.    Reasonableness was an inappropriate standard to review the facts underlying the County's decision because all of the justifications relied on by King County were viewpoint-based. ........................................................42

  B.  The District Court's Application of the Reasonable Forecast of Disruption Standard is at Odds with First Amendment's Disruption Standard...........................................................43

  C.  Even Applying the Reasonableness Standard, Material Factual Disputes Existed About the Alleged Threats of Disruption................45

    1.    Law enforcement recommendations to not run SeaMAC's ad were vague, not based on any credible threat and did not provide a reasonable basis to censor SeaMAC...................................................................46

    2.    The threat of disruption from drivers was speculative and did not support a decision to censor SeaMAC........................48

    3.    Genuine factual disputes exist regarding whether riders or the public would cause a disruption if SeaMAC's ad were run......................................................................49

    4.    The adequacy of King County's response plan undermined any reasonable foreseeability of disruption, but the County and the District Court discounted it. ................51

III.  SEAMAC PROVIDED COMPARATOR EVIDENCE SUFFICIENT TO GIVE RISE TO AN INFERENCE OF VIEWPOINT DISCRIMINATION ...................................................................................52

IV.  KING COUNTY'S ARGUMENT THAT IT MAY CLOSE THE FORUM DOES NOT DISPOSE OF SEAMAC'S CLAIMS......................................55

CONCLUSION....................................................................56

CERTIFICATE OF COMPLIANCE........................................................59

STATEMENT OF RELATED CASES ................................................61

CERTIFICATE OF SERVICE .........................................................62

## TABLE OF AUTHORITIES

### SUPREME COURT CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)............................................20

Bd. of Regents v. Southworth, 529 U.S. 217 (2000) ........................................ 37, 38

Bose Corp v. Consumer's Union, 466 U.S. 485 (1984.................................... 20, 40

Brandenburg v. Ohio, 395 U.S. 444 (1969).............................................................34

Cohen v. California, 403 U.S. 15 (1971) ......................................................... passim

Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788 (1985).......... passim

Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992)............................30

Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988).........................................31

Lehman v. City of Shaker Heights, 418 U.S. 298 (1974)................................ 24, 29

Meyer v. Grant, 486 U.S. 414 (1988) .......................................................................3

Miller v. California, 413 U.S. 15 (1973) .................................................................38

Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37 (1983)..............23

Reno v. ACLU, 521 U.S. 844 (1997) ......................................................................31

Rosenberger v. Rector, 515 U.S. 819 (1995)....................................... 23, 24, 25, 29

Terminiello v. City of Chicago, 337 U.S. 1(1949) ......................................... 30, 44

Tinker v. Des Moines Independent Community School District, 393 U.S. 503
(1969) ................................................................................................................ 44, 45

### APPELLATE COURT CASES

A.C.L.U. of Nevada v. City of Las Vegas, 333 F.3d 1092 (9th Cir. 2003).............20

Aids Action Committee of Mass. v. MBTA, 42 F.3d 1 (1st Cir. 1994)...  27, 40, 41,
58

Airline Pilots Ass'n Int'l v. City of Chicago, 45 F.3d 1144 (7th Cir. 1995)...........
…………………………………………………………………………….28, 39, 40

Arizona Life Coalition Inc. v. Stanton, 515 F.3d 956 (9th Cir. 2008) ....... 24, 26, 46

Bravo v. City of Santa Maria, 665 F.3d 1076 (9th Cir. 2011)................................20

Chicago Acorn v. Metropolitan Pier and Exposition, 150 F. 3d 695 (7th Cir.
1998)…………………… .......................................................................................35

Children of the Rosary v. City of Phoenix, 154 F.3d 972 (9th Cir. 1998) ..........4, 38

v

Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth., 148 F.3d 242 (3d Cir. 1998).. .......................................................................................... 27, 38

Cogswell v. City of Seattle, 347 F.3d 809 (9th Cir. 2003) .....................................25

Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't, 533 F.3d 780 (9th Cir. 2008).................................................................................44

Daily Herald Co. v. Munro, 838 F.2d 380 (9th Cir.1988)......................................21

Hopper v. City of Pasco, 241 F.3d 1067 (9th Cir. 2001)................................. passim

Lewis v. Wilson, 253 F.3d 1077 (8th Cir. 2001) .....................................................35

Norse v. City of Santa Cruz, 629 F.3d 966 (9th Cir. 2010) ....................................48

Pittsburgh League of Young Voters Educ. Fund v. Port Authority of Allegheny County, 653 F.3d 290 (3d Cir. 2011)............................................................. 28, 57

Planned Parenthood v. Chicago Transit Authority, 767 F.2d 1225 (7th Cir. 1985).... 40

Ridley v. Massachusetts Bay Transp. Authority, 390 F.3d 65 (1st Cir. 2004)..57, 60

Robb v. Hungerbeeler, 370 F.3d 737 (8th Cir. 2004)..............................................35

Sammartano v. First Judicial District Court, 303 F. 3d 959 (9th Cir. 2002)…………. ...................................................................... passim

Tucker v. California Dep't of Educ., 97 F.3d 1204 (9th Cir. 1996) ........................21

United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Auth., 163 F.3d 341 (6th Cir. 1998) .............................................................. passim

## DISTRICT COURT CASES

American Freedom Defense Initiative v. SMART, 10-12134, 2011 WL 1256918 (E.D. Mich.; Mar. 31, 2011) ....................................................................46

Ayers v. Univ. of Wyoming, 10-cv-00079 (D. Wyo.; Apr. 27, 2010) ....................36

Erickson v. City of Topeka, 209 F. Supp. 2d 1131 (D. Kan. 2002) ........................36

San Diego Minutemen v. Dept of Transp., 570 F. Supp.2d 1229 (S.D. Cal. 2008).... 36

## STATUTES

28 U.S.C. § 1291 ......................................................................................4

28 U.S.C. § 1332 ......................................................................................4

## INTRODUCTION

For over twenty five years, King County allowed a wide range of political and controversial advertising in its Metro bus advertising forum. Previous advertisements on Metro buses included: "Yes, Virginia . . . There is no God," featuring a picture of Santa Claus, from the Freedom From Religion Foundation; "Thousands Have Fallen in Pursuit of Peace. Remember Israel's soldiers and victims of terror," inviting participation in a moment of silence, from the Jewish Federation of Greater Seattle; and "Save Gaza! Justice For All" and "End Siege of Gaza!" from the Arab American Community Coalition. The Seattle Mideast Awareness Campaign, ("SeaMAC"), a non-profit organization whose goal it is to bring attention to Israeli-Palestinian relations, proposed to display a message opposing the United States government's support for Israel. SeaMAC submitted an ad to Titan, the outside contractor responsible for administering the transit advertising forum for King County Metro. Titan recommended SeaMAC use a different image to accompany its proposed text. After that change was incorporated, Titan accepted the ad and forwarded it to King County Metro. The County reviewed the ad against its written transit advertising policy at the highest levels within its Metro Transit and Executive Departments. The ad was found to be consistent with the policy at each level of review. A copy of SeaMAC's ad, as approved by Titan and King County, is below:



The ad was slated to run on King County Metro buses for four weeks, starting on December 27, 2010. On December 17, 2010, KING 5, a local television station ran a story on the ad. The KING 5 story prompted coverage in a variety of media channels and generated interest, including in national and international media outlets. In response to the media attention, King County received what it characterized as a flood of communications relating to the ad and its bus ad policy. The communications relating to the ad were mixed and often of unknown origin, but many of the messages expressed strong disagreement with the viewpoint expressed by SeaMAC's ad. Some communications threatened acts of civil disobedience, vandalism, or disruption.  King County acknowledged that many of the communications were part of an organized campaign and that many of the messages did not originate from King County. King County did not view any of these communications as serious enough to warrant any sort of criminal investigation. Nevertheless, in response to public pressure, King County unilaterally cancelled the contract to display the ad.

In King County's initial public statement following its decision, King County argued that the "escalation of the international debate," and two proposed

2

"counter ads" justified King County's decision to withdraw SeaMAC's ad. During the course of the litigation, King County claimed that SeaMAC's ad no longer fit within its written transit advertising policy because it was now "so objectionable" under "contemporary community standards" and that it directed a message at a group that was "so insulting, degrading or offensive" that it was reasonably foreseeable that running SeaMAC's ad would result in disruption or acts of violence. On this basis, King County argued that SeaMAC's ad should be censored, and not be permitted to run on the Metro buses with other political, religious, non-commercial, and commercial advertisements. In its summary judgment filings, King County cited to various communications King County and Titan received which expressed offense, or threatened disruption, acts of vandalism or civil disobedience if SeaMAC's ad was run. King County also cited to messages which the President of Amalgamated Transit Union (Local 587) allegedly received from King County Metro bus drivers which expressed objections to SeaMAC's ad or safety concerns in refusing to drive King County Metro buses.

There is no doubt that SeaMAC's message is core political speech, which lies at the heart of the First Amendment. Meyer v. Grant, 486 U.S. 414, 425 (1988). The key question in this case is whether having accepted political and controversial advertising generally, and having reviewed and accepted SeaMAC's ad, King County may reverse its decision and censor SeaMAC, relying solely on

public reaction to SeaMAC's message. Having invited political speech in its forum, the First Amendment requires King County, and the public, to tolerate "the clashes of opinion and controversy . . . ." that accompany political speech. Children of the Rosary v. City of Phoenix, 154 F.3d 972, 978 (9th Cir. 1998). Regardless of the nature of the forum, King County may not impose a heckler's veto or a public referendum on SeaMAC's speech. The District Court's decision approves this exact result, and therefore should be reversed.

## STATEMENT OF JURISDICTION

On October 7, 2011, the District Court entered an order granting King County's request for summary judgment, and dismissing SeaMAC's claims. The District Court had jurisdiction over the dispute under 28 U.S.C. § 1331.

SeaMAC filed a timely notice of appeal on November 3, 2011, within thirty days of entry of the District Court's order.

This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in finding as a matter of law that King County did not create a designated public forum, given the County's policy and practice of accepting political, controversial, and "cause" advertising?

2. Whether the District Court erred in finding as a matter of law that Sections 6.4(D) and (E) of King County's policy were viewpoint neutral and did not effectuate a heckler's veto or a public referendum?

3. Whether the District Court erred in ignoring factual disputes and resolving inferences in favor of the County in concluding, as a matter of law, that a

4

claimed threat of disruption provided a reasonable basis for censoring SeaMAC's message?

4. Whether the District Court erred in finding no evidence of viewpoint discrimination based on differential treatment of SeaMAC's ad compared to similar ads?

## STATEMENT OF THE CASE

SeaMAC's Complaint alleged that King County's exclusion of its message from King County's bus advertising forum violated SeaMAC's rights under the First Amendment, and sought an injunction requiring the County to display SeaMAC's ad on its Metro buses. SeaMAC moved for a preliminary injunction, which the District Court denied. The court looked to the written policy embodied in the agreement between King County and Titan, and held that the terms "evince a governmental intent to prohibit speech on certain topics and avoid controversy to the extent that [a proposed advertisement] threatens transit operations or public safety." Excerpts of Record ("ER") 131. The court held that King County's "policy and practice indicates that it consistently applied content restrictions on advertising." ER 135. Concluding that King County's bus advertising forum was a "limited public forum," the District Court evaluated King County's decision to prohibit SeaMAC's advertisement under a test of reasonableness. Applying this test, the District Court found King County's decision to be reasonable. ER 137. In an amended complaint, SeaMAC added claims under 42 U.S.C. § 1983 for nominal and compensatory damages.

Following discovery, King County moved to exclude the testimony of Richard Conte, a former FBI agent retained by SeaMAC to testify as an expert on the question of whether the communications received by King County gave rise to a foreseeable threat of disruption. ER 110-121. The District Court denied that motion, finding that Mr. Conte's testimony was reliable and would be relevant to "one of the key issues in this case": the "reasonableness of King County's threat assessment." ER 84. King County then moved for summary judgment, which the District Court granted on October 7, 2011. The court again concluded that the exterior of King County Metro buses is a "limited public forum."  ER 7. The court further found that King County's advertising restrictions were reasonable and imposed in a viewpoint neutral manner. ER 11. The court read Sections 6.4(D) and (E) of King County's Metro advertising policy as allowing for the exclusion of advertising where it is "reasonably foreseeable that disruption or lawlessness will …. result" due to inclusion of the material. ER 9. As at the preliminary injunction stage, the court credited King County's assertion that its decision was reasonable "in light of the threats of violence or disruption from the public, the threatening photographs left anonymously at Metro offices, the safety concerns raised by bus drivers, and the advice of law-enforcement officials." ER 8.

## STATEMENT OF FACTS

### I.     FOR A QUARTER OF A CENTURY, KING COUNTY RAN CONTROVERSIAL ADS ON ITS BUSES

King County Metro "has contracted with consultants to sell advertising space on its buses since at least 1978," ER 182, and, as described by the County's long-time ad contractor, the ad space has always been designed "to allow the freedom and opportunity for all organizations and associations either political or non-profit to benefit from using transit as a form of advertising their 'cause.'" ER 16. Prior to the controversy surrounding the SeaMAC message, Metro had run other ads that drew controversy, including ads about the Israeli-Palestinian conflict, atheism, and other political and social issues. ER 187. In 2009, in response to an email complaining about the posting of an ad advocating "End the Siege of Gaza," Metro defended its decision to include speech on controversial issues in its forum, stating:

> Metro has always accepted non-commercial advertising, including candidates for elected office, ballot measures, and "cause" advertising. Having accepted non-commercial advertising generally, Metro is legally constrained in its ability to accept or reject an advertisement based on the identity of the group purchasing the advertising or the message.

ER 14. Further, display of the "End the Siege of Gaza" ad, which was described in a complaint to Metro as "anti-semetic, anti-Israel and racist," was defended by Metro as consistent with Section 6.6 of its policy, which states:

The Consultant is permitted to sell political and other noncommercial

7

> advertising but shall ensure that any advertising which does not relate
> to a clearly-identifiable commercial product, service or business, must
> include the following phrase in clearly visible letters ….
> 'Advertisement paid for by _____.'

ER 12. Although King County opened its bus ad forum widely to political and

noncommercial advertisements, including some that might be "offensive or

contrary" to "personal beliefs," it also attempted to limit the forum by excluding

some categories of speech. ER 14. The policy in effect when SeaMAC's message

was censored is embodied in the agreement between King County and Titan, and

includes restrictions on: (1) certain products and services, such as alcohol, tobacco,

illegal products, adult stores and establishments; (2) content that is sexually

themed, deceptive, fraudulent, defamatory or which would constitute an invasion

of privacy; and (3) content such as flashing lights, mirrors or special effects that

would cause safety concerns. ER 179-80. The policy also included two additional

broad categories of prohibited material—those invoked by King County in this

litigation—which King County refers to as "civility clauses." ER 183. These

clauses purport to exclude: (1) material that is "so objectionable under . . .

community standards," that running the advertisement will foreseeably cause harm,

disruption, or interference to the transportation system, at Section 6.4(D); and (2)

material directed at a "person or group that is . . . so insulting, degrading or

offensive" that the material will foreseeably "incite or produce imminent lawless

action," at Section 6.4(E). ER 179-80. The policy provides no further guidance on

how to identify when material violates either of these subsections, nor does it incorporate the obscenity and incitement standards established by case law. Id.

In a quarter century of operating the bus ad forum King County had only once attempted to reject an advertisement because it violated these "civility clauses." ER 149-51; ER 152-54. However, those proposed ads, which reference "Nazi medical abuse …state hate committed by elected officials & doctors" and "www.mormonstalker.com," were withdrawn before King County had the opportunity to inform the advertiser that the messages had been rejected. Id. SeaMAC's message was the first to be rejected under the "civility clauses," and the only one to be originally accepted for publication and then rejected without a change in the message or the governing policy.

## II.    KING COUNTY REVIEWED AND APPROVED SEAMAC'S MESSAGE TO RUN IN ITS BUS ADVERTISING FORUM

In 2010, in response to the heightened tensions between Israel and Palestine, a group of concerned individuals created Seattle Mideast Awareness Campaign ("SeaMAC") with the objective of educating the public about the Israeli-Palestinian conflict and raising awareness about the circumstances in Palestine. ER 243. SeaMAC assessed various methods of public outreach, and created a strategic plan for its public outreach. ER 243. This plan included using the King County Metro bus ad forum to get their message out to the general public.  ER 243-46.

In October 2010, SeaMAC submitted its message to King County's bus ad

9

program via Titan. ER 185. The message read: "Israeli War Crimes Your Tax Dollars at Work. www.Stop30Billion-Seattle.org." ER 185. The image accompanying this text showed a child walking through a refugee camp. ER 156. Titan recommended a new image and SeaMAC submitted another draft of its advertisement with a new image showing children standing next to a razed building. ER 183. SeaMAC's ad was then approved by Titan. ER 65; ER 185. Recognizing that the ad might stir controversy, Titan forwarded it to King County Metro's Transit Advertising Program Project Manager, Sharon Shinbo. Id. Ms. Shinbo reviewed SeaMAC's ad against the County's policy and approved its display as consistent with the policy. ER 71. Ms. Shinbo forwarded the ad to King County Metro's General Manager, Kevin Desmond, who reviewed SeaMAC's ad against the County's policy and approved its display as consistent with the policy. ER 47-48. Metro forwarded SeaMAC's ad to the King County Executive, who reviewed it against the County's policy and concurred that the ad did not contain any material prohibited by the policy and that it should run in the bus advertising forum. ER 41-43. Although the Executive "recognized that [SeaMAC's message] was potentially offensive to some of the community" he "didn't feel that it rose to the level of violating [the County's] policy." ER 41-42.

## III. IN RESPONSE TO PUBLIC OUTCRY, KING COUNTY REVERSED COURSE AND CENSORED SEAMAC'S AD

On Friday, December 17, 2010, a local television news station, KING 5, ran

10

a story about SeaMAC's message and its upcoming scheduled publication on Metro buses. ER 186. In response to the KING 5 story, Metro explained its policy guidelines and reaffirmed the County's determination that SeaMAC's message fit within its policy. ER 17-20. In response to an individual complaint characterizing SeaMAC's message as "inflammatory, inaccurate and anti-Israel," the County again reiterated its conclusion that, despite the fact that it might offend some people, SeaMAC's ad fit within King County's policy. ER 17-20.

## A. The County Received a Flood of Messages from an Organized Campaign Opposing SeaMAC's Message

Following the KING 5 report, the story took on a life of its own, and was featured in numerous national media outlets and websites. An organized campaign targeted King County and began to exert pressure by flooding Metro and the Executive's Office with emails and phone calls expressing disapproval of SeaMAC's message. ER 50. King County received approximately 6,000 email messages between December 20, 2010 and December 30, 2010. ER 218. Titan also received similar messages, some of which were duplicates of the ones received by King County. ER 66-67. Many of these emails were written by individuals who lived out of the state and out of the country. ER 28; ER 50. In fact, Metro's General Manager noted that a "flurry of emails … was being generated by one or more pro-Jewish or pro-Israeli websites that were being broadcast throughout the United States and internationally . . ., and as a result a lot of people who subscribe

to those websites were writing to us." ER 50-51.

The County Executive's Leadership Team met in person with representatives from several Jewish organizations and reported to the Executive that it was apparent that SeaMAC's message "would be perceived as insulting, degrading or offensive by many members of the local Jewish community." ER 203. Specifically, the Executive noted that there was "sensitivity regarding the assertion in the SeaMAC Ad that Israel had committed war crimes." Id.

The County was also subjected to internal pressure to censor SeaMAC's message. After the news of SeaMAC's message began to garner controversy, the bus drivers' union, Local 587 of the Amalgamated Transit Union ("ATU 587"), communicated with King County Council members and informed them that the Executive Committee of Local 587 was going to meet to discuss how this might affect bus drivers and whether it was going to take action. ER 34. Local 587's President, Paul Bachtel, reported that he had heard that there were "several operators who were planning to refuse to drive the buses that carried the SeaMAC ad," and "numerous operators voicing safety concerns." ER 223. There was also concern that drivers would deface the ads, as had drivers who were offended by prior controversial ads.[1] ER 33-40. However, there is evidence in the record that

---

[1] In 2009, there was substantial unrest from bus drivers when the Seattle Atheists and the Freedom From Religion Foundation ran a series of ads promoting atheism,

members of the union disagreed with Mr. Bachtel taking an overt stance on

SeaMAC's ad. ER 140-142. The Executive heard only Mr. Bachtel's message. ER

203.

## B. The County Implemented a 'Mid-Range' Response Plan to Deal with any Potential Disruption Caused by Opponents of SeaMAC's Ad

During this time Metro proceeded with plans to run the ad as it had

contracted to do. ER 17. To mitigate against potential threats of disruption or harm,

Metro Operations staff worked with Metro Transit Police to create a "deployment

plan." ER 51. Captain Lisa Mulligan, of Metro Transit Police, decided to

implement a mid-range, not a high range, deployment plan. ER 24; ER 51-53.

Metro Operations designed a plan to ensure that there were enough drivers for the

buses and that the buses would be able to operate safely. ER 59-62. The plan

addressed the concern expressed by the operators by making clear that drivers

could not opt out if they "disagree with the message" but they could opt out if they

"express safety concerns." ER 31; ER 58. Ultimately, the plan included: routing

buses with SeaMAC's ad through less populated areas; rerouting buses to avoid the

Jewish Federation Center; increasing security during peak hours; informing

policing agencies of the controversy and potential for disturbances; distributing

guidelines directing Metro employees how to handle perceived threats; parking the

_____

and bus drivers, who did not agree with the message damaged many of the ads. ER
33; ER 39.

buses at Metro's base in a manner that make them less vulnerable to defacement; and a procedure for vetting drivers' objections. ER 59-62; ER 24-27. Once the deployment plan was formulated, Metro Operations staff described it as "a good plan of action." ER 23; ER 46. Instead of implementing the plan, on December 23, 2010, the King County Executive, Dow Constantine, decided to censor SeaMAC's message. ER 21.

### C. King County Censored SeaMAC's Ad, Citing to the "Civility Clauses," Contained in Sections 6.4(D) and (E) of its Advertising Policy

On December 23, 2010, King County issued a press release announcing its decision to censor SeaMAC and claiming that this was necessary because: (1) some of the messages the County received where "threatening;" (2) King County desired to keep out of an "international debate" and avoid an "escalation of global interest in SeaMAC's ad[;]" and (3) the County did not want to display "inflammatory response ads" that were submitted in response to SeaMAC's message. ER 21; ER 98.

### 1. King County failed to investigate "threatening" communications.

Metro employees described complaints relating to SeaMAC's ad as "more aggressive and angrier than usual complaints[,]" and some of the calls were described as borderline threatening. ER 219; ER 54. Other messages that the County received expressed concern for rider and personal safety, and many emails contained statements by riders promising a boycott of buses carrying SeaMAC's

message. Id. The County also received two communications in the form of photographic depictions of violent acts which appeared to be associated with Israel or the Middle East. Id.; ER 209-211.

Although the County received a number of messages from individuals who appeared irate, the County did not receive any messages that were deemed significant enough for any law enforcement agency to follow up on or to investigate.[2] ER 54-56. Further, many of the alleged threatening messages came from individuals who identified themselves, to Metro staff, by name and phone number, which would have assisted law enforcement officers in deterring those individuals from engaging in unlawful activities. ER 219; ER 214-15. SeaMAC's expert, Richard Conte, reviewed the communications and concluded, based on his expertise and experience as a former FBI agent and member of the Joint Terrorism Task Force, that these communications contained "no threats of disruption of or threat to public safety that are credible or specific." ER 80-81. Mr. Conte also concluded that "[e]ven collectively, the information does not demonstrate a reasonable basis to conclude that there was a threat of disruption or [a threat] to public safety." Id.

---

[2]  The Seattle Police Department did weigh in on the deployment plan, and suggested that the buses carrying SeaMAC's message be routed around the Jewish Federation Center. ER 45.

### 2. Law enforcement recommendations to King County were equivocal and based on generalized concerns.

Before making the decision to censor SeaMAC, the County Executive spoke with the U.S. Attorney for the Western District of Washington, Jenny Durkan. Ms. Durkan declined to make a specific recommendation regarding display of SeaMAC's ad, but advised him generally that other public transportation systems have been the object of terrorist attacks. ER 87; ER 90; ER 204. She advised against anything that "inches up the dial" and draws international attention. Id. The Executive also spoke with King County Sheriff Sue Rahr, who recommended against running the ad, similarly noting generally that buses are vulnerable targets. ER 190. Neither Ms. Durkan, nor Sheriff Rahr, cited to any specific threats.

### 3. King County relied on the risk posed by alleged terrorist threats despite law enforcement conclusions to the contrary.

On December 22, 2010, a King County resident forwarded a link to a website of the Al-Qassam Brigade where someone had posted a copy of an article about the controversy surrounding SeaMAC's ad and King County's decision to run it. ER 29; ER 193-95. This email was forwarded to the Homeland Security manager for Metro, Mike DeCapua, and then to the Joint Terrorism Task Force ("JTTF"), the Fusion Center, and the King County Sheriff's Office. ER 102-06. The Homeland Security manager believed that the inclusion of this article on the Al-Qassam website took the discussion about the appropriateness of running

16

SeaMAC's message on Metro buses "way beyond free speech issues" and created a concern of potential terrorist acts. ER 105. These concerns were expressed at security meetings, and forwarded in emails to law enforcement officers who specialized in detecting and preventing terrorist threats. ER 102-06. None of these concerns were found to be legitimate. ER 102-03. Detective Marlon Hoyle of the King County Sheriff's Department, Joint Terrorism Task Force, and the Fusion Center found that "none of th[e evidence presented] arises to a level of terrorist activity." ER 102. Further, the Joint Terrorism Task Force and the State Fusion Center declined to complete a situational assessment, which would normally be completed if these law enforcement agencies perceived a credible terrorist threat. ER 44-45.

### 4. King County relied on the volume of the messages to conclude that there was a threat of disruption.

The publicity around SeaMAC's message evoked a vocal response, and many people contacted Metro to express their opinion about Metro's decision to run the ad. ER 218-20. Usually Metro's call center receives approximately 50 to 1800 customer contacts a day. ER 218. During the 10-day stretch that was the height of the SeaMAC controversy Metro received approximately 6,000 customer contacts, but it is unclear exactly how many calls and emails King County received. ER 218. Although King County had a process in place for logging comments or complaints relating to King County Metro services, as the volume of

comments and phone calls increased, King County employees stopped logging the

comments and phone messages. ER 218. The County also did not read or review

all, or even most, of the messages. ER 219. Instead of relying on any objective

indicia of a threat in the messages themselves to determine whether there was a

threat to Metro services or riders, Metro officials relied on the volume of customer

contacts in determining that there was a potential for disruption of service. ER 57.[3]

However, SeaMAC's expert, Mr. Conte, testified, "[p]rofessional threat assessment

is not a process subject to a public vote – it is more than counting up the number of

e-mails or letters or assessing whether a particular issue is controversial." ER 80.

### D. King County Also Justified its Decision to Censor SeaMAC Based on the Submission of Counter Ads Which Would "Escalate the Debate"

The publicity surrounding SeaMAC's message encouraged other groups,

who do not agree with SeaMAC's message, to submit "counter-ads." ER 187. On

December 21, 2010, Metro was informed that two other organizations, Horowitz

Freedom Center and American Freedom Defense Initiative/Stop Islamization of

America, had submitted ads. ER 187. These ads included photos of burning buses,

Nazi imagery, and equated Palestinians with savages. ER 171-74. The ads were

---

[3] While there was a significant number of email and phone messages from individuals, many of whom did not live in King County, that encouraged the County to censor SeaMAC, there were many individuals who urged the County not to censor SeaMAC. ER 22. In fact, on December 18, 2010, when King 5 tallied votes from its online survey, seventy percent of the individuals who polled supported the County's original decision to run SeaMAC's message. Id.

never formally reviewed by King County. A Titan representative, Pamela Quadros, testified that ads, such as those, which contained images of violence or directly equated a particular ethic group with the word savage, "wouldn't have gone very far" toward approval under the County's policy. ER 70. Still, in explaining its decision to censor SeaMAC, the County Executive explained that he was "concerned about how the SeaMAC ad would be perceived by members of the Jewish community and also how the counter-ads would be perceived by the Palestinian and Muslim communities." ER 203. The County's press release cited to a "dramatic escalation of debate," and the "submission of inflammatory response ads" which created an unacceptable risk of harm, as a basis for censoring SeaMAC's message. ER 21.

## STANDARD OF REVIEW

The Court reviews a grant of summary judgment de novo. Hopper v. City of Pasco, 241 F.3d 1067, 1073 (9th Cir. 2001). "Viewing the evidence and drawing all inferences in the light most favorable to the non-moving party, [this Court] must determine whether any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law." Bravo v. City of Santa Maria, 665 F.3d 1076, 1083 (9th Cir. 2011); A.C.L.U. of Nevada v. City of Las Vegas, 333 F.3d 1092, 1097 (9th Cir. 2003) (review on summary judgment requires "giving the nonmoving party in each instance the benefit of all reasonable

19

inferences"). Summary judgment cannot be affirmed where "a rational trier of fact could resolve a genuine issue of material fact in the nonmoving party's favor." Bravo, 665 F.3d at 1083. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

In cases raising First Amendment issues, an appellate court "has an obligation to make an independent examination of the whole record . . . to make sure that the [trial court's] judgment does not constitute a forbidden intrusion on the field of free expression." Bose Corp v. Consumer's Union, 466 U.S. 485, 499 (1984) (internal quotations and citation omitted); Tucker v. California Dep't of Educ., 97 F.3d 1204, 1209 n.2 (9th Cir. 1996); Daily Herald Co. v. Munro, 838 F.2d 380, 383 (9th Cir.1988).

## SUMMARY OF ARGUMENT

The District Court misapplied First Amendment law when it granted Defendant's Motion for Summary Judgment. To determine whether the government may exclude speech from a forum, a court first has to determine the type of forum in question. Relying on the existence of a policy, and misapplying case law directing courts to look to both the forum-related policy and practice, the District Court mistakenly found, as a matter of law, that King County did not

create a designated public forum.

The court also misapplied First Amendment law in finding that King County had created a proper limited public forum. Whatever the nature of the forum, the First Amendment does not permit a heckler's veto. It also bars the use of vague standards that can be applied to selectively restrict unpopular viewpoints, and it bars public referenda on speech. In a limited public forum that is opened generally to political speech, the inclusion or exclusion of particular views cannot be left to a popular vote. Because the standards King County used to justify exclusion of SeaMAC's message were both implicitly and explicitly viewpoint-driven, the court erred in applying a deferential reasonableness standard not just to the question of the scope of the forum, but also to the question of whether SeaMAC's message fit within that forum.

Even assuming that reasonableness was the appropriate standard, the record supports a finding that the County faced no real threat of disruption. SeaMAC presented evidence that created genuine disputes of material fact, and gave rise to permissible inferences from which a jury could have found that there was no credible threat of disruption. This evidence includes: (1) expert testimony from a law enforcement expert regarding the validity of using the volume of mostly angry, but ultimately harmless communications, to determine whether there is a risk of disruption, terrorism, or other violence; (2) the County's decision not to open a

21

single investigation into the alleged threats and threats of disruptions; and (3) law enforcement opinions which did not cite to any specific threat but that were instead vague recommendations to not run SeaMAC's ad based on generalized concerns over heightened disruption to transit systems. The District Court resolved conflicting inferences that could be drawn from this evidence, in favor of the County, and also ignored permissible inferences that could be drawn from a security plan designed to neutralize drivers' concerns and risk of disruption.

While SeaMAC is not required to present evidence that King County intended to discriminate against SeaMAC's message in order to prevail, SeaMAC did present evidence sufficient for a reasonable juror to conclude that King County treated SeaMAC's ad differently from other similar controversial and political advertising that King County had previously run in its bud advertising forum. Because a jury could have found a First Amendment violation on any one of these grounds summary judgment was improper.

## **ARGUMENT**

## I.    THE DISTRICT COURT ERRED IN ITS APPLICATION OF FIRST AMENDMENT PRINCIPLES REGARDING THE SCOPE OF THE FORUM

The District Court correctly focused on the nature of the forum as the starting point for the First Amendment analysis. Hopper v. City of Pasco, 241 F.3d

1067, 1074-75 (9th Cir. 2001). However, it misapplied relevant First Amendment principles.

## A. First Amendment Principles Applicable to Government-Created Forums

The Supreme Court and federal appellate courts have recognized three types of forums for First Amendment purposes. These include: (1) the traditional public forum, which for time immemorial have been used for expressive activity; (2) the designated public forum, which is not a traditional public forum, but one that the government has opened up for all forms of expressive activity; and (3) the "limited public forum," which is a sub-category of a designated public forum. The limited public forum is a type of nonpublic forum, but one that "the government has intentionally opened to certain groups or certain topics." Arizona Life Coalition Inc. v. Stanton, 515 F.3d 956, 968 (9th Cir. 2008) (internal quotation omitted).

In traditional and designated public forums content-based restrictions on speech are presumptively unconstitutional. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983). A state however may impose content-based restrictions when it creates a limited public forum, so long as the restrictions are "reasonable in light of the purpose served by the forum." Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 806 (1985); see also Rosenberger v. Rector, 515 U.S. 819, 830 (1995) (the State may regulate access to the forum by subject matter, provided that the exclusion of certain subject matter

"preserves the purposes of that limited forum"). While the Court's decisions recognize that drawing distinctions based on content is inherent in creating a limited public forum, viewpoint-based distinctions, in either a limited or designated public forum, are anathema to the First Amendment. Rosenberger, 515 U.S. at 829.

As this Court recognized in Cogswell v. City of Seattle, 347 F.3d 809 (9th Cir. 2003), the line between content and viewpoint-based distinctions is not a clear one. Id. at 815. Courts treat the exclusion of identifiable subjects, which can be justified due to incompatibility with the nature of the forum (e.g. violence, sex, and drugs), as content-based distinctions. Id. (concluding that limiting a forum to "candidate self-discussion" and excluding "[c]andidate criticism of an opponent" is subject-matter not viewpoint distinction). Courts also recognize that a government entity can design a limited forum by excluding entire categories of speech that are more likely to generate controversy. Lehman v. City of Shaker Heights, 418 U.S. 298, 303-04 (1974). Noting that political speech is often controversial Lehman affirmed as reasonable, the exclusion of any "paid political advertising on behalf of a candidate for public office" from a transit advertising forum. Id. at 299, 304. Similarly, in United States v. Kokinda, a plurality of the Supreme Court upheld a Postal Service regulation that categorically banned *all* in-person solicitations,

agreeing with the Postal Service that solicitation was "inherently disruptive" and thus incompatible with the purposes of the forum. 497 U.S. 720, 732-33 (1990

In contrast, where the State seeks to exclude a particular perspective, as opposed to "the general subject matter," it is impermissibly regulating viewpoint, rather than content. For example, in Rosenberger, the Court found viewpoint discrimination where the State opened a forum generally to student expression, but sought to exclude only those individuals who wrote from "religious editorial viewpoints." Rosenberger, 515 U.S. at 831. This Court reached a similar result in Arizona Life Coalition, concluding that the agency operating a license plate forum, which had been open generally to non-commercial speech, could not later exclude pro-life messages even if though the court recognized that the avoidance of controversy is generally a reasonable governmental purpose.

The cases reviewing the advertising policies of transit agencies have followed this general approach, according deference to categorical exclusions, while more closely reviewing policies which open a forum to political and other non-commercial speech while attempting to keep out some controversial messages. See, e.g., Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth., 148 F.3d 242, 252 (3d Cir. 1998) (concluding, despite "[agency's] written policies . . . [which] provide for the exclusion of only a very narrow category of ads" that agency created a designated public forum based on its practice of "permitting virtually

unlimited access to the forum"). <u>See also</u> <u>United Food & Commercial Workers</u>
<u>Union v. Southwest Ohio Regional Transit Auth.</u>, 163 F.3d 341, 355 (6th Cir.
1998) (concluding that SORTA demonstrated an intent to designate its advertising
space a public forum, despite a written policy excluding broad categories of
advertisements). When faced with broad, and often inconsistently applied, policies
regarding forum advertising, some courts conclude that an agency created a
designated public forum by indiscriminately opening its forum to expression. <u>See</u>,
<u>e.g.</u>, <u>Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.</u>, 148 F.3d 242, 254 (3d
Cir. 1998) (noting that a transit authority's long practice of allowing ads on
controversial subjects trumps the general rule that no public forum is created when
the government requires speakers to obtain permission). Other courts find a limited
public forum, but more closely review the agency's decisions as to whether
particular speech fits within the forum. <u>See</u>, <u>e.g.</u>, <u>Pittsburgh League of Young</u>
<u>Voters</u>, 653 F.3d at 297 (scrutinizing exclusion of particular ad in light of past
practice and finding viewpoint discrimination in a limited public forum); <u>Airline</u>
<u>Pilots Ass'n Int'l v. City of Chicago</u>, 45 F.3d 1144, 1155 (7th Cir. 1995) (noting
that necessity of factual inquiry into the nature of the forum is "not altered by the
existence of a purported policy screening out the subject matter of the proposed
message"). Regardless of the approach taken, the result is the same: a policy which
broadly invites political or controversial expression warrants closer judicial

26

scrutiny. King County's policy inviting political ads but subjecting them to its "civility clauses" requires this kind of scrutiny.

**B. Factual Disputes Regarding King County's Acceptance of a Broad Range of Advertising Preclude a Finding that no Designated Public Forum was Created**

Government property, not traditionally open to speech, may be converted into a "designated public forum" if the government intentionally opens it up for public discourse. Cornelius, 473 U.S. at 800. When such a forum is opened, to determine whether a designated or a limited public forum has been created, courts "must examine the terms on which the forum operates." Hopper, 241 F.3d at 1075. "[G]overnment intent is the essential question in determining whether a designated public forum has been established." Id. Courts must look to "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Cornelius, 473 U.S. at 802.

King County's policy explicitly permitted "political and other noncommercial advertising" with the requirement only that the sponsor of the ad be identified. ER 180. King County's policy and practice of accepting such ads were confirmed by the King County official in charge of implementing the advertising program. ER 12-14 ("Metro has always accepted non-commercial advertising, including candidates for elected office, ballot measures, and 'cause'

advertising.""). The policy and practice were also confirmed by King County's outside contractor who was responsible for administering the program. ER 116 (King County program exists "to allow the freedom and opportunity for all organizations and associations either political or non-profit to benefit from using transit as a form of advertising their 'cause.'"). While Metro's program manager stated in a declaration that it was not "a goal of the Program to create an open forum for public debate," ER 182, both she and others acknowledged in deposition testimony that King County had accepted a wide range of "cause" advertisements, and many of these past advertisements had created substantial controversy. See, e.g., ER 33 (testifying that there had "been different ads over the years that have raised the hackles of union members"); ER 187 (testifying that advertisement of Freedom From Religion Foundation generated a "large number of comments" from the public).

The evidence of King County's practice of accepting controversial and political advertisements, along with statements from King County and Titan that the forum has been open to political and 'cause' advertising raised a question of material fact as to King County's intent. This material dispute of fact should have precluded the grant of summary judgment on the threshold question of whether King County created a designated public forum by opening its forum. Hopper, 241 F.3d at 1075. Even assuming that the District Court properly found that the bus ad

28

forum was not a designated public forum, forum analysis still required the District Court to determine whether the standards used by King County to define the bounds of the forum comported with the First Amendment. Cf. Hopper, 241 F.3d at 1075 n.9 (while policies opening a forum are "often taken at face value," forum restrictions warrant closer scrutiny); Rosenberger, 515 U.S. at 829 ("Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set."). The policy provisions King County relied on to censor SeaMAC's ad, Sections 6.4(D) and (E) of its advertising policy, stand in sharp contrast to the type of categorical exclusions which the Court has found acceptable content based restrictions that do not present an impermissible risk of viewpoint discrimination. See above; see also; Kokinda, 497 U.S. at 736-37; Cornelius, 473 U.S. at 808; Lehman, 418 U.S. at 304. In fact, King County's "civility clauses" present an impermissible risk of viewpoint discrimination. These clauses borrow portions of definitions of proscribable conduct, as articulated by case law. These borrowings may give Section 6.4 (D) and (E) an overall impression of being consistent with the First Amendment. However, a closer look shows that neither section of the policy provides a viewpoint neutral basis for defining a limited public forum.

## C. The First Amendment Does not Permit a Heckler's Veto, Whether in a Public or a Non-public Forum

The Supreme Court has repeatedly invalidated government regulation which gives effect to a "heckler's veto" as offensive to core First Amendment principles.

29

Forsyth County v. Nationalist Movement, 505 U.S. 123, 134-35 (1992) ("Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."). Censorship of protected expression is not justified on the grounds that it may offend others and cause a violent reaction. Cohen v. California, 403 U.S. 15, 22-23 (1971) (government cannot "excise . . . one particular scurrilous epithet from the public discourse. . . [on] the theory . . . that its use is inherently likely to cause violent reaction"). As courts recognize, political speech often generates controversy, but controversial speech, even speech that stirs people to anger, cannot be censored based on the actual or perceived over-reaction of listeners. Terminiello v. City of Chicago, 337 U.S. 1, 5 (1949) (reversing a conviction for disorderly conduct where the speech "stirred people to anger, invited public dispute, or brought about a condition of unrest").

Once a forum is opened to political speech, as King County's bus ad forum was, allowing censorship based on the possibility that a certain political viewpoint might provoke some in the audience improperly grants the power of censorship to any opponent of that view. In Cohen, the Supreme Court rejected the argument that the State's interest in preventing violence caused by offended viewers was sufficient to support a conviction of a man who walked through a courthouse wearing a jacket bearing the phrase, "Fuck the Draft." Cohen, 403 U.S. at 22-23.

30

The Court noted that this argument:

> amounts to little more than the self-defeating proposition that to avoid physical censorship of one who has not sought to provoke such a response by a hypothetical coterie of the violent and lawless, the States may more appropriately effectuate that censorship themselves.

403 U.S. at 23; see also Reno v. ACLU, 521 U.S. 844, 880 (1997) (striking down a prohibition on knowingly communicating electronically, indecent material to minors because it conferred "broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech . . .").

The animating principle behind these decisions is that using listener reaction—in the form of the threat of violence or disruption—as a proxy for what is acceptable speech invites discriminatory application, inevitably resulting in viewpoint discrimination. Hopper, 241 F.3d at 1080 (holding that exclusion of speech "contingent upon the subjective reaction of viewers . . . as perceived by the city," is "censorship by public opinion").

## 1.  A heckler's veto is impermissible even in a limited public forum.

While the government enjoys some latitude in determining the bounds of a government-created forum, even in the context of a limited forum, the heckler's veto is impermissible. This Court recognized in Sammartano v. First Judicial District Court that, although Cohen was decided prior to the Supreme Court's articulation of the current forum analysis, Cohen's central holding—that the mere

offensiveness of speech from the point of view of listeners is presumptively an invalid basis for restricting speech—applies regardless of the classification of the forum. Sammartano v. First Judicial District Court, 303 F. 3d 959, 969 (9th Cir. 2002). In Sammartano, despite concluding that a courthouse was a "nonpublic forum," the Court held that rules prohibiting: (1) the use of "words, pictures or symbols which are degrading or offensive to any ethnic, racial, social or political group" and (2) the use of "[w]ords, pictures or symbols with clearly offensive meanings" could not withstand scrutiny under Cohen. Id. (internal quotations omitted). Thus, even in a limited public forum, where a speaker's message falls within the category of speech that is accepted within the forum, federal appeal courts have uniformly rejected the government's attempt to exclude speech based on the perceived offensiveness of the speech as measured by the audience reaction. See, e.g., Robb v. Hungerbeeler, 370 F.3d 737, 743 (8th Cir. 2004) (holding that Missouri could not exclude a unit of the Ku Klux Klan from the State's "adopt-a-highway" program, which the court found was a "nonpublic forum," on the basis of the potential responses of travelers on the highways); Lewis v. Wilson, 253 F.3d 1077, 1080-81 (8th Cir. 2001) (citing Cohen, 403 U.S. at 23) (holding that Missouri's attempt to deny participation in the state's specialty license plate program could not be justified on the basis that the message on the license plate ("ARYAN-1") would be likely to provoke violent reaction); Chicago Acorn v.

Metropolitan Pier and Exposition, 150 F.3d 695, 701 (7th Cir. 1998) (holding that,

although Chicago's Navy Pier meeting rooms were "nonpublic" facilities under the

First Amendment, the Metropolitan Pier and Exposition Authority could not vary

its rental rates based on potential adverse publicity generated by the users).[4] As

these decisions implicitly recognize, a "desire to stem listeners' reactions to speech

is simply not a viewpoint-neutral basis for regulation." Erickson v. City of Topeka,

209 F. Supp. 2d 1131, 1145 (D. Kan. 2002). The case law thus makes clear that

whatever the scope of the particular forum, the State may not exclude speech from

a forum solely on the basis that the speech in question may cause a hostile reaction

from the audience. See Cohen, 403 U.S. at 23; Sammartano, 303 F.3d at 969. In

other words, "speech that elicits a heckler's veto" is not a permissible category of

speech to exclude from a forum.

### 2.   Section 6.4(E) invited a heckler's veto.

King County relied on Section 6.4(E), one of the "civility clauses," in

justifying its decision to censor SeaMAC's message. Section 6.4 (E) excluded:

---

[4]  Lower courts have reached the same result.  For example, in San Diego
Minutemen v. Dept of Transp., 570 F. Supp. 2d 1229, 1252 (S.D. Cal. 2008), the
defendants sought to justify their revocation of a site-specific Adopt a Highway
permit to the San Diego Minutemen based on the "belief that persons opposed to
plaintiff's organization could create safety issues through violent or disruptive
action." The court concluded that this justification was not reasonable in light of
Sammartano and Cohen. Id. In Ayers v. Univ. of Wyoming, the court held that the
University of Wyoming could not bar a speaker on the basis of "undifferentiated,
general and veiled threats." Ayers v. Univ. of Wyoming, 10-cv-00079 (D. Wyo.;
Apr. 27, 2010).

> [a]ny material directed at a person or group that is so insulting,
> degrading or offensive as to be reasonably foreseeable that it
> will incite or produce imminent lawless action in the form of
> retaliation, vandalism or other breach of public safety, peace
> and order.

Section 6.4(E) purports to exclude messages that are "insulting, degrading or offensive . . . to person[s] or group[s]," but only those that King County reasonably believes will incite or cause imminent lawless conduct. This section incorporates a component of the Brandenburg v. Ohio, 395 U.S. 444 (1969), incitement test by referring to material which is likely to "incite or produce" "imminent lawless action." Id. at 447. However, Section 6.4(E) is broader than the Brandenburg test, because Section 6.4(E) does not require that the speech be "*directed to* inciting or producing imminent lawless action." Brandenburg, 395 U.S. at 447-48 (emphasis added).[5] Instead, Section 6.4(E) looks to what may cause a negative reaction in the community. As interpreted by King County and as applied by the District Court, Section 6.4(E) failed to provide neutral standards or objective criteria, leaving the decision of what is "so insulting, degrading or demeaning," as to warrant censorship, in the hands of the "hypothetical coterie of the violent and lawless."

---

[5] SeaMAC does not suggest that King County's speech restrictions must satisfy the Brandenburg test, but that a policy which excludes potentially disruptive speech upon a finding that the speaker intended to incite lawless action would not raise the same risks of viewpoint discrimination. Indeed, if King County were to exclude speech which was defamatory, obscene, or constituted a true threat, it should be able to do so even if those categories were not excluded by its policy (provided it was acting in a viewpoint-neutral manner). Here, King County seeks to exclude core political speech which it admits has been permitted in the forum.

Cohen, 403 U.S. at 23. Section 6.4(E) thus invites, and in this case, improperly effectuated a heckler's veto. Section 6.4(D), the other "civility clause" of King County's policy, suffers from similar First Amendment problems.

### D. A Policy May not Exclude Controversial Material From a Forum by Public Referendum

Courts reviewing transit advertising policies have approved clear, categorical exclusions of certain subjects because categorical exclusions properly constrain the discretion of the policy's administrators. For example, in Children of the Rosary v. City of Phoenix, the Ninth Circuit upheld the City of Phoenix's policy which excluded all "political and religious" advertising. 154 F.3d at 983. Similarly, in Lebron v. National Railroad Passenger Corp., the Second Circuit upheld Amtrak's policy of excluding "noncommercial advertisements." 69 F.3d 650, 656-57 (2d Cir. 1995).

In contrast, courts have rejected an agency's attempt to reserve discretion to reject particular controversial or objectionable messages which are not categorically excluded.  See, e.g., Hopper, 241 F.3d at 1079 (noting that controversial is an "inherently subjective" standard, and on its own will not adequately constrain decision-makers); Christ's Bride Ministries Inc., 148 F.3d at 250 (3d Cir. 1998) (rejecting agency's decision to exclude anti-abortion ad on the

35

basis of policy that allowed agency to determine "in its sole discretion" that the ad was "objectionable"); Air Line Pilots Ass'n, 45 F.3d at 1157 (explaining that "[u]nlike a consistently enforced prohibition on political speech, a claimed policy that enabled the City to prohibit the narrow category of speech critical of airlines would virtually guarantee discrimination."); United Food, 163 F.3d at 361 (explaining that "any prohibition against 'controversial' advertisements unquestionably allows for viewpoint discrimination"); see also Lebron, 69 F.3d at 658 (explaining that a transit authority's use of a policy "to screen out only controversial political advertisements – that is political advertisements distasteful to the majority – [] would be void for viewpoint bias").  Policies thus may only exclude controversial material where neutral and objective standards serve to guide the official's discretion in applying the policy.

### 1. The First Amendment does not allow reliance on "community standards" without neutral and objective criteria.

Due to their amorphous nature, courts have been skeptical of policies which define what is acceptable within a forum based on community standards or what is in good taste. Hopper, 241 F.3d at 1080, n.11. It is questionable as to whether a regulation "that has as its touchstone a government official's subjective view that the speech is 'controversial' could ever pass constitutional muster."  Planned Parenthood v. Chicago Transit Authority, 767 F.2d 1225, 1230 (7th Cir. 1985). As explained in Hopper, "[a]bsent objective standards, government officials may use

36

their discretion to interpret the policy as a pretext for censorship." 241 F.3d at 1077. Accordingly, courts recognize that the incorporation of community standards of decency in forum speech restrictions should be reduced to objective criteria. Aids Action Comm. of Massachusetts, Inc. v. Massachusetts Bay Transp. Auth., 42 F.3d 1, 13-14 (1st Cir.1994) (transit authority may exclude certain subjects but must "act according to neutral standards").

The transit advertising cases thus evince a deep distrust of the government's invocation of public offense as a rationale for not accepting proposed advertising. Airline Pilots Ass'n, 45 F.3d at 1157; Lebron, 69 F.3d at 658; United Food, 163 F.3d at 361. The rationale underlying this distrust is the same as the rationale underlying the heckler's veto decisions: a standard that allows the government to invoke public objections invites viewpoint discrimination. Hopper, 241 F.3d at 1067. Without objective criteria in place, these types of standards also act as a public referendum on speech, which is at odds with the requirement of viewpoint neutrality. See Bd. of Regents v. Southworth, 529 U.S. 217, 235 (2000) (public referendum for defunding student organizations "would undermine the constitutional protection the [university's registered student organization] program requires" – i.e., "viewpoint neutrality").

### 2. Section 6.4(D) lacked neutral criteria and created an impermissible risk of viewpoint discrimination.

King County's alternate basis for censoring SeaMAC's message is Section

37

6.4(D) of its policy. Section 6.4(D) of the County's policy states:

> Any material so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system.

Section 6.4(D) borrows a phrase from the <u>Miller v. California</u>, 413 U.S. 15 (1973) obscenity test, but Section 6.4(D) does not exclude speech which is obscene, or even risqué. <u>Cf.</u>, <u>Aids Action Comm.</u>, 42 F.3d at 12 (noting the incorporation of one portion of obscenity definition, which was "never intended as a stand-alone criterion," was not sufficient). The language of Section 6.4(D) does not provide any objective criteria for determining whether a message warrants exclusion. In practice, King County's determination that SeaMac's message violated Section 6.4(D) was "based solely on opinions volunteered, a sample pool likely weighted toward those voicing complaints." <u>Hopper</u>, 241 F.3d at 1080 n.13. Moreover, King County "failed to articulate any basis to validate its asserted distinction based on the degree of 'controversialness'" separating SeaMACs ad from any other ad "other than the entirely subjective and ad hoc reactions of the limited subset of [the public] whose opinions came to the attention of . . . administrators." <u>Hopper</u>, 241 F.3d at 1080. This is an untenable standard. As applied by King County, the Section 6.4(D) standard "substitutes majority determinations for viewpoint neutrality." <u>Bd. of Regents v. Southworth</u>, 529 U.S. at 235. Section 6.4(D) also effectuates a heckler's veto, by linking the exclusion of objectionable speech to the

38

"threat of disruption" which would presumably be caused by listeners or viewers of speech in the forum. Section 6.4(D) thus fails to provide a viewpoint-neutral means for determining what speech can be excluded under it, and allowed a viewpoint discriminatory decision in this case.

## II.   THE DISTRICT COURT APPLIED THE INCORRECT SUMMARY JUDGMENT STANDARD TO RESOLVE FACTUAL DISPUTES

The District Court erred in ruling, as a matter of law, that censorship of SeaMAC's ad under Sections 6.4(D) or (E) was reasonable by ignoring disputed issues of fact and resolving inferences in favor of the County. It began by defining the dispositive question as whether "King County's restriction was reasonable under the circumstances." ER 8. Rather than limiting its conclusion to a question of whether King County's policy was reasonable, on its face, the District Court improperly resolved all of the legal and factual issues through the reasonableness inquiry.

There is a difference between the determination of whether King County's policy was reasonable as formulated, and the determination of whether King County was correct to exclude SeaMAC's ad under the policy. See United Food & Commercial Workers Union, 163 F.3d at 357 (declining to defer to the transit agency defendant and noting the distinction between "policy determinations and application of state policy"). As the court noted in United Food, deferring to the government's decision as to whether speech fits within the limitations of the forum

39

based on a reasonableness standard would "leave First Amendment rights with little protection." United Food, 163 F.3d at 357. Deference to the government's decision regarding whether speech fit within the forum would also be contrary to the rule from Bose Corp. v. Consumers Union that courts are required to "make an independent examination of the whole record [to ensure that] the judgment does not constitute a forbidden intrusion on the field of free expression." Bose, 466 U.S. 485, 499 (1984) (internal quotation omitted). The rule from Bose is particularly applicable in this case, where, as in United Food, the trial court's deference is based on the "unproven subjective determinations of state officials." United Food, 163 F.3d at 357. By "sanction[ing] the suppression of speech on this basis . . . [the District Court] abdicate[d] meaningful judicial review." Hopper, 241 F.3d at 1080.

## A. The District Court Improperly Employed a Deferential Reasonableness Standard in Reviewing the *Facts* Underlying the County's Decision to Reject SeaMAC's Ad

King County's decision that SeaMAC's ad violated sections 6.4 (D) and (E) warrants close scrutiny because SeaMAC's speech "was permitted until the [public] reacted to it, at which point the speech was deemed disruptive and ordered stopped under" Sections (D) and (E). See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't, 533 F.3d 780, 789 (9th Cir. 2008) (noting that "application of the statute [following public objection] raises serious First Amendment concerns"). King County's decision also deserved skepticism because

40

its justification shifted from its initial decision as explained in its public

announcement (international escalation of the debate; the response ads) through the

course of this litigation (terrorism; threats from the risk of drivers and the public).

The District Court reviewed King County's decision through a lens of

reasonableness, but this was improper, due to King County's failure to articulate

neutral standards to guide application of Sections 6.4(D) and (E) of its policy, and

its consistent reliance on viewpoint-based reasons for it exclusion of SeaMAC's

message.

1. **Deference to the County's interpretation of the facts was
inappropriate because the County excluded a political message
otherwise permitted in the forum by reference to non-neutral,
subjective standards.**

Having allowed political speech in the forum, the First Amendment required

King County to articulate neutral standards for distinguishing what type of political

speech is permitted in the forum and what is not. At its core, King County's

decision was based on the flood of emails from the public. In relying on its

inartfully drafted "civility clauses," the County ran a high risk of simply

acquiescing to this public pressure, and effecting a classic heckler's veto, which is

exactly what occurred in this instance.  For King County to properly exclude

SeaMAC's ad, it must point to objective standards that do not depend on whether

members of the public agree or disagree with SeaMAC's viewpoint, or find it

offensive. Rather than point to any such standards, King County merely relies on

the quantity of communications which it received as a proxy for determining that SeaMAC's ad, though originally acceptable, had become sufficiently offensive to warrant censorship. As this Court warned, reliance on the subjective reaction of listeners creates risk of constitutional impropriety. <u>Hopper</u>, 241 F.3d at 1079-80. The reasonableness standard employed by the District Court failed to guard against this constitutional impropriety.

**2. Reasonableness was an inappropriate standard to review the facts underlying the County's decision because all of the justifications relied on by King County were viewpoint-based.**

While the County continues to argue that its decision had nothing to do with the viewpoint expressed in SeaMAC's ad, even its own public articulation of its reasons point to the conclusion that the decision was viewpoint-driven. The King County Executive himself stated that in deciding to not run SeaMAC's ad, he "sought to avoid offending persons on both sides of the Mid-East debate . . . ." ER 99. The County's press release cited its concern over the submission of counter-ads and the escalating public debate as main factors in its decision to censor SeaMAC. ER 21. As this Court has clearly explained, censoring a particular message, from a forum opened to political speech, based on a desire to avoid offending either side

42

of a controversial issue, is an impermissible viewpoint driven rationale. <u>Arizona Life</u>, 515 F.3d at 972. [6]

Given the risk of the heckler's veto created by King County's policy and King County's consistent reliance on viewpoint-driven reasons for excluding SeaMAC's ad, reasonableness was not the appropriate standard for reviewing the decision to censor SeaMAC's ad after it had been found by the County to fit within the parameters of its forum. Even if it was, the District Court improperly resolved factual disputes and failed to view the evidence in light most favorable to the non-moving party (SeaMAC).

## B. The District Court's Application of the Reasonable Forecast of Disruption Standard is at Odds with First Amendment's Disruption Standard

In determining that King County's forecast of the threat of disruption was reasonable, the District Court, and King County, looked to language in the policy and found that a message can be rejected if it is "reasonably foreseeable" that the message would result in disruption. This language in King County's policy mirrors

---

[6] One of the proposed counter ads was submitted by the American Freedom Defense Initiative (AFDI). ER 187-88 ("IN ANY WAR BETWEEN THE CIVILIZED MAN AND THE SAVAGE, SUPPORT THE CIVILIZED MAN").) AFDI sponsors various "anti-jihad bus and billboard campaigns," and has been involved in bus advertising disputes in Michigan. <u>See</u> <u>AFDI v. SMART</u>, 10-12134, 2011 WL 1256918 at *5-6 (E.D. Mich.; Mar. 31, 2011) (order granting preliminary injunction). In the Michigan lawsuit, the court granted AFDI's request for injunctive relief, requiring the transit authority to display its ad; this is currently on appeal to the Sixth Circuit. <u>See</u> <u>AFDI v. SMART</u>, 11-1538 (6th Cir. Apr. 26, 2011) (appeal pending).

language from the test articulated by the Supreme Court in <u>Tinker v. Des Moines</u>

<u>Independent Community School District</u>, 393 U.S. 503 (1969). However, the

<u>Tinker</u> test does not support censorship of SeaMAC's ad.

In <u>Tinker</u>, the Court held that even in a school environment, the First

Amendment did not permit censorship of a student's expression of his opinions,

"even on controversial subjects" as long as the views are expressed in a manner

that does not "materially and substantially" interfere with the appropriate operation

of the school and does not infringe on rights of others. <u>Tinker</u>, 393 U.S. at 513.  As

the Court noted, "[a]ny word spoken, in class, in the lunchroom, or on the campus,

that deviates from the views of another person may start an argument or cause a

disturbance. But our Constitution says we must take this risk." <u>Tinker</u>, 393 U.S. at

508-509 (citing <u>Terminiello v. Chicago</u>, 337 U.S. 1(1949)). As this Court

explained in <u>Norse v. City of Santa Cruz</u>, a government may not define disruption

or disturbance in any way it chooses, even in a limited public forum. 629 F.3d 966,

976 (9th Cir. 2010). <u>See also id.</u> at 979 (Kozinski, J. concurring) (explaining that

while a Nazi salute was offensive it was not the actual cause of disruption and

therefore should not have been excluded). As <u>Norse</u> and <u>Sammartano</u> make clear,

regardless of the type of forum in question, listeners' reaction is not a First

Amendment-acceptable means for determining whether particular content is

acceptable within a forum. <u>Sammartano</u>, 303 F. 3d at 969.

Here, SeaMAC sought to express a political viewpoint in a forum that had been opened for more than 25 years to other political messages, including ones on the same topic. Unlike those messages which may present safety concerns (flashing lights), or disrupt the experience of passengers inside a bus (in-person solicitations), SeaMAC's ad was not in any way at odds with the purpose of the forum. Having consistently allowed this type of expression in the forum, King County cannot make a credible argument that political advertising is in any way inconsistent with the nature of the forum. Indeed, SeaMAC's printed message, which had been vetted and approved for content by the County, was like the silent expression that the Court found would not create the kind of disruption that could be excluded even in the context of a school. Tinker, 393 U.S. at 510.

Even if the County could reasonably rely on the "threat of disruption" posed by those reacting to SeaMAC's message as a basis to censor SeaMAC, the District Court ignored genuine disputes of fact and failed to draw permissible inferences in SeaMAC's favor in determining that such a threat was reasonably foreseeable, or even that the County could have reasonably concluded that it was.

## C. Even Applying the Reasonableness Standard, Material Factual Disputes Existed About the Alleged Threats of Disruption

"The reasonableness of a governmental restriction limiting access to a nonpublic forum must be assessed 'in light of the purpose of the forum and all of the surrounding circumstances.'" Cogswell, 347 F.3d at 817 (quoting Cornelius,

45

473 U.S. at 789). Reasonableness is a stricter standard than the traditional rational basis test. <u>Sammartano</u>, 303 F.3d at 966-67. Even under the reasonableness standard of review, a reasonable juror could conclude on this record that there was no realistic threat of disruption caused by SeaMAC's ad, and therefore, no reasonable basis to exclude it from the forum.

### 1. Law enforcement recommendations to not run SeaMAC's ad were vague, not based on any credible threat and did not provide a reasonable basis to censor SeaMAC.

King County's decision to censor SeaMAC's message relied heavily on law enforcement recommendations to not run the ad, ER 21, but the County acknowledged that no law enforcement officer warned of any particular threat of disruption. ER 87-92

The County also initially alluded to a potential terrorist threat in explaining its decision to censor SeaMAC's ad, but the record reflects that law enforcement did not express anything more than broad, generalized concerns about the vulnerability of transit systems. ER 87-92. In its District Court briefing, King County disavowed the terrorist threat from its list of justifications, but still cited to law enforcement officials' input in justifying its decision to not run SeaMAC's ad. ER 97. The United States Attorney for the Western District of Washington, Jenny Durkan, did not give any recommendation as to whether the ad should run or not, ER 87, and did not have any specific feedback regarding threats concerning the

46

SeaMAC ad or the Metro buses. ER 88. King County Sheriff Sue Rahr recommended that the ad not run, but made clear that her recommendation to not run SeaMAC's ad was based on concern about local people overreacting, not on any terrorism-related concerns. ER 95; ER 91. While the District Court discounted the threat of terrorism as a reasonable basis for King County's decision, it nevertheless credited reliance on the recommendations from Ms. Durkan and Sheriff Rahr as a legitimate basis for censoring SeaMAC's ad, despite the undisputed testimony in the record that Ms. Durkan gave no recommendation and Sheriff Rahr's recommendation was not based on any specific threats or assessment of threats. Presumably both would advise against opening a bus forum to potentially controversial political speech in the first instance, but that is not the choice King County made. Accordingly, in order to censor a message that otherwise fit within its forum, the County needed something more than the general vulnerability of transit systems or a possibility of over-reaction by riders to justify censorship, even in a limited public forum.

In finding the reliance on Sheriff Rahr's recommendation reasonable, the District Court also ignored evidence in the record that other County law enforcement officials did not perceive a real threat. ER 102-03. Contrary to its earlier finding that SeaMAC's expert, Richard Conte, could offer reliable and relevant testimony regarding the reasonableness of the threat assessment, at

47

summary judgment, the District Court discounted his testimony entirely. Compare ER 79-86 (Order denying King County's Motion to Exclude SeaMAC's expert) and ER 1-11 (Summary Judgment Order). The District Court rejected Mr. Conte's testimony disputing the foreseeability of a threat because it contradicted the recommendation of Sheriff Rahr and Ms. Durkan, yet, Mr. Conte was the only one of the three who had actually analyzed the communications that the County cited to as evidence of a threatened disruption. The Court also discredited Mr. Conte's testimony finding that even absent the communications from the public, a potential threat of disruption from bus drivers could have itself justified the decision to censor SeaMAC.  That conclusion also ignored genuine disputes of fact.

### 2.  The threat of disruption from drivers was speculative and did not support a decision to censor SeaMAC.

A second justification asserted by King County, and accepted by the district court, was the alleged threat of disruption from drivers who may refuse to drive buses on which the SeaMAC ad was displayed. ER 93. The President of Local 587 of the Amalgamated Transit Union reported that some bus drivers were "concerned about the potential for violence," but described it as "all speculative." ER 36-37. A possible disruption caused by drivers' refusal to work was anticipated in light of prior incidents in which union members "responded negatively through work actions to other ads" that "raised the hackles of union members." ER 33. Further, if the County had refused to run SeaMAC's message because of objections from

drivers based on political objection to SeaMAC's ad this would have been a plainly viewpoint discriminatory basis for censorship. In any event, under the own Union's rules, political objections to bus advertising were not a valid basis for refusing to drive a bus.  King County did not explain what steps it would take to separate political objections from valid safety concerns. Despite the evidence that some drivers objected based on political opinion, and without considering whether Metro had a plan to address any credible, non-speculative safety concerns raised by drivers, the District Court deferred to the County's decision to censor SeaMAC.

At a minimum, a genuine dispute of fact existed whether the threat of disruption from drivers was a valid basis for censoring SeaMAC.

### 3. Genuine factual disputes exist regarding whether riders or the public would cause a disruption if SeaMAC's ad were run.

In explaining its decision to censor the previously approved political message, the County focused on four messages suggesting an intention to disrupt; four suggesting a threat of violence; and the photographs depicting exploded buses. ER 3-4. At the same time, however, its actions belied any real concern of a potential threat posed by these communications. First, King County acknowledged that it had no "active investigations" relating to any of the communications it received. ER 54-55. The photos were not the subject of any follow up. ER 54-55 Second, King County itself acknowledged that a large quantity of communications came from people obviously outside of King County, as a result of media exposure

49

to King County's decision, ER 28, and that these individuals are not likely to be in a position to cause disruption to King County Metro buses.  Third, the tenor of many of the messages reflects the idea that merely expressing intent to commit violence in reaction to the ads would be sufficient to change King County's position. ER 208 ("AT ATTY WHO SAYS THE SIGNS ARE PREMITTED UNDER THE FIRST AMENDMENT IS FORCING ME TO CONDUCT VIOLENCE JUST TO PROVE THAT I AM EALLY UPSET AT THESE HORRIBLE WORLD WAR2 KINDS OF HATRED SIGNS."); ER 216 ("Maybe you should take note that you just 'incited' ME to anger all the way from Austin, Texas!"). Fourth, most of these threatening communications came to King County via email, providing the County with a means to identify and follow up with the individuals making the threats. ER 218. Finally, SeaMAC presented the testimony of an expert witness, a veteran of the Joint Terrorism Task Force, who rejected King County's view that the messages cited to the District Court were sufficient to create a credible risk of violence or disruption. ER 76-77. Though the text of the particular messages was not in dispute, genuine disputes existed regarding what reasonable inferences should be drawn from the evidence. Disputes also existed over what inferences should be drawn from the undisputed evidence of the County's development of a plan it approved as adequate to neutralize threats of disruption; these disputes over material facts should have precluded summary

judgment.

### 4. The adequacy of King County's response plan undermined any reasonable foreseeability of disruption, but the County and the District Court discounted it.

In affirming the reasonableness of King County's decision, the court emphasized that the Executive made his decision in reliance on advice from law enforcement, which the District Court deemed reasonable. This was in spite of the fact the Executive knew, at the time he relied on that advice, that it was not premised on any specific evidence of a threat. ER 87-92. At the same time, the District Court refused to consider permissible inferences that could be drawn from the fact that Metro had devised a response plan that it felt would neutralize any likely disruption.

Although the metrics used by the County to determine the level of risk posed by running SeaMAC's ad were unclear, its Metro Police Department officials ultimately decided to develop a "mid-range" response plan to provide for security and prevent disruption in the event of rider or driver over-reaction. ER 24; ER 51-53. The final plan was satisfactory to Mr. Bachtel, Local 587 President. ER 38 (Q. "Did you agree with that plan?" A. "I did."). Metro's Operations Manager, Mr. O'Rourke, was similarly satisfied that the operations plan would work. ER 63-64. He had, in his experience, dealt with much more problematic issues than this. ER 64 (discussing winter snow storm). He communicated the plan to Metro's General

Manager, Kevin Desmond, who responded that it "looks like a good plan of action." ER 23. Although he did not participate in developing it, Homeland Security Manager for King County Metro Michael DeCapua also thought it was a good plan. ER 46. The District Court's summary judgment order did not assess either the necessity of the plan or the fact that King County officials believed the plan would be sufficient to avoid any threat of disruption. It ignored reasonable inferences that could be drawn from the existence and broad approval of the plan, and the fact that the plan would have neutralized the key concern relied on by Executive Constantine: the threat of disruption from drivers. In light of the sparse evidence of any actual threat identified by law enforcement officers or presented by riders, the reasonable inference could have been drawn that with the plan in place, there would be no actual disruption of the transit system. These factual disputes should have precluded summary judgment.

## III.   SEAMAC PROVIDED COMPARATOR EVIDENCE SUFFICIENT TO GIVE RISE TO AN INFERENCE OF VIEWPOINT DISCRIMINATION

Summary judgment was also improper because evidence in the record regarding King County's differential treatment of other similarly situated ads is sufficient to find viewpoint discrimination. The government "rarely flatly admits it is engaging in viewpoint discrimination." Ridley v. Massachusetts Bay Transp. Authority, 390 F.3d 65, 86 (1st Cir. 2004).  Accordingly, courts have cautioned

against accepting a non-discriminatory rationale for the exclusion of speech at face value "because it could be a cover-up for unlawful discrimination." Pittsburgh League of Young Voters Educ. Fund v. Port Authority of Allegheny County, 653 F.3d 290, 297 (3d Cir. 2011); Sammartano, 303 F.3d at 971-72. Although the Supreme Court has acknowledged that a government's desire to avoid disruption of a limited forum was a "facially neutral and valid justification[,]" it has cautioned that "the purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers." Cornelius, 473 U.S. at 812 (1985).

Courts use comparator evidence, when available, to determine whether a governmental entity engaged in impermissible viewpoint discrimination. See Pittsburgh League of Young Voters, 653 F.3d at 298-99 (warning that ample evidence of viewpoint discrimination exists where, despite its written policy excluding all non-commercial ads, the agency had accepted non-commercial ads similar to the one it later rejected); Ridley, 390 F.3d at 88 (warning that "the suspicion of viewpoint discrimination is deepened" when a government has previously run ads promoting subjects similar to the one banned); Aids Action Committee, 42 F.3d at 12 (warning that viewpoint discrimination likely exists where a government entity refuses to run a specific ad that falls into a category of ads that the agency previously ran).

Here, undisputed evidence in the record demonstrates that King County subjected SeaMAC's message to differential treatment compared to other similar ads, which raises an inference of viewpoint discrimination. The County had previously accepted a variety of political and controversial ads. ER 12-14. The County had previously accepted advertising on the subject of Israel's foreign policy. ER 165-67.

King County has attempted to distinguish SeaMAC's ad from prior ads on the basis that SeaMAC's ad generated complaints that were different in number and in kind; that it singled out an ethnic, national, or religious group for negative treatment; and that it created a risk of disruption. ER 98; ER 183-84. But there was conflicting evidence as to whether SeaMAC's ad presented a risk of disruption, and a bare recitation of the qualitative nature of complaints is not sufficient to dispel an inference of differential treatment. Indeed, as explained above, relying on the amount and tenor of public reaction to an advertisement which addresses a subject matter that fits within the forum is not a permissible basis for censorship, even in a limited public forum. See above at Section II, C and D.

The County's argument that SeaMAC's ad was different because there had not been any other ad that "singled out any ethnic, national, or religious group for negative treatment" strains credulity. ER 186-87. The County acknowledged that it had run ads urging readers to "End Siege of Gaza" and one stating "Thousands

have fallen in pursuit of peace," and urging readers to "Remember Israel's soldiers and victims of terror":



ER 165-67; 186-87.

Yet, in the face of this, the County still suggests that SeaMAC's reference to "Israeli war crimes" singles out "an ethnic, national or religious group for negative treatment," while these other ads do not. Each of these ads takes a position regarding the nature of the conflict between Israel and Palestine, and one of the ads equates Palestinians with terrorists. See ER 167. SeaMAC's ad does not, any more than any of the other advertisements accepted by King County, single out any ethnic, national, or religious group for negative treatment. See also ER 169.

Because SeaMAC submitted evidence which gave rise to an inference of viewpoint discrimination, dismissal without a full trial on the merits was not proper.

## IV. KING COUNTY'S ARGUMENT THAT IT MAY CLOSE THE FORUM DOES NOT DISPOSE OF SEAMAC'S CLAIMS

In its reply brief on summary judgment, King County raised for the first

time, a new argument that SeaMAC is not entitled to injunctive relief because the challenged policy is no longer in effect. ER 11. This argument should not be addressed in the first instance because it was not raised properly, and SeaMAC has not had an opportunity to present evidence regarding the current status of the forum. [7]

Even if it had been raised properly, it is does not foreclose SeaMAC's entitlement to relief. King County's argument that closure of the forum disposed of SeaMAC's claims was solely directed at SeaMAC's claim for injunctive relief, and did not address SeaMAC's entitlement to declaratory relief, nominal damages, or compensatory damages.

## CONCLUSION

Factual disputes regarding nature of the forum, the alleged threat of disruption, King County's response plan, and King County's treatment of similarly situated messages all precluded the grant of summary judgment in King County's favor. Even assuming the facts as alleged by King County are true, the District Court also applied the incorrect legal standards, giving effect to a heckler's veto

---

[7] While the government retains power to close a forum, it may not do so in order to suppress speech. Hopper, 241 F.3d at 1081–82 (a city could not, absent some compelling government interest, open property to some and close it to others solely in order to suppress content); Ridley, 390 F.3d at 77 ("if the MBTA revised a guideline merely as a ruse for impermissible viewpoint discrimination, that would be found unconstitutional regardless of the type of forum created").

and a public referendum on SeaMAC's message. The District Court's deference to King County's decision regarding the threat of disruption failed to guard against viewpoint discrimination and the threat of censorship by public opinion.

Indeed, the standard adopted by the District Court would allow a vocal group of far-flung hecklers to routinely silence speech—by threatening violence or disruption—in a variety of government forums, such as universities, libraries, and highways. A standard which looks to whether the government's forecast of disruption was "reasonably foreseeable" would result in speakers being regularly silenced in these forums based on threats from hecklers who disagree with the speech in question. <u>Cohen</u>, <u>Hopper</u> and <u>Sammartano</u> demonstrate that this is not the appropriate result. The standard adopted by the District Court rewards those who threaten violence and unlawful conduct in response to what they perceive as objectionable speech. It also insulates government entities from responsibility for decisions acquiescing to those threats even where evidence shows the threats are not credible or can be effectively addressed without censorship.

For the reasons set forth above, SeaMAC respectfully requests that this Court reverse the District Court's decision granting King County summary judgment, and remand this matter for trial.

Dated February 13, 2012.

/s Venkat Balasubramani
VENKAT BALASUBRAMANI

57

Focal PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
Telephone: (206) 529-4827

JEFFREY C. GRANT
Skellenger Bender, P.S.
1301 5th Ave # 3401
Seattle, WA 98101
Telephone: (206) 623-6501

Cooperating Attorneys for ACLU of
Washington Foundation

SARAH A. DUNNE
M. ROSE SPIDELL
LA ROND MARIE BAKER
Attorneys
ACLU of Washington Foundation
901 5th Avenue, Suite 630
Seattle, WA 98164-2008
Telephone: (206) 624-2184


Attorneys for Plaintiff Seattle Mideast
Awareness Campaign

## CERTIFICATE OF COMPLIANCE

PURSUANT TO FED. R. APP. P. 32(A)(7)(C) AND CIRCUIT RULE 32-1 FOR
CASE NUMBERS 11-35914 & 11-35931

I certify that:

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is:

⊠ Proportionately spaced, has a typeface of 14 points or more and contains **13,652** words (petitions and answers must not exceed 14,000 words; reply briefs must not exceed 7,000 words).

/s/ Venkat Balasubramani

VENKAT BALASUBRAMANI
Focal PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
Telephone: (206) 529-4827

JEFFREY C. GRANT
Skellenger Bender, P.S.
1301 5th Ave # 3401
Seattle, WA 98101
Telephone: (206) 623-6501

Cooperating Attorneys for ACLU of
Washington Foundation

SARAH A. DUNNE
M. ROSE SPIDELL
LA ROND MARIE BAKER
Attorneys
ACLU of Washington Foundation
901 5th Avenue, Suite 630

59

Seattle, WA 98164-2008
Telephone: (206) 624-2184


Attorneys for Plaintiff Seattle Mideast
Awareness Campaign

## <u>STATEMENT OF RELATED CASES</u>

Appellant is unaware of any related cases, other than the cross-appeal filed in this case by Appellee (Case No. 11-35931).

## <u>CERTIFICATE OF SERVICE</u>

U.S. Court of Appeals Docket Numbers: 11-35914 & 11-35931

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 13, 2012.

I certify that all counsel for Appellee King County are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature:   /s/ Venkat Balasubramani_____