Nos. 11-35914 & 11-35931
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

**SEATTLE MIDEAST AWARENESS CAMPAIGN**
Appellant,

v.

**KING COUNTY**
Appellee.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WASHINGTON
CASE NO. 11-CV-00094-RAJ (HON. RICHARD A. JONES)
_____

**THIRD BRIEF ON CROSS-APPEAL: SEATTLE MIDEAST AWARENESS
CAMPAIGN'S REPLY AND RESPONSE BRIEF**

VENKAT BALASUBRAMANI
Focal PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
Telephone: (206) 529-4827

JEFFREY C. GRANT
Skellenger Bender, P.S.
1301 5th Ave # 3401
Seattle, WA 98101
Telephone: (206) 623-6501

Cooperating Attorneys for ACLU of
Washington Foundation

SARAH A. DUNNE
Legal Director

VANESSA T. HERNANDEZ
M. ROSE SPIDELL
LA ROND MARIE BAKER
Attorneys
ACLU of Washington Foundation
901 5th Avenue, Suite 630
Seattle, WA 98164-2008
Telephone: (206) 624-2184

Attorneys for Seattle Mideast
Awareness Campaign

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT.................................................................1

ISSUES PRESENTED FOR REVIEW.........................................................1

INTRODUCTION........................................................................................2

ARGUMENT ...............................................................................................4

I.  KING COUNTY'S ACTUAL PRACTICE OF ACCEPTING A BROAD
    RANGE OF ADVERTISING CREATES A FACTUAL DISPUTE
    REGARDING THE NATURE OF THE FORUM...................................4

    A.  The Existence of a Policy Alone is Insufficient to Establish Beyond
        Dispute that King County Created a Limited Public Forum..................5

    B.  King County's Acceptance of a Broad Range of Messages Supports the
        Conclusion that it Intended to Open its Forum to Public Discourse.......7

II. KING COUNTY FAILS TO OFFER A VIEWPOINT-NEUTRAL
    BASIS CONSISTENT WITH FIRST AMENDMENT PRINCIPLES
    FOR EXCLUDING SEAMAC'S MESSAGE...........................................11

    A.  Access to a Government-Created Forum Open to Political Speech,
        Cannot be Denied Pursuant to a Majority Vote or a Heckler's Veto....11

    B.  King County Cannot Rely on its Business Interests to Effect a Public
        Referendum on Speech.........................................................................15

    C.  Sections 6.4(D) and (E) Could not be Applied Here in a Viewpoint
        Neutral Fashion because They Lack Objective Criteria .......................17

    D.  Viewpoint Discrimination Does not Require Discriminatory Animus.21

III. KING COUNTY'S PROPOSED REASONABLENESS STANDARD
     DOES NOT ADEQUATELY GUARD AGASINT VIEWPOINT
     DISCRIMINATION ...................................................................................23

    A.  Because King County's Policy Contained no Categorical Restrictions
        like those in Lehman, Children of the Rosary or Cogswell, a Relaxed
        Reasonableness Standard is Inappropriate ...........................................23

    B.  King County's Expressed Intent to "Avoid Taking Sides on a Debate"
        is Prima Facie Viewpoint Discrimination and Not Entitled to a Relaxed
        Standard of Review .............................................................................25

    C.  King County's Proposed Reasonableness Standard Would Undermine
        First Amendment Protection in the Bus Ad Forum ..............................26

**IV.   EVEN UNDER THE REASONABLENESS STANDARD, FACTUAL DISPUTES PRECLUDED THE GRANT OF SUMMARY JUDGMENT** ..................................................................................**28**

    A.   The Evidence Underlying the Threats and Safety Concerns Lend Themselves to Competing Inferences ...................................................28

    B.   Comparator Evidence Presented by SeaMAC Created a Material Factual Dispute ....................................................................................34

**V.   THE CHANGED CIRCUMSTANCES DOCTRINE DOES NOT WARRANT DENIAL OF SEAMAC'S REQUEST FOR INJUNCTIVE RELIEF**..................................................................................................**36**

**VI.   KING COUNTY IS NOT ENTITLED TO RELIEF ON ITS APPEAL OF THE JURY DEMAND ISSUE** ........................................................**37**

    A.   This Court Lacks Appellate Jurisdiction Over the Jury Demand Ruling ....................................................................................................37

    B.   SeaMAC Timely Asserted its Jury Demand by Including it in the First Pleading Directed to an Issue Triable of Right by a Jury ....................39

**CONCLUSION**....................................................................................................**42**

**CERTIFICATE OF COMPLIANCE** ....................................................................**45**

**CERTIFICATE OF SERVICE** ...........................................................................**46**

# CASES

AIDS Action Comm. of Massachusetts v. MBTA, 42 F.3d 1 (1st Cir.1994) .........22

Airline Pilots Ass'n Int'l v. City of Chicago, 45 F.3d 1144 (7th Cir. 1995).. 6, 7, 15

Akin v. Pafec Ltd., 991 F.2d 1550 (11th Cir. 1993)................................... 37, 38, 39

Allied Indus.Workers v. Gen. Elec. Co., 471 F.2d 751 (6th Cir. 1973) ................40

Arizona Life Coalition Inc. v. Stanton, 515 F.3d 956 (9th Cir. 2008) ....... 22, 25, 26

Bereslavsky v. Caffey, 161 F.2d 499 (2d Cir. 1947)................................................40

Board of Regents v. Southworth, 529 U.S. 217 (2000)................................... 11, 12

Boos v. Barry, 485 U.S. 312 (1988) .......................................................................14

Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485 (1984).....................27

Chicago Acorn v. Metropolitan Pier and Exposition Authority, 150 F. 3d 695 (7th
Cir. 1998) ............................................................................................. 13, 16, 24

Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth., 148 F.3d 242, 252 (3d Cir.
1998) ........................................................................................... 5, 6, 8, 10

Cogswell v. Seattle, 347 F.3d 809, 814 (9th Cir. 2003) ........................................23

Del Monte Dunes at Monterey, Ltd. v. Monterey, 95 F.3d 1422 (9th Cir. 1996)...39

Forsyth County v. The Nationalist Movement, 505 U.S. 123 (2000) ............. passim

Germain v. Connecticut Nat'l Bank, 930 F.2d 1038 (2d Cir. 1991) ............... 37, 38

Hopper v. Pasco, 241 F.3d 1067 (9th Cir. 2001)............................................. passim

Keller v. Prince George's Cnty, 827 F.2d 952 (4th Cir. 1987) ...............................39

Kletzelman v. Capristano Unified Sch. Dist., 91 F.3d 68 (9th Cir. 1995) .............42

Las Vegas Sun, Inc. v. Summa Corp., 610 F.2d 614 (9th Cir. 1979).....................41

Lebron v. National Railroad Passenger Corp (Amtrak), 69 F.3d 650 (2d Cir. 1995)
    12, 16

Litchfield v. Spielberg, 736 F.2d 1352 (9th Cir. 1984) ..........................................37

Lurie v. Blackwell (In re Popkin & Stern), 105 F.3d 1248 (8th Cir. 1997) ............37

Lutz v. Glendale Union High Sch., 403 F.3d 1061 (9th Cir. 2005) ........................41

Norse v. City of Santa Cruz, 629 F.3d 966 (9th Cir. 2010)....................................26

iii

*Pacific Fisheries Corp. v. HIH Cas. & Gen. Ins., Ltd.*, 239 F.3d 1000 (9th Cir. 2001) ................................................................................................42

*Pittsburgh League of Young Voters Educ. Fund v. Port Authority of Allegheny County*, 653 F.3d 290, 298 (3d Cir. 2011)...............................................34

*Planned Parenthood Assoc. v. Chicago Transit Auth.*, 767 F.2d 1225 (7th Cir. 1985) ...............................................................................................6, 9

*R.A.V. v. City of St. Paul*, 505 U.S. 377(1992) ............................................. 14, 21

*Reno v. ACLU*, 521 U.S. 844 (1997) .........................................................11

*Ridley v. Massachusetts Bay Transp. Authority*, 390 F.3d 5 (1st Cir. 2004)... 17, 20

*Rodriguez v. Lockheed Martin Corp.*, 627 F.3d 1259 (9th Cir. 2010)...................38

*Ruud v. United States Dep't of Licensing*, 347 F.3d 1086 (9th Cir. 2003).............39

*Sammartano v. First Judicial District Court*, 303 F. 3d 959 (9th Cir. 2002)...........27

*Terminiello v. City of Chicago*, 337 U.S. 1, 3, 5 (1949) .........................................13

*Texas v. Johnson*, 491 U.S. 397 (1989) ....................................................19

*Thomas v. Collins*, 323 U.S. 516 (1945) .....................................................36

*Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503 (1969).........................27

*Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045 (9th Cir. 1974) ........41

*United Food & Commercial Workers Union v. Sw. Ohio R'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998) ............................................................ passim

*White v. City of Norwalk*, 900 F.2d 1421 (9th Cir. 1990) .....................................27

## RULES

Fed. R. Civ. P. 39 ........................................................................ 48, 49

Fed. R. Civ. P. 38 ........................................................................ 46, 47

iv

## JURISDICTIONAL STATEMENT

SeaMAC disagrees with King County's jurisdictional statement on cross-appeal. As explained in Section VI below, the District Court's ruling on the jury demand issue is not appealable at this juncture.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred in granting summary judgment in favor of King County where disputed evidence in the record and reasonable inferences that can be drawn from that evidence support the conclusion that King County had no legitimate, viewpoint-neutral basis for censoring SeaMAC's political message in a forum King County had intentionally opened to political speech?

2.      Whether this Court has appellate jurisdiction over King County's cross-appeal challenging the District Court's Order granting SeaMAC's request for a jury trial where ruling was not part of the basis for the District Court's final judgment?

3.      Whether the District Court correctly applied Rule 38 in granting SeaMac's request for a jury trial where it was asserted concurrently with an amendment seeking monetary relief; and, alternatively, whether the District Court properly exercised its discretion pursuant to rule 39 in granting SeaMac's request for a jury trial?

## **INTRODUCTION**

SeaMAC's message is core political speech addressing a topic that King County admits was the subject of other advertisements previously accepted and displayed on King County Metro buses. King County vetted SeaMAC's message at the highest levels, and at each level approved it as acceptable under King County's own advertising standards. Only after news of the planned ad drew objections from the public did King County determine that it was somehow too offensive to run in the same forum that had hosted other political, religious and cause ads for decades and that SeaMAC's message should be censored. The standards used by King County to exclude SeaMAC's speech amount to nothing more than a nebulous category of "speech that some members of the public deem too objectionable for the forum."

King County asserts that its intent to limit its forum is undisputed, but ignores evidence supporting the reasonable conclusion that it in fact intended to open its forum broadly and in practice failed to consistently impose legitimate, viewpoint neutral restrictions on political speech.

King County seeks to rely on decisions by this and other courts accepting that transit agencies can reasonably exclude all political or non-commercial speech in order to avoid potential controversy and further their commercial interests. But King County did not make that choice. Rather, evidence supports the reasonable

conclusion that King County in fact intended to open its forum broadly and in practice failed to consistently impose legitimate, viewpoint neutral restrictions on political speech. Accordingly, King County's about-face as to whether SeaMAC's ad violates the civility clauses—Sections 6.4(D) and (E)—of its policy warrants judicial skepticism.

Even when the deferential review for reasonableness urged by King County is applied to the record, there is sufficient evidence to support a conclusion that King County was not reasonable in relying on generalized, unsubstantiated "threats" of disruption from the public, generalized recommendations from law enforcement, or equivocal evidence of drivers' safety concerns in deciding to censor SeaMAC's political message. Each of the "undisputed facts" cited by King County supports a set of reasonable inferences that there was no actual or realistic threat, and that the decision to censor SeaMAC's message was based on disagreement with the viewpoint it expressed. SeaMAC also presented comparator evidence of previous controversial ads, including those addressing the same topic as SeaMAC's ad. King County's evidence of why these prior ads were qualitatively different from SeaMAC's ad consists of listener reaction, which is an impermissible basis to exclude speech from a forum. Because of the numerous factual disputes in the record and the competing inferences that could be drawn from the evidence in the record, summary judgment was improper.

King County's cross appeal, which challenges the District Court's decision to grant SeaMAC leave to amend its Complaint and assert its right to a jury trial for its newly asserted claim for damages, attacks a non-final order which did not produce or have any effect on the District Court's final judgment. The order does not fall under either the collateral order exception, or the Court's pendent jurisdiction. As such, this Court does not have appellate jurisdiction to review the grant of King County's request for a jury trial. In the event the Court decides to address this ruling, it should affirm the District Court's decision allowing SeaMAC's jury demand. SeaMAC's request for a jury trial was timely. Alternatively, the District Court did not abuse its discretion in granting SeaMAC's request for a jury trial.

## **ARGUMENT**

### I. **KING COUNTY'S ACTUAL PRACTICE OF ACCEPTING A BROAD RANGE OF ADVERTISING CREATES A FACTUAL DISPUTE REGARDING THE NATURE OF THE FORUM**

King County admittedly opened its bus ad forum to a broad range of expression, including controversial messages, and yet invokes provisions of the King County code to argue that it indisputably did not intend to open its forum to public discourse. Second Brief, p. 25. However, forum analysis requires examination of policy *and practice* to determine whether a government has intentionally opened a space for public discourse, or alternatively, has imposed and maintained reasonable, viewpoint neutral restrictions creating only a limited public

4

forum. Hopper v. Pasco, 241 F.3d 1067, 1074-75 (9th Cir. 2001). As this Court

stated in Hopper, when weighing competing evidence of government intent,

"actual practice speaks louder than words." Hopper, 241 F.3d at 1076 (quoting

Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5, 941 F.2d 45, 47

(1st Cir. 1991)). In the face of conflicting evidence as to its actual practice and the

contours of King County's policy, King County is not entitled to judgment as a

matter of law that it created and maintained a proper limited public forum.

### A. The Existence of a Policy Alone is Insufficient to Establish Beyond Dispute that King County Created a Limited Public Forum

This Court (in Hopper) and Courts of Appeals of the Third, Sixth and

Seventh Circuits have held that the simple fact that an agency has adopted written

restrictions governing a forum does not necessitate a finding as a matter of law that

an agency has created a proper limited public forum. See Hopper, 241 F.3d at 1090

("we . . . must closely examine whether in practice [the authority] has consistently

enforced its written policy in order to satisfy ourselves that [its] stated policy

represents its actual policy") (internal citations and quotations marks omitted);

United Food & Commercial Workers Union v. Sw. Ohio R'l Transit Auth., 163

F.3d 341, 355 (6th Cir. 1998) (concluding that SORTA demonstrated an intent to

designate its advertising space a public forum, despite a written policy excluding

broad categories of advertisements); Christ's Bride Ministries, Inc. v. Se. Pa.

Transp. Auth., 148 F.3d 242, 252 (3d Cir. 1998) (concluding, despite "[agency's]

written policies . . . [which] provide for the exclusion of only a very narrow category of ads" that agency created a designated public forum based on its practice of "permitting virtually unlimited access to the forum"); Airline Pilots Ass'n Int'l v. Chicago, 45 F.3d 1144, 1155 (7th Cir. 1995) (noting that necessity of factual inquiry into the nature of the forum is "not altered by the existence of a purported policy screening out the subject matter of the proposed message").

King County argues that the cases relied on by SeaMAC are distinguishable because those cases lacked written guidelines or policies comparable to King County's restrictions. Second Brief, p. 29. This is incorrect. In Planned Parenthood Association v. Chicago Transit Authority, the government agency imposed contractual restrictions under which the contractor who handled advertising could not accept "immoral, vulgar, or disreputable advertisements." 767 F.2d 1225, 1227 (7th Cir. 1985). In Christ's Bride, there was also a contract, which restricted "libelous, slanderous, or obscene advertising," and also directed the contractor to ensure that advertising "be of an appropriate character and quality." Christ's Bride, 148 F.3d at 250.

As this Court stated in Hopper, the key question is not whether a policy existed but whether King County developed an acceptable policy and consistently enforced that policy. Hopper, 241 F.3d at 1078 ("so-called policy of non-controversy became no policy at all because it was not consistently enforced and . .

6

. lacked any definite standards"); <u>see also</u> <u>Air Line Pilots Ass'n</u>, 45 F.3d at 1153-54 ("The City's claimed ability to exclude 'political' advertisements does not definitely settle the question of display cases' status. Instead, a court must examine the actual policy—as gleaned from the consistent practice with regard to various speakers—to determine whether a state intended to create a designated public forum."). Although King County argues that "Metro actively enforced [its] policy and rejected advertisements that violated its restrictions," Second Brief, p. 7, as described below, the record is equivocal.

**B. King County's Acceptance of a Broad Range of Messages Supports the Conclusion that it Intended to Open its Forum to Public Discourse**

In actual practice, King County admits that it accepted a "broad spectrum of advertising." Second Brief, p. 28. Additionally, Ms. Quadros, the outside contractor responsible for administering King County's policy, stated her understanding that King County's advertising program exists "to allow the freedom and opportunity for all organizations and associations either political or non-profit to benefit from using transit as a form of advertising their 'cause.'" ER 116. Ms. Shinbo, the King County official in charge of implementing the program also confirmed that King County "has always accepted non-commercial advertising, including [advertising relating to] candidates for elected office, ballot measures, and 'cause' advertising." ER 12-14. These statements, along with undisputed evidence that King County accepted controversial and political

7

advertising, are probative as to King County's actual practices, and create a material issue of fact as to King County's intent. See United Food, 163 F.3d at 355 ("Acceptance of a wide array of advertisements, including political and public-issue advertisements, is indicative of the government's intent to create an open forum."); Christ's Bride, 148 F.3d at 252 (acceptance of a broad range of advertising indicated an intent to create a public forum for public discourse, including abortion-related material).

King County argues that statements from the Titan representative are not probative as to the "primary purpose" of the King County advertising program. Second Brief, p. 42. Again, the key evidentiary question is not King County's self-described "primary purpose," but King County's actual practice, which would be reflected by Ms. Quadros's understanding, as the person charged with administering the program. A fact-finder could reasonably give weight to Ms. Quadros's statement, particularly in light of evidence that King County officials deferred to Titan in reviewing the majority of proposed ads that were run on the buses. SER 313; ER 183 ("[a]ll . . . creatives . . . are screened by Titan and if there is a question about a potential Section 6 content violation, they are passed through to me for further evaluation").

Several cases have found transit advertising forums to be public forums based on the agency's practice of allowing a broad range of advertising, or its

8

failure to maintain or enforce guidelines. <u>See</u>, <u>e.g.</u>, <u>Planned Parenthood</u>, 767 F.2d at 1232 (noting that agency "ha[d] allowed its advertising space to be used for a wide variety of commercial, public-service, public-issue, and political ads"). Prior advertisements approved by King County have included: (1) ads for Rush Limbaugh (ER 33); (2) an ad from an Atheist group urging viewers to question the existence of "God" (ER 169); (3) several ads on the Mid-East controversy, including ads that said "SAVE GAZA!" (ER 165) and "END SEIGE OF GAZA!" (ER 166); and (4) ads from the Jewish Federation of Seattle that stated: "THOUSANDS HAVE FALLEN IN PURSUIT OF PEACE Remember Israel's soldiers and victims of terror." ER 167.

Not only did King County accept a broad range of expression, the record indicates that King County had never rejected a political advertisement, and never rejected an advertisement under Sections 6.4(D) and (E) until the public response led to censorship of SeaMAC's message. ER 153-54 (correctly or not, King County directed Titan to reject one set of ads under 6.4(D) but these ads were withdrawn prior to their formal rejection). This evidence shows effectively no restriction of political messages over the course of nearly three decades of running the bus ad forum and creates a genuine dispute of material fact regarding whether King County created or maintained a proper limited public forum. <u>United Food</u>, 163 F.3d at 354 ("where the record indicates [the agency] has rejected few

9

advertisements since the Policy's inception … we cannot readily surmise that [the agency's] exercise of control over access to its advertising space operates so as to ensure that the speech is compatible with the forum's larger purpose"); <u>Christ's Bride</u>, 148 F.3d at 252 (agency did not maintain "tight control" over political ads in a forum in which it rejected only three ads and "at least 99% of all ads are posted without objection"). King County's invocation of the King County Code and Sections 6.4(D) and (E) do not dispel this factual dispute. <u>Hopper</u>, 241 F.3d at 1075 ("abstract policy statement purporting to restrict access to a forum is not enough").

King County's reliance on Edward Mast's testimony regarding the two "counter-ads" does not salvage its arguments. The Mast testimony is irrelevant to the scope of the forum and does not undermine the evidence of King County's actual practice of imposing practically no restrictions on political speech until faced with the public response to SeaMAC's message.

Even if the District Court was correct in determining as a matter of law that King County created and maintained a proper limited public forum, genuine disputes regarding the reasonableness and the viewpoint neutrality of the decision to exclude SeaMAC's message from that forum should have precluded summary judgment.

10

## II.  KING COUNTY FAILS TO OFFER A VIEWPOINT-NEUTRAL BASIS CONSISTENT WITH FIRST AMENDMENT PRINCIPLES FOR EXCLUDING SEAMAC'S MESSAGE

### A. Access to a Government-Created Forum Open to Political Speech, Cannot be Denied Pursuant to a Majority Vote or a Heckler's Veto

King County implicitly takes the position that it was entitled to exclude SeaMAC's ad because it was allegedly offensive to a majority of King County residents. Second Brief, p. 8 ("the overwhelming majority of the feedback regarding the ad was negative"); ER 57 ("I was most impressed by the quantity as opposed to the specifics of the contacts, because the quantity far outweighed the quantities we had received in the past"); ER 202 ("the volume and content of complaints about the SeaMAC Ad exceeded the scope of any prior response to advertisements"). King County also distinguishes SeaMAC's ad from previous ads addressing the same subject matter based on the quantity of complaints received by King County. Second Brief, p. 8 ("[t]he volume . . . of complaints were unprecedented"). Even assuming that this evidence could support an inference that a majority of King County residents objected to SeaMAC's message, King County could not constitutionally exclude SeaMAC's message by giving effect to a public referendum or heckler's veto. Reno v. ACLU, 521 U.S. 844, 880 (1997) (striking provision that allowed heckler's veto). As the Supreme Court noted in Board of Regents v. Southworth:

[t]he whole theory of viewpoint neutrality is that minority views are treated

11

with the same respect as are majority views. Access to a public forum, for instance, does not depend upon majoritarian consent.

529 U.S. 217, 235 (2000); see also Lebron v. Nat'l R.R. Passenger Corp (Amtrak), 69 F.3d 650, 658 (2d Cir. 1995) ("if . . . a policy were used to screen out only controversial political advertisements – that is, political advertisements distasteful to the majority—it would be void for viewpoint bias").[1]

King County alternatively argues that even if only a minority of King County residents or bus-riders found SeaMAC's ad sufficiently offensive, the threat of violence from these individuals justified the exclusion of SeaMAC's message from the forum. However, the government may not censor speech based on fear of crowd hostility. In Forsyth County v. The Nationalist Movement the Supreme Court invalidated a permitting scheme that allowed the administrators to factor in the audience's hostility in setting the amount of the permit fee. 505 U.S.

---

[1] Boos v. Barry, 485 U.S. 312 (1988), does not require a different conclusion. King County latches on to a passing statement from Justice O'Connor's opinion in Boos to argue that "a restriction based on listener-reaction is not inherently viewpoint discriminatory." Second Brief, p. 34. Given that resolution of the viewpoint-neutrality issue was not necessary to rule in favor of the petitioners, Justice O'Connor's passing statement (in a portion of the opinion joined only by Justices Stevens and Scalia) is dicta. See Boos, 485 U.S. at 319. Even if it were relevant here, the restriction in Boos arguably provided greater protection against viewpoint discrimination by tethering the restriction in that case to the policies of foreign governments. See id. at 318-19. In contrast, Sections 6.4(D) and (E) merely reference public objection, turning the statute into a free-floating instrument for a majority referendum or a heckler's veto.

123, 135 (2000). The Court identified several problems with that permitting statute, including the overly broad discretion it vested in the hands of government officials and the lack of objective standards. Id. at 134-35. However, the key holding of Forsyth is that audience hostility is not a valid governmental interest and cannot be the basis for restricting speech: "Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." Id. See also Terminiello v. Chicago, 337 U.S. 1, 3, 5 (1949) (restricting speaker that drew "angry and turbulent" crowd of more than one thousand violated the First Amendment).

King County's argument that it was justified in censoring SeaMAC's message because it was concerned about a hostile response from the public may have a certain surface appeal, but must ultimately be rejected. As the Supreme Court noted in Forsyth, a government decision to censor or otherwise penalize speech may not be based on its assessment of public hostility because "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." Forsyth, 505 U.S. at 131 (internal quotation marks omitted); see also Chicago Acorn v. Metro. Pier and Exposition Auth., 150 F. 3d 695, 701 (7th Cir. 1998) (citing Forsyth County and rejecting the government's argument that it may discriminate in terms of access to a forum based on favorable publicity

because: "[s]uch a policy would be a form of the heckler's veto").[2]

King County also misapplies First Amendment law in suggesting that the "secondary effects" doctrine can justify censorship of SeaMAC's political message. As the Supreme Court clearly stated in R.A.V. v. City of St. Paul, "[l]isteners' reactions to speech are not the type of 'secondary effects'" that can justify restrictions on certain types of protected expression. R.A.V. v. City of St. Paul, 505 U.S. 377, 394 (1992) (citing Boos v. Barry, 485 U.S. 312 (1988)). Indeed, as directly relevant to this case the Court stated, "[t]he emotive impact of speech on its audience is not a 'secondary effect.'" Id. King County does not, and cannot, point to any supposed secondary effects of SeaMAC's message independent of the public's reaction to SeaMAC's message. See, e.g., Second Brief, p. 11 (photos reflected the "depth of feelings about the ad"). The sole basis to exclude the message was the supposed offensiveness from the audience standpoint, and this is clearly not a secondary effect that renders King County's decision viewpoint-neutral.

---

[2] Even if there were some set of facts upon which a public response to protected political expression created a real threat to public safety could justify excluding speech from a government-created forum, as discussed below, this case presents genuine disputes regarding whether those facts existed, precluding summary judgment.

**B. King County Cannot Rely on its Business Interests to Effect a Public Referendum on Speech**

King County next argues that "[c]ommon-sense requires that the government have greater latitude to consider listener reaction when it is acting in a commercial and common carrier capacity . . . ." Second Brief, p. 33. This view has been repeatedly rejected. The time for a transit agency to avoid the concerns associated with listener reaction is when it first creates legitimate, categorical, subject-matter restrictions in its forum policy. The means of accomplishing this is not a mystery: in Lehman v. Shaker Heights, the transit authority set a policy excluding all political speech. 418 U.S. 298, 300-301 (1974). In Children of the Rosary v. Phoenix, the transit agency set a policy excluding all political and religious speech. 154 F.3d 972, 976 (9th Cir. 1998).

Where agencies fail to establish clear categorical exclusions in advance of opening the forum, courts have rejected agency attempts to censor particular messages based on their possible effect on the agency's commercial interests. United Food, 163 F.3d at 361-62 (transit agency could not exclude pro-union ad from transit ad forum open to political advertising out of concern for the agency's "ability to attract and maintain its ridership"); Air Line Pilots Ass'n, 45 F.3d at 1161 ("right to ban advertisements that would offend or undermine commercial interests . . . rapidly devolves into a form of viewpoint-based discrimination");

15

Lebron, 69 F.3d at 658 ("if . . . a policy were used to screen out . . . political

advertisements distasteful to the majority . . . it would be void for viewpoint bias").

    The Seventh Circuit's decision in Chicago Acorn, which held that the

Metropolitan Pier and Exposition Authority could not vary its rental rates based on

potential adverse publicity generated by the users, is directly on point. 150 F. 3d at

701. ("Although the principle barring discrimination in favor of popular [political

messages] may make it more difficult . . . to maximize its profits . . . nowhere is it

written that government, when it embarks on essentially commercial ventures, is

entitled to the same freedom of action as private venturers."). King County

characterizes Chicago Acorn as involving the use of "political criteria to decide

who may use [the government] facilities." Second Brief, p. 37. However, the

Seventh Circuit explicitly noted that the record did *not* contain any evidence of

such discrimination. Chicago Acorn, 150 F.3d at 699 As in this case, in Chicago

Acorn, the government tried to justify regulation of access to the forum based on

economic concerns, and publicity and spillover effects, which were in turn related

to the government's economic justification. Id. at 700. The Seventh Circuit (citing

to Forsyth) concluded that this was not permitted under the First Amendment, even

though the government's "motive may indeed be innocently commercial rather

than invidiously political." Id. at 700-01("MPEA may not . . . employ political

criteria to decide who may use its facilities and on what terms, *even if they are not*

16

*public forums in even the most limited sense*") (emphasis added)). The court rested its conclusion on the fact that the city's financial justification could not be separated from political criteria which was based on listener reaction. King County's economic justification, whether in the form of maintaining ridership or expending resources to deal with the supposed risks from SeaMAC's ad, is thus not a viewpoint neutral basis to justify exclusion of SeaMAC's message.[3]

### C. Sections 6.4(D) and (E) Could not be Applied Here in a Viewpoint Neutral Fashion because They Lack Objective Criteria

King County relies on this Court's decision in <u>Hopper</u> and on the First Circuit's decision in <u>Ridley</u> to argue that: (1) it is not excluding "controversial" speech; and (2) its policy is akin to that approved in <u>Ridley</u>. Neither case supports King County's position.

### 1. Restrictions on "controversial" speech are inherently suspect as permitting viewpoint discrimination.

<u>Hopper</u>, casts serious doubt upon whether a vague restriction on "controversial" material could ever permissibly define the bounds of a limited public forum. <u>Hopper</u>, 241 F.3d at 1079 ("ban on 'controversial art' may all too

---

[3] As a factual matter, this argument is also inconsistent with the position King County took when it received complaints in response to a previous ad, also on the Mid-East conflict ("STOP THE SEIGE OF GAZA"). ER 12-15 (email from Ms. Shinbo acknowledging that "each of us will occasionally find text or graphics . . . in advertising [on King County Metro buses] to be offensive . . . but [King County's advertising program] has provided as much as $7.25 million in one year to help fund transportation services . . . .").

easily lend itself to viewpoint discrimination, a practice forbidden even in limited public fora"); see also United Food, 163 F.3d at 362 ("an ad's controversy often is inseparable from the viewpoint it conveys").[4] Sections 6.4(D) and (E) do not simply limit controversial speech, but purport to exclude speech that is so controversial that it generates a reaction from the public.

King County repeatedly justifies the exclusion of SeaMAC's ad based on the "unprecedented response" and threats from members of the public. Second Brief, p. 53. But this is not an objective standard. King County makes no attempt to quantify this response or articulate exactly what level of public response is necessary to fit a controversial but otherwise acceptable message into Sections 6.4(D) and (E). In an era where technological advancement allows for internet activism and organized email advocacy (as King County admits occurred in this case), approximately 6000 emails from unknown sources were apparently sufficient for King County to conclude that SeaMAC's ad was "too objectionable" by community standards. Would 5000, or 4000 emails have been sufficient? King

---

[4] King County mischaracterizes SeaMAC's viewpoint discrimination arguments as a facial challenge to King County's advertising restrictions, and argues that these "late-blooming arguments" have been waived. Second Brief, p. 21-32. This is incorrect. SeaMAC does not bring a facial challenge to Sections 6.4(D) and (E). SeaMAC argued in the District Court, as it argues in this Court, that Sections 4(D) and (E) fail to constrain the administrators' discretion and present an impermissible risk of viewpoint discrimination that was realized in this case. SER 303-04.

County's metric opens the door for unbridled discretion. This was precisely the problem in Hopper, where this Court warned that an agency's assessment of after-the-fact public reaction "would [be] based solely on opinions volunteered, a sample size likely weighted toward those voicing complaints." Hopper, 241 F.3d at 1080, n.13; see also Forsyth, 505 U.S. at 134.

Here, Sections 6.4(D) and (E) create additional risk of viewpoint discrimination by attempting to exclude only a subset of controversial material—material that is *so* controversial that it might engender a disruptive reaction. The line between what is controversial but acceptable within the forum and what is so controversial that it warrants exclusion is drawn by the government's assessment of the likely disruption from the public. This is not an appropriate standard under the First Amendment in a forum opened broadly to political speech. Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); Forsyth, 505 U.S. at 134 (invalidating permitting statute where the "fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content"); Hopper, 241 F.3d at 1079 ("The fact that society may find speech offensive is not a sufficient reason for suppressing it . . . .") (quoting Federal Commc'n Corp. v. Pacifica Found., 438 U.S. 726, 745-46

19

(1978)).

**2. Unlike in <u>Ridley</u>, King County's policies include no objective criteria to guide discretion and prevent viewpoint discrimination.**

The policy at issue in <u>Ridley</u> excluded any advertisement that "contains material that demeans or disparages an individual or group of individuals." 390 F.3d at 90-91. As the First Circuit noted, the regulation excluded all demeaning speech equally—no advertiser could use this type of speech. <u>Id.</u> In contrast to the regulation in <u>Ridley</u>, King County's regulation does not exclude all material that is "objectionable," or "insulting, degrading, or offensive." Section 6.4(D) excludes only material that is "so objectionable" to the community that displaying it will make it likely a disruption will occur. ER 02. Section 6.4(E) similarly prohibits only material directed at a person or group that is "so offensive, insulting, or degrading" that it is likely to "*incite or produce* imminent lawless action." ER 02 (emphasis added).

In <u>Ridley</u> the First Circuit noted that the hypothetical "'reasonable person' referenced in the [agency's] guidelines . . . does not belong to any particular religious group, and would protect minority, as well as majority religious beliefs from language that would 'demean or disparage' them." 390 F.3d at 91. The government official charged with determining which ads fit within the policy could determine from the face of the proposed ad whether it was acceptable or not. That official need not measure actual or anticipated public response. This is in sharp

contrast to Sections 6.4(D) and (E), both as written and as applied by King County in this case.

It is not difficult to see why King County's standard threatens to exclude unpopular (minority) viewpoints while voting to include popular (majority) viewpoints. Those views that are most controversial will generate the most reaction while those that are mainstream will be accepted. See Hopper, 241 F.3d at 1080, n.12. This effects viewpoint discrimination that is anathema to the First Amendment. R.A.V., 505 U.S. at 392 ("The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content.").

The record amply supports the conclusion that this is what happened here. A review of the *text* of SeaMAC's message led to conclusion at the highest levels (including by Executive Constantine) that it did not violate these provisions. In ultimately excluding SeaMAC's ad, King County looked to community reaction, and nothing more, to determine that the material in SeaMAC's message had become too objectionable or offensive to be included within the forum. King County's decision to exclude SeaMAC's ad was thus based entirely on disagreement with the view it expressed.

## D. Viewpoint Discrimination Does not Require Discriminatory Animus

King County proposes a view of viewpoint discrimination that is cramped and

21

at odds with First Amendment law. King County argues that to prove viewpoint discrimination SeaMAC is required to make a showing that "the government's actions are motivated by the same viewpoint animus as the listeners," or that King County "selectively enforce[d] . . . boundaries because [it] oppose[d] [SeaMAC's] specific motivating ideology, opinion, or perspective." Second Brief, p. 36; 51. This is incorrect. In Arizona Life Coalition Inc. v. Stanton, this Court held that an agency committed viewpoint discrimination when it excluded a message out of a desire to avoid taking sides in a controversial issue because that decision was clearly "based on the nature of the message." 515 F.3d 956, 972 (9th Cir. 2008). Similarly, Forsyth held that a government violates the First Amendment when it gives effect to the public's objection to a message, regardless of any benign motivation on the part of the government. Forsyth, 505 U.S. at 134-35; see also Board of Regents, 529 U.S. at 235 (finding a possibility of a public referendum leading to viewpoint discrimination regardless of lack of evidence of viewpoint animus on the part of the University officials); AIDS Action Comm. of Massachusetts v. MBTA, 42 F.3d 1, 36 (1st Cir.1994) ("[r]egardless of actual motivation, grave damage is done if the government, in regulating access to public property, even appears to be discriminating in an unconstitutional fashion"). Under these cases, King County's decision to censor SeaMAC's political message cannot be shielded from scrutiny simply because individual county officials may not have

22

personally taken issue with SeaMAC's message. Government censorship of

otherwise permissible speech in response to a public outcry is an equally insidious

form of viewpoint discrimination.

### III.  KING COUNTY'S PROPOSED REASONABLENESS STANDARD DOES NOT ADEQUATELY GUARD AGASINT VIEWPOINT DISCRIMINATION

#### A. Because King County's Policy Contained no Categorical Restrictions like those in <u>Lehman</u>, <u>Children of the Rosary</u> or <u>Cogswell</u>, a Relaxed Reasonableness Standard is Inappropriate

King County admits that "[n]othing in Metro's policy prohibited advertising

content about the Middle East or any other 'controversial' issues." Second Brief, p.

52. It is undisputed that when King County officials reviewed the text of

SeaMAC's message they found nothing in it that was prohibited by the policy. ER

185 (Shinbo); ER 48 (Desmond); ER 42 (Constantine). Yet, King County insists

that its policy is analogous to the policies with broad categorical restrictions on

"any political or public issue advertising" in <u>Lehman</u>, 418 U.S. at 300-301, and on

"political and religious advertising" in <u>Children of the Rosary</u>, 154 F.3d at 976. It

is not. Nor is King County's policy analogous to the more narrowly drawn

categorical restriction at issue in <u>Cogswell v. Seattle</u>, 347 F.3d 809, 814 (9th Cir.

2003) (exclusion of all candidate mention of opponents in voters' pamphlets). In

<u>Cogswell</u>, the rules for the voters' pamphlets did not allow *any* speech regarding

other candidates. <u>Id.</u> at 816. By making this categorical restriction, the rule avoided

the risk of viewpoint discrimination presented when a government official is tasked with determining whether a particular critical message is acceptable while another is not, or equally problematically, measuring voter response to determine acceptability.

King County did not make the same choices as did the agencies in <u>Lehman,</u> <u>Children of the Rosary</u> or <u>Cogswell</u>; it did not choose to *categorically* exclude potentially controversial *subject areas* of expression in advance. These cases therefore do not support King County's position that its decision to exclude SeaMAC's ad should be viewed through the lens of reasonableness. <u>Cf.</u> <u>Chicago</u> <u>Acorn</u>, 150 F.3d at 701 (agency could "as the <u>Lehman</u> and <u>Cornelius</u> cases make clear, adopt a blanket rule barring the use of its meeting rooms for political events").

As this Court's decision in <u>Cogswell</u> illustrates, the reasonableness question at play in limited public forum cases is whether the restrictions defined by the government are reasonable "in the context of the forum's intended purpose." <u>Id.</u> at 817. It does not apply to the question of whether a particular message addresses a topic included within the subject matter of the limited public forum. <u>See also</u> <u>id.</u> at 815 (analyzing whether message fit within scope of forum without any reference to a reasonableness standard). Even if the parameters of the forum are reasonable as a general matter, when an agency excludes a particular message from a limited

24

public forum in spite of the fact that the message itself complies with those

parameters, that agency acts "unreasonably in violation of the First Amendment."

Arizona Life Coal., 515 F.3d at 973; see also id. at 972 ('CHOOSE LIFE' license

plate must be included within the forum because the statute did not "prohibit

speech related to abortion . . . [or] create objective criteria for limiting

'controversial' material").

Because SeaMAC's message addressed matters within the scope of King

County's bus ad forum, see Second Brief, p.52, King County's decision to exclude

it from that forum must be reviewable under something more than the deferential

reasonableness standard proposed by King County.

**B. King County's Expressed Intent to "Avoid Taking Sides on a Debate" is Prima Facie Viewpoint Discrimination and Not Entitled to a Relaxed Standard of Review**

Surprisingly, King County continues to argue that its decision to censor

SeaMAC's message was indisputably reasonable and viewpoint neutral because it

was motivated by a desire to avoid taking sides on a controversial topic. Both in its

initial explanation of its decision to censor SeaMAC's message and in its brief in

this Court, King County expressly offers the justification that King County

excluded SeaMAC's message in large part because it feared the messages that

opposing groups would want to run, and therefore "declined to take a side in the

debate between SeaMAC and the Counter-Ad proponents." ER 2; Second Brief, p.

25

37. Yet, as this Court said in <u>Arizona Life Coalition</u>, once a government opens a forum to political speech, viewpoint discrimination occurs where the government prevents a speaker from "expressing its viewpoint out of a fear that other groups would express opposing views." <u>Ariz. Life Coal.</u>, 515 F.3d at 972 ("Preventing Life Coalition from expressing its viewpoint out of a fear that other groups would express opposing views seems to be a clear form of viewpoint discrimination."). Ample evidence supports the conclusion that a desire to avoid taking sides motivated, at least in part, King County's decision to censor SeaMAC. This should have precluded summary judgment.

### C. King County's Proposed Reasonableness Standard Would Undermine First Amendment Protection in the Bus Ad Forum

King County's position as to the standard of review leaves little protection for the First Amendment rights of speakers in its bus advertising forum. King County insists that its determination of whether a particular message is or has become too "objectionable" for its bus ad forum can be reviewed only for "reasonableness."  Under the view King County proposes, any time it receives what appear to be threats regarding any advertisement on a bus (or in any other forum for that matter) King County can make the "reasonable" determination to exclude the otherwise permissible ad. Ninth Circuit and Supreme Court cases dealing with speech on limited public forums do not envision such a relaxed standard of review. <u>See</u> <u>Norse v. Santa Cruz</u>, 629 F.3d 966, 978 (9th Cir. 2010);

<u>Sammartano v. First Judicial District Court</u>, 303 F. 3d 959, 966-67 (9th Cir. 2002); <u>see also Tinker v. Des Moines Ind. Cmty. Sch. Dist.</u>, 393 U.S. 503, 508 (1969) ("undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression"). Other courts reviewing exclusion of messages from transit ad forums have also rejected such a relaxed standard of review. <u>United Food</u>, 163 F.3d at 357 (citing cases and explaining, "courts must remain free to engage in an independent determination of whether the government's rules and its application of its rules are reasonably related to the government's policy objectives").

Nor is King County's position consistent with the rule requiring courts to independently examine the record where First Amendment freedoms are involved. <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 501 (1984); <u>United Food</u>, 163 F.3d at 357 ("deferring to the subject determinations of state officials . . . would leave First Amendment rights with little protection"). Indeed, King County seeks to inject an extra level of deference to its determination, phrasing the question as whether King County's forecast as to reasonable foreseeability was reasonable. <u>Cf. White v. Norwalk</u>, 900 F.2d 142, 1426 (9th Cir. 1990) (construing a statute to allow removal from a public meeting only where speech "disrupts, disturbs or otherwise impedes the orderly conduct of the Council meeting"). King County's proposed standard would render judicial review of King County's

27

determination to selectively allow or exclude particular political messages from its

bus ad forum essentially meaningless.

## IV. EVEN UNDER THE REASONABLENESS STANDARD, FACTUAL DISPUTES PRECLUDED THE GRANT OF SUMMARY JUDGMENT

### A. The Evidence Underlying the Threats and Safety Concerns Lend Themselves to Competing Inferences

King County argues that several undisputed facts supported the District

Court's finding that King County's decision was reasonable: (1) the

communications from the public, including purported threats of violence and

disruption; (2) law enforcement recommendations; and (3) the concerns of

operators. Second Brief, pp. 47-48. However, a fact finder could conclude that

King County's decision does not withstand even the most relaxed version of

reasonableness review (i.e., whether it was reasonable for King County to conclude

that it was reasonably foreseeable that SeaMAC's message would engender

violence or disruption). When the various categories of evidence that King County

relies on are peeled away, at bottom, King County's decision to censor core

political speech was premised on messages from the public which in King

County's view tended to indicate a threat of disruption or violence. One key factual

question is whether the various messages expressed an intent to disrupt King

County buses (or reasonably could be read as expressing such an intent), or rather

28

were merely designed to intimidate King County into excluding SeaMAC's ad.

Nothing in the evidence relied on by King County dispels this factual dispute.

### 1. Competing inferences can be drawn as to whether the communications that King County received pointed to a threat of disruption or violence.

The bulk of the communications King County relies on were received via email, many came from out-of-state senders, and most were never reviewed by County employees. ER 28; 50. The content of most of the emails was unknown to King County, ER 218, but there is no dispute that its employees recognized many of the messages to be part of an organized campaign that opposed SeaMAC's message. ER 50-51. While a trier of fact could find that the receipt of a high volume of email messages might have been sufficient evidence that disruption would occur if SeaMAC's message ran, this is not a proper basis to exclude speech from a forum, nor is it the only reasonable inference that could be drawn from that evidence. See Hopper, 241 F.3d at 1080, n.13 (noting the sample pool of comments likely to be weighted toward those with complaints about expression). Moreover, there is evidence that many of those messages were tailored to respond to King County's public statements that it could exclude SeaMAC's message if the public expressed an intent to disrupt King County buses. SER 516 ("you just 'incited' ME to anger all the way from Austin, Texas") (internal quotation in original); SER 522; SER 526 ("I think I will organize a 'riot' at your bus stops") (internal quotation in original).

29

There was admittedly public dissension over SeaMAC's ad, but other than a few communications which expressed vehement opposition, nothing in King County's evidence shows that this public debate would have resulted in violence if SeaMAC's ads were run. In fact, KING5 conducted an online poll, the results of which were received by the County, and the poll showed general community support for running SeaMAC's message. ER 22. It bears noting that SeaMAC's message was also reviewed by multiple King County representatives (a Titan representative, King County's internal reviewers, Executive Constantine, and others from the Executive and Transit Departments) without a single individual concluding that SeaMAC's message was too offensive or objectionable to run on the buses. ER 185; 42; 48. When viewed in the light most favorable to SeaMAC, the evidence supports the conclusion that these messages could have been part of a campaign to pressure King County and nothing more.

King County also relies heavily on the photographs that it received, and which are reproduced in its brief. These photographs lend themselves to the same competing inferences—they may be viewed as expressions of intent to commit disruption or violence, or they may be viewed as an attempt to intimidate King County into censoring SeaMAC's ad. The record contains evidence that King County did not view these photographs as real threats, thus strengthening the view that they were merely part of a campaign of intimidation, intended to effect

30

censorship. <u>See</u> Second Brief, p. 11.

**2. The law enforcement recommendations do not compel the conclusion that it was reasonable not to run SeaMAC's ad.**

King County's argument that it reasonably relied on statements and advice from law enforcement in its decision to censor SeaMAC's message is undercut by the actual recommendations in question. The first recommendation relied on by King County was from the United States Attorney for the Western District of Washington (Ms. Jenny Durkan). However, as Executive Constantine's testimony makes clear, Ms. Durkan declined to make a recommendation regarding the SeaMAC ad. ER 87; 90; 204. Ms. Durkan's statements should not be considered at all in resolving the factual issue regarding the import of the messages that King County received.

The second recommendation cited by King County was from King County Sheriff Susan Rahr. However, Sheriff Rahr: (1) did not review the communications King County received; and (2) only made a general statement to not run the ad due to concerns about people overreacting. ER 190. Sheriff Rahr's recommendation was not based on any of the purportedly threatening communications King County relies on to argue that public reaction to SeaMAC's ad justified its exclusion. ER 91, 95.

In addition, SeaMAC presented the testimony of a veteran law enforcement officer, who actually reviewed the communications in question, and opined that

none of them rose to the level where objective law enforcement standards would point to a threat of violence. ER 76-77; 80. <u>See</u> <u>also</u> ER 54 (there were no "case reports that were being actively investigated as a result of a phone call or a message"). At the very least, there is a dispute of material fact as to whether King County reasonably could have believed these recommendations provided a basis to censor SeaMAC's message.

### 3.  The alleged safety concerns of transit operators are equivocal at best.

King County also argues that its decision to censor SeaMAC's message was reasonable in part because it was based on safety concerns expressed by transit operators. The only evidence in the record expressing safety concerns on the part of drivers is second-hand testimony from Paul Bachtel, the transit operators' union president. While Mr. Bachtel purported to speak on behalf of the Union, other members of the Union disagreed with Mr. Bachtel's opposition to SeaMAC's ad. These members faulted Mr. Bachtel for taking a stance on behalf of the Union without engaging in a dialogue with all of the Union membership. ER 140-42. Mr. Bachtel also revealed his own possible political bias when—in sharp contrast to Ms. Shinbo, Ms. Quadros, Mr. Desmond, and Executive Constantine— he described SeaMAC's message as "the most inflammatory thing [he] had ever seen proposed to be placed on the side of a Metro bus." SER 369-70. Bachtel's statement about driver safety is subject to two possible interpretations: (1) many

32

transit operators expressed legitimate safety concerns; or (2) Mr. Bachtel opposed SeaMAC's message and this colored his perspective about whether transit operators truly had safety concerns regarding SeaMAC's ad.

Moreover, nothing in the record indicates that King County attempted to separate political opposition to SeaMAC's ad from genuine expressions of concern over safety. Political opposition to an ad is not a valid basis under Union rules for refusing to drive a King County bus (ER 58), and also is not a legitimate basis for excluding SeaMAC's message. King County's failure to distinguish between legitimate safety concerns and political opposition undercuts its claims that there was a threat of disruption from drivers who feared for their safety. Finally, King County ignores the Metro operations plan which was put in place to address legitimate safety concerns from drivers. ER 31; SER 385. Instead, the County relied on a general statement *from Mr. Bachtel* that drivers feared for their safety. King County's reliance on generalized concerns presented by Mr. Bachtel, is particularly problematic given that King County had previously run advertisements that "raised the hackles of union members," resulting in protests in the form of work stoppages and defacements. ER 33.

Weighing the credibility of witnesses and drawing inferences from the evidence is the job for a fact-finder, not a court on summary judgment. The disputed evidence and competing inferences that can be drawn from the facts

behind King County's asserted basis for excluding SeaMAC's message should

have precluded summary judgment.

**B. Comparator Evidence Presented by SeaMAC Created a Material Factual Dispute**

SeaMAC also presented comparator evidence that King County treated

SeaMAC's ad differently from other similarly situated ads, giving rise to an

inference of viewpoint discrimination. Pittsburgh League of Young Voters Educ.

Fund v. Port Authority of Allegheny County, 653 F.3d 290, 298 (3d Cir. 2011)

(concluding, in regard to three ads that all sought to educate the public on similar

issues, "[t]he suspicion of viewpoint discrimination is fortified by the high degree

of similarity between the [rejected] ad and the comparator ads"). King County does

not dispute that it accepted other advertising that addressed the "Middle East

Debate."  Second Brief, p. 53. Those other ads, like SeaMAC's urged the public to

consider one perspective on that issue. King County fails to point to evidence in

the record sufficient to dispel a factual dispute as to King County's disparate

treatment of SeaMAC's ad *vis-a-vis* other advertisements about Mid-East political

affairs. Indeed, the primary excuse that King County offers to explain its

differential treatment of SeaMAC's ad (the quantity and tenor of the messages

which King County received in response to SeaMAC's ad) amounts to nothing

more than evidence that the public objected to SeaMAC's viewpoint, and King

County gave effect to this public veto. This is not a proper basis to exclude

34

SeaMAC's message from the forum. See Section II, above.

King County also attempts to distinguish SeaMAC's message from the Jewish Federation's ad that previously ran on Metro buses by claiming that the Jewish Federation ad, unlike SeaMAC's, did not "contain an express accusation against a specific person or group." Second Brief, p. 53. However, as set forth in SeaMAC's opening brief, this distinction borders on the incredulous. The unstated premise behind King County's position is that any statement attacking the policies of the State of Israel constitutes an attack on its citizens or on Jewish people. This is unsupported by the facts, and a reasonable trier of fact could easily find that SeaMAC's ad does not attack a group of people, but instead takes a position on a disputed political issue, in much the same way the Jewish Federation's ad did. SeaMAC's message is no different from saying that a particular foreign government engaged in human rights abuses and therefore people should not buy products from that country. If anything, the subtext of the Jewish Federation ad goes farther, accusing Palestinians of being terrorists. ER 167 ("Remember Israel's soldiers and victims of terror"). Indeed, King County's own brief implicitly admits this, by noting that SeaMAC's ad "accused *Israel* of war crimes and [stated] that Americans were financing those international criminal actions." Second Brief, p. 53 (emphasis added).

35

The view—that SeaMAC's ad attacked the citizens of Israel or Jewish people generally—is something that a viewer may subjectively ascribe to SeaMAC's ad, but is not an objective basis to distinguish SeaMAC's from the prior ads. See Thomas v. Collins, 323 U.S. 516, 535 (1945). The similarities between the comparator ads and the competing inferences that can be drawn from those similarities should preclude summary judgment.

## V. THE CHANGED CIRCUMSTANCES DOCTRINE DOES NOT WARRANT DENIAL OF SEAMAC'S REQUEST FOR INJUNCTIVE RELIEF

The Court should decline to assess King County's argument, not properly raised below, that changed circumstances warrant denial of the requested injunctive relief. In the event that the Court finds the District Court erred in granting King County's request for summary judgment, King County's changed circumstances argument should be left to the District Court to address in the first instance.

Resolution of King County's changed circumstances argument thus requires a more fully developed record. King County admits that it amended its policy since its December 23, 2011 decision to exclude SeaMAC's ad. Second Brief, p. 55; SER 288. Yet King County fails to offer evidence of the current parameters of its bus ad forum. Because King County raised this issue in only in reply in support of its summary judgment motion, SeaMAC has not had an opportunity to offer

36

evidence on this point. It is not necessary for this Court to determine the availability of injunctive relief at this juncture, since SeaMAC's entitlement to *some* relief in the event it proves a First Amendment violation is not in dispute (including, at a minimum, nominal damages and declaratory relief). Accordingly, the Court should not address King County's argument on changed circumstances.

## VI.   KING COUNTY IS NOT ENTITLED TO RELIEF ON ITS APPEAL OF THE JURY DEMAND ISSUE

### A. This Court Lacks Appellate Jurisdiction Over the Jury Demand Ruling

A decision as to whether a litigant is entitled to a jury trial is not immediately appealable. See Lurie v. Blackwell (In re Popkin & Stern), 105 F.3d 1248, 1250 (8th Cir. 1997) (court lacks jurisdiction because "bankruptcy court order denying debtor's demand for a jury trial is not a final order"); Germain v. Connecticut Nat'l Bank, 930 F.2d 1038, 1039 (2d Cir. 1991) ("order denying a motion to strike a demand for jury trial is obviously not a final decision that disposes of the case"). The fact that the District Court issued a final order in this case (granting summary judgment in favor of King County) does not turn the jury demand ruling into an appealable issue. "An appeal from a final judgment draws in question all earlier, non-final orders and rulings *which produced the judgment*." Litchfield v. Spielberg, 736 F.2d 1352, 1355 (9th Cir. 1984) (emphasis added); Akin v. Pafec Ltd., 991 F.2d 1550, 1563 (11th Cir. 1993) (same). The Eleventh Circuit's decision in Akin provides a helpful illustration of this rule. In that case, as

37

here, the district court dismissed the case against defendants on summary judgment. <u>Akin</u>, 991 F.2d at 1563. Plaintiffs appealed the final judgment and also sought to appeal an earlier ruling on a jury trial demand. However, the Eleventh Circuit explained that it lacked jurisdiction over the appeal of the jury demand issue because "the jury issues . . . were in effect pretermitted by the entry of final judgment" and therefore "played no role" in the final judgment. <u>Id.</u> Because the District Court granted King County's request for summary judgment, concluding that SeaMAC was not entitled to any trial, its decision to allow SeaMAC to proceed in front of a jury on its amended claims played no part in the final judgment. Therefore, the District Court jury demand ruling is not appealable at this juncture.

Resolution of the jury demand issue is also not appealable as a collateral order, under which an otherwise unappealable order is considered final if "(1) conclusively determine[s] the disputed question"; (2) "resolve[s] an important issue completely separate from the merits of the action"; and (3) would effectively be "unreviewable on appeal from a final judgment." <u>Rodriguez v. Lockheed Martin Corp.</u>, 627 F.3d 1259, 1264 (9th Cir. 2010). A grant of a request for a jury trial does not fall in this category because it can be corrected following trial (on appeal). <u>See</u> <u>Germain</u>, 930 F.2d at 1040 (order denying motion to strike jury demand not reviewable as a collateral order because it can be effectively reviewed on appeal of

the final judgment following trial). Under the doctrine of pendent appellate jurisdiction, this Court may exercise jurisdiction over an otherwise non-appealable order where the issues are "inextricably intertwined" or are "necessary to ensure meaningful review" of an issue that is properly before the Court. Ruud v. United States Dep't of Licensing, 347 F.3d 1086, 1089 (9th Cir. 2003). Neither scenario is present here. See also Akin, 991 F.2d at 1563 (declining to exercise pendent appellate jurisdiction over jury trial issue). Pendent appellate jurisdiction is thus not proper with respect to the jury demand ruling.

## B. SeaMAC Timely Asserted its Jury Demand by Including it in the First Pleading Directed to an Issue Triable of Right by a Jury

Rule 38 of the Federal Rules of Civil Procedure provides that "[o]n *any issue triable of right by a jury*, a party may demand a jury trial" by serving a demand "no later than fourteen days after the last pleading directed to *the issue* is served." Fed. R. Civ. P. 38(b) (emphasis added). There is no right to a jury trial where a party asserts purely equitable claims under section 1983. See Del Monte Dunes at Monterey, Ltd. v. Monterey, 95 F.3d 1422, 1427 (9th Cir. 1996) ("section 1983 gives aggrieved parties the right to bring an "action at law" or a "suit in equity," right to jury attaches to claims "at law"); see also Keller v. Prince George's Cnty, 827 F.2d 952, 955-56 (4th Cir. 1987) (noting that when a Title VII or § 1983 trial is limited to equitable relief, no jury trial is available). Because SeaMAC asserted only claims for equitable relief in its original complaint, neither SeaMAC's

39

original complaint, nor King County's answer to that complaint was directed to "any issue triable of right by a jury." Cf. Fed. R. Civ. P. 38(b).

Within the deadline set by the District Court's scheduling order for filing of amended pleadings, SeaMAC filed a motion to amend its complaint to add a claim for money damages and assert its right to a jury trial. SER 442-446. SeaMAC's claims for monetary damages triggered its right to a jury trial, and consistent with Rule 38(b)(1), SeaMAC included its jury demand in the amended complaint. SER 413. Accordingly, SeaMAC's demand for a jury trial, which was asserted concurrently with the first pleading directed to any issue triable of right by jury (its amended complaint), was timely. Fed. R. Civ. P. 38. King County's sole argument to the contrary is simply mistaken.

Courts faced with circumstances like those here have recognized the distinction between equitable and monetary relief and held that a jury demand is timely under Rule 38 when asserted in conjunction with an amended complaint that adds a claim for monetary damages to a complaint initially seeking equitable relief. See Bereslavsky v. Caffey, 161 F.2d 499, 499-500 (2d Cir. 1947) (plaintiff who originally sought relief in equity but amended complaint to seek a remedy at law may assert a jury demand in the amended complaint); see also Allied Indus.Workers v. Gen. Elec. Co., 471 F.2d 751, 755 (6th Cir. 1973) (noting that a jury demand is timely where the original complaint sought injunctive relief, but

40

"the amended complaint requested additional relief in the form of money damages and was triable by jury as a matter of right").

    In contrast, none of the cases cited by King County address the situation presented here. In each of those cases, the courts were confronted with amended pleadings that asserted new legal theories for recovery, not ones that first asserted a claim for monetary (as opposed to equitable) relief. See Lutz v. Glendale Union High Sch., 403 F.3d 1061, 1064 (9th Cir. 2005) (original complaint included claims under the American Disabilities Act for various forms of relief, including compensatory damages; amended complaint added claims under additional statutes); Las Vegas Sun, Inc. v. Summa Corp., 610 F.2d 614, 615 (9th Cir. 1979) (original complaint included claims under the Sherman Act for monetary damages and injunctive relief; amended complaint added claims under the Clayton Act); Trixler Brokerage Co. v. Ralston Purina Co., 505 F.2d 1045, 1047, 1049-50 (9th Cir. 1974) (original complaint included claims under the Sherman Act, and for bad faith, breach of contract and misrepresentation; amended complaint added two new claims which at most, clarified the prior claims). Because SeaMAC requested a jury trial at the same time that it first asserted a claim triable of right by a jury, King County's argument that SeaMAC could not "revive" a right already waived does not make sense.

    Even assuming that SeaMAC's jury demand was untimely, the District

41

Court could have exercised its discretion under Fed. R. Civ. P. 39(b) to grant

SeaMAC's request. Kletzelman v. Capristano Unified Sch. Dist., 91 F.3d 68, 71

(9th Cir. 1995). A trial court's discretion in this regard is limited, and does not

extend to a failure to make a timely demand due to mistake or inadvertence. Pacific

Fisheries Corp. v. HIH Cas. & Gen. Ins., Ltd., 239 F.3d 1000, 1002 (9th Cir.

2001). Here, SeaMAC's request for a jury demand was not included in its original

complaint because it was not entitled to a jury trial on the claims asserted in the

complaint. In these circumstances, SeaMAC's failure to initially request a demand

was not a result of inadvertence or mistake. Accordingly, the District Court could

have exercised its discretion to grant SeaMAC's request for a jury trial under Rule

39(b).

## **CONCLUSION**

The District Court's ruling granting King County's request for summary

judgment should be reversed. King County allowed controversial and political

advertising in the forum but excluded SeaMAC's ad under vague policy standards

that left the definition of what is appropriate in the hands of the majority of King

County residents or those who most vocally protested. Allowing King County to

exclude SeaMAC's ad based on the threat from hecklers is particularly problematic

because it has no logical stopping point. Affirming the District Court's judgment

would allow people to exclude expression from the bus ad forum, or any forum, by

threatening disruption or violence. The First Amendment does not permit hecklers who threaten violence to silence speakers, whether in a public or a private forum. Sanctioning the behavior of government entities who acquiesce to these threats will merely encourage similar threats in the future.

This Court should not address King County's argument on changed circumstances, and it should dismiss for lack of jurisdiction or deny relief on King County's jury demand appeal.

Respectfully submitted, and dated April 11, 2012.

/s Venkat Balasubramani

VENKAT BALASUBRAMANI
Focal PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
Telephone: (206) 529-4827

JEFFREY C. GRANT
Skellenger Bender, P.S.
1301 5th Ave # 3401
Seattle, WA 98101
Telephone: (206) 623-6501

Cooperating Attorneys for ACLU of Washington Foundation

SARAH A. DUNNE
VANESSA T. HERNANDEZ
M. ROSE SPIDELL
LA ROND MARIE BAKER

43

Attorneys
ACLU of Washington Foundation
901 5th Avenue, Suite 630
Seattle, WA 98164-2008
Telephone: (206) 624-2184


Attorneys for Plaintiff Seattle Mideast
Awareness Campaign

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 28.1(e)(2)(A)(i) for case numbers 11-35914 & 11-35931, I certify that the attached Response and Reply Brief is:

☒ Proportionately spaced, has a typeface of 14 points or more and contains 10,206 words.

/s Venkat Balasubramani

VENKAT BALASUBRAMANI
Focal PLLC
800 Fifth Avenue, Suite 4100
Seattle, WA 98104
Telephone: (206) 529-4827

JEFFREY C. GRANT
Skellenger Bender, P.S.
1301 5th Ave # 3401
Seattle, WA 98101
Telephone: (206) 623-6501

Cooperating Attorneys for ACLU of
Washington Foundation

SARAH A. DUNNE
VANESSA T. HERNANDEZ
M. ROSE SPIDELL
LA ROND MARIE BAKER
Attorneys
ACLU of Washington Foundation
901 5th Avenue, Suite 630
Seattle, WA 98164-2008
Telephone: (206) 624-2184

Attorneys for Plaintiff Seattle Mideast
Awareness Campaign

45

## <u>CERTIFICATE OF SERVICE</u>

U.S. Court of Appeals Docket Numbers: <u>11-35914 & 11-35931</u>

I hereby certify that I electronically filed Appellant/Cross-Appellee SeaMAC's Response and Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 11, 2012.

I certify that all counsel for Appellee King County are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature:    /s Venkat Balasubramani_____