

Venkat Balasubramani<br>
*venkat@focallaw.com*<br>
206.529.4827

**FILED BY CM/ECF**

October 17, 2012

Molly C. Dwyer, Clerk of Court
United States Court of Appeals for the Ninth Circuit
95 7th Street,
San Francisco, CA 94103

   Re: <u>Seattle Mideast Awareness Campaign (SeaMAC) v. King County</u>, Nos. 11-35914 & 11-35931 (citation of supplemental authority pursuant to Rule 28(j))

Ms. Dwyer:

Appellant SeaMAC submits as supplemental authority the attached decision in <u>American Freedom Defense Initiative v. Washington Metro. Area Transit Auth.</u>, No. 12-1564, 2012 U.S. Dist. LEXIS 147052 (RMC) (D.D.C. Oct. 12, 2012) (<u>AFDI</u>).

In <u>AFDI</u>, the Washington Metropolitan Area Transit Authority (WMATA) accepted AFDI's ad, but decided to postpone display of the ad based on advice from the Department of Homeland Security and the Transportation Security Administration. The text of AFDI's ad read "IN ANY WAR BETWEEN THE CIVILIZED MAN AND THE SAVAGE, SUPPORT THE CIVILIZED MAN. SUPPORT ISRAEL. DEFEAT JIHAD." As the court noted, AFDI's ad was currently displayed on public buses in San Francisco and subway stations in New York City. <u>AFDI</u>, slip op. at 3. The court held that AFDI's ad did not constitute fighting words and therefore was protected speech. <u>Id.</u> at 9. Judge Collyer further held that WMATA's decision to restrict AFDI's message was a content-based restriction and subject to strict scrutiny. <u>Id.</u> at 12. While the court found that the interest in passenger and employee safety was a compelling one, the court ruled that WMATA's decision to postpone display of the ad was not narrowly tailored to serve this interest. <u>Id.</u> at 14-15.

Judge Collyer's ruling supports SeaMAC's arguments in its Opening Brief (at pp. 40-43) and Third Brief (at pp. 23-26) that the District Court should not have employed a deferential reasonableness standard to review King County's decision to exclude

800 Fifth Avenue, Suite 4100, Seattle, WA 98104  |  Fax: 206.260.3966  |  info@focallaw.com

www.focallaw.com

*Rule 28(j) Citation of Supplemental Authority*
*October 17, 2012 – Page 2*

SeaMAC's ad, and supports reversal of the District Court's grant of summary judgment in favor of King County.

Sincerely,

s/ Venkat Balasubramani
VENKAT BALASUBRAMANI
**Focal PLLC**

JEFFREY C. GRANT
**Skellenger Bender, P.S.**

SARAH A. DUNNE
LA ROND MARIE BAKER
**ACLU of Washington Foundation**

**Attorneys for Appellant-Cross Appellee, Seattle Mideast Awareness Campaign**

cc:    Counsel for Appellee-Cross Appellant, King County (via e-filing)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FREEDOM DEFENSE INITIATIVE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 12-1564 (RMC) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## OPINION

Plaintiffs contracted with the Washington Metropolitan Area Transit Authority ("WMATA") to display an advertisement in four 43 x 62 inch dioramas on subway platforms. The ads state:

**IN ANY WAR BETWEEN THE CIVILIZED MAN AND THE SAVAGE,**

**SUPPORT THE CIVILIZED MAN.**

**SUPPORT ISRAEL.**

**DEFEAT JIHAD.**

The ads were to be displayed for approximately one month starting on September 24, 2012. Before that date, however, an American-made movie trailer that disgraced the Prophet Mohammad went viral on the Internet and caused large and dangerous anti-American demonstrations across multiple continents. Advised by the Department of Homeland Security ("DHS") to be wary of a risk of violence in the United States and abroad in response to the

1

video, warned by the Transportation Security Administration ("TSA") that the Metro subway is a unique target for terrorist attacks, and knowledgeable about previous threats to the Metro subway, WMATA advised Plaintiffs that it would postpone display of their ad. Plaintiffs promptly sued. The matter proceeded to hearing on Plaintiffs' motion for a preliminary injunction on October 4, 2012.[1]

It cannot be said that WMATA acted unreasonably in considering the degree of anti-American anger roiling the Muslim world, previous threats to the subway system, the immediate advice from DHS and TSA, and its paramount responsibility to the safety of its passengers, when it decided to postpone display of Plaintiffs' advertisement. In the face of protected speech, which the Court finds is a combination of political speech in favor of Israel and hate speech directed to Muslims, WMATA certainly presents a compelling government interest in the safety of its passengers and employees. However, its concerns – no matter how rational – were prompted by the content of Plaintiffs' advertisement. And, even if WMATA's concerns were sufficiently compelling to support a content-based restriction on speech, the Court concludes that WMATA's failure to consider alternative placements plus the open-ended and purely subjective duration of its postponement were not narrowly tailored as required.

The Court therefore ordered WMATA to display Plaintiffs' ad no later than 5 p.m. on Monday, October 8, 2012. *See* [Dkt. 16]. This Opinion explains its rationale. The parties have requested that the Court enter a permanent injunction and a final ruling with this Opinion, which it will do.

---

[1] Plaintiffs initially sought a temporary restraining order but withdrew that petition when counsels' schedules would not allow an immediate hearing.

2

## I.  FACTS

Plaintiff American Freedom Defense Initiative ("AFDI") is an advocacy organization whose self-described mission is to "go on the public relations offensive when . . . actions are taken to dismantle our basic freedoms and values."  Am. Compl. [Dkt. 9] ¶ 7.  Plaintiff AFDI purchases advertising space on transit authority property in major cities in the United States to express its message on Islam, sharia, Israel, and the Middle East.  Plaintiff Pamela Geller is the Executive Director of AFDI, and Plaintiff Robert Spencer is the Associate Director.  Plaintiffs brought this suit against Richard Sarles, the General Manager and Chief Executive Officer of WMATA.[2]

Sometime before September 6, 2012, Plaintiffs submitted their advertisement to WMATA.  *See* Opp'n [Dkt. 13], Ex. H ("AFDI Ad").  The text of the message is emphasized by the use of white, blue, and red color, in turn, for each sentence.   The same ad ran already on public buses in San Francisco and, after months of litigation, began running in subway stations in New York City on September 24, 2012.  *See Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, No. 11 Civ. 6774, 2012 WL 2958178 (S.D.N.Y. July 20, 2012).  Plaintiffs proposed to move their messages to Washington, D.C., by displaying the ad on four free-standing dioramas on WMATA subway platforms.  That location provides a venue for large ads that are illuminated and, therefore, quite prominent.  *See* Opp'n, Ex. I ("Ad Agreement").

WMATA previously has accepted advertisements on controversial subjects and does not deny that it is a government actor to which the First Amendment applies.  *See* Opp'n, Exs. B-G (examples of ads posted in WMATA advertising space covering a wide-range of

---

[2] Established through an Interstate Compact to provide public transportation in the D.C. metropolitan area, WMATA cannot be sued directly.  Having initially brought suit against WMATA, Plaintiffs amended their Complaint to substitute Mr. Sarles in his official capacity as the defendant.  This Opinion uses "WMATA" to refer to both WMATA and Mr. Sarles.

political and public issues). When CBS Outdoor, WMATA's advertising agency, notified WMATA of the controversial nature of the ad, WMATA's Office of General Counsel reviewed the ad, noted its First Amendment protections, and authorized its display. *See* Opp'n, Murray Aff. ¶¶ 7-8. On September 6, 2012, Plaintiffs executed a contract with CBS Outdoor to display the ads from September 24, 2012 until October 21, 2012. *See* Ad Agreement. All of this occurred before violence erupted abroad in response to the American-made amateur movie trailer ("video") that depicted the Prophet Mohammad in scandalous ways.

The 14-minute video provoked anti-American demonstrations from Africa to the Middle East and Indonesia and, notably, appeared to have provided cover for a terrorist attack on the U.S. consulate in Benghazi, Libya, on September 11, 2012, that took the lives of four Americans, including the Ambassador.[3] In light of these escalating events, WMATA evaluated the safety risks of running the ad. WMATA contacted TSA, which expressed its concern about running the ad at the scheduled time because the D.C. Metro could become an even greater target for terrorist attacks given recent world events. *See* Opp'n, Taborn Aff. ¶ 8 ("The TSA Officials were concerned that WMATA's Metrorail system is a unique target because of its close association with the federal government, both because so many stations are located adjacent to landmark federal facilities and because the Metrorail system carries such a high percentage of the federal workforce resident in this area to work on a daily basis."). WMATA also received an official federal communique issued by DHS warning of the risk of violence in the United States and abroad in response to the video. *See* Opp'n, Ex. K ("Fed. Communique (Under Seal)"). WMATA decided to delay posting the ad due to these security concerns.

---

[3] When first reported, the U.S. State Department attributed the attack in Benghazi entirely to the movie trailer, not terrorists – as with an earlier attack on the same day on the embassy in Egypt.

4

Plaintiffs received an email on September 18, 2012, from CBS Outdoor stating that "due to the situations happening around the world at this time," the posting of the ads would be postponed until "a future date to be determined." *See* Opp'n, Ex. M ("Marcus Email"). Plaintiffs demanded that WMATA run the ads but CBS Outdoor confirmed, "Metro is not refusing to run the ad, they are merely deferring it due to world events and a concern for the security of their passengers." *See id.* The Court finds that as of September 18, when WMATA notified Plaintiffs' of the postponement of their ad, the scope and duration of the escalating anti-American demonstrations were very unclear. Additionally, shortly after WMATA postponed Plaintiffs' ad, it received an email threatening damage to Metro property and disruption to train and bus routes if the ad were displayed. *See* Opp'n, Ex. L ("Threat").

Plaintiffs alleged that WMATA deprived them of their right to engage in protected speech in a public forum in violation of the First Amendment.[4] Plaintiffs asserted that the decision to postpone display of the ad was content-based and failed to satisfy strict constitutional scrutiny.[5] The Court granted Plaintiffs' motion on October 5 and ordered WMATA to post Plaintiffs' ads no later than 5 p.m. on October 8, 2012.

## II. LEGAL STANDARD

A district court may grant a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. Of Tex. v. Camenisch*, 451

---

[4] The Complaint also alleges a violation of Plaintiffs' constitutional rights to equal protection of the laws but their motion and argument focused entirely on the alleged First Amendment violation.

[5] The Complaint contends that WMATA's restriction was also viewpoint-based but because the Court concludes that the restriction on the ad is based on its subject matter, it need not reach the issue of viewpoint discrimination. *See Carey v. Brown*, 447 U.S. 455, 462 n.6 (1980) ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." (internal quotation marks and citation omitted)).

U.S. 390, 395 (1981). An injunction is an equitable remedy so its issuance is one which falls within the sound discretion of the district court. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). A plaintiff seeking a preliminary injunction must establish that:

> (a) he is likely to succeed on the merits;
>
> (b) he is likely to suffer irreparable harm in the absence of preliminary relief;
>
> (c) the balance of equities tips in his favor; and
>
> (d) an injunction is in the public interest.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The D.C. Circuit has further instructed that "the movant has the burden to show that all four factors . . . weigh in favor of the injunction." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

In the past, courts have balanced the four factors on a "sliding scale," *i.e.*, a lesser showing on one factor could be surmounted by a greater showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005). *Winter* called this approach into question: "[i]ssuing a preliminary injunction based only on a *possibility* of irreparable harm [despite a strong likelihood of success on the merits] is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis added). The D.C. Circuit has interpreted *Winter* to require a positive showing on all four preliminary injunction factors. *See Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

Plaintiffs claimed that WMATA's decision to delay posting Plaintiffs' ad restricted their speech based on its content in violation of the First Amendment. WMATA

6

responded that Plaintiffs' ad is not protected by the First Amendment because it constitutes "fighting words." In the alternative, WMATA argued that if Plaintiffs' ad is protected speech, its restriction was content-neutral and a reasonable time, place, and manner restriction. To determine Plaintiffs' likelihood of success on the merits, the Court must consider: (1) whether Plaintiffs' ad is speech protected by the First Amendment, (2) whether the forum is public or nonpublic, and (3) whether the justifications for the restriction satisfy the requisite standard. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985). Since WMATA conceded that it provides a public forum for advertising, the Court considers that aspect of the standard satisfied.[6]

### 1. Plaintiffs' Ad Is Protected Speech

Plaintiffs' ad contains elements of both political and hate speech. The phrase "Support Israel" certainly sends a political message. The remainder of the ad, however, sends an anti-Muslim message, as it equates *all* Muslims with "savages."[7] It is unnecessary to decide whether the advertisement is predominantly one type of speech or the other, because on these facts, the First Amendment protects speech from government intrusion in either case. While

---

[6] When a state actor opens public property for "expressive activity," "it is bound by the same standards as apply in a traditional public forum." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). "[A] content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Id.* at 46. Having opened public property for such activity, a state actor remains free to end its open character if it chooses to do so. *Id.* The D.C. Circuit has previously held that "there [is no] question that WMATA has converted its subway stations into public fora by accepting other political advertising." *Lebron v. WMATA*, 749 F.2d 893, 896 (D.C. Cir. 1984).

[7] In court, Plaintiffs' counsel attempted to limit the ad to "savage" terrorist attacks. Such a limitation does not reflect the ad's anti-Muslim message that sweeps widely.

7

political speech receives the highest form of protection under the First Amendment,[8] hate speech also can receive First Amendment protections. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 396 (1992) ("Let there be no mistake about our belief that burning a cross in someone's front yard is reprehensible. But St. Paul has sufficient means at its disposal to prevent such behavior without adding the First Amendment to the fire."); *Brandenburg v. Ohio*, 395 U.S. 444, 448-49 (1969) (per curiam) (protecting racist speech that constituted "mere advocacy *not distinguished from incitement to imminent lawless action*" (emphasis added)). Additionally, WMATA imposed a prior restraint because it prevented Plaintiffs from displaying their ad in WMATA stations; a prior restraint "bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also Lebron*, 749 F.2d at 896 ("Because WMATA, a government agency, tried to prevent Mr. Lebron from exhibiting his poster in advance of actual expression, WMATA's action can be characterized as a 'prior restraint . . . .'" (internal quotation marks and citations omitted)).

WMATA asserted that Plaintiffs' ad constitutes "fighting words" and therefore falls in an unprotected category of speech. *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942), carved out "fighting words" as a category of speech unprotected by the First Amendment.[9] Fighting words include "the insulting or 'fighting' words – those which by their very utterance

---

[8] *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.") (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)); *Lebron*, 749 F.2d at 896 (D.C. Cir. 1984) (affording First Amendment protections to an ad critical of the Reagan administration).

[9] The words in question in *Chaplinsky* were uttered on the public street "with force and arms . . . addressed to the complainant . . . 'You are a God damned racketeer' and 'a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists.'" *Chaplinsky*, 315 U.S. at 569 (internal quotation marks omitted).

8

inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572. *Chaplinksy* addressed a state law that the New Hampshire Supreme Court had limited by interpretation to "do[] no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker." *Id.* at 573. Since *Chaplinsky*, the Court has further narrowed the nature of unprotected "fighting words" to speech that is "directed to the person of the hearer" and likely to evoke a violent response. *Cohen v. California*, 403 U.S. 15, 20 (1971) (internal quotation marks and citation omitted);[10] *see also Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 774 (1994) (holding that "[a]bsent evidence that the [antiabortion] protesters' speech is independently proscribable (*i.e.*, 'fighting words' or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm," a ban on all uninvited approaches to persons coming to a clinic could not stand (citation omitted)). As a message communicated in advertising space, Plaintiffs' speech does not meet the Court's description of this category of unprotected speech.

### 2. WMATA's Restriction Fails to Meet Strict Scrutiny

The analysis of a restriction on speech in a public forum depends, in the first instance, on whether the restriction is based on the message itself ("content-based") or based on a concern that exists irrespective of the message ("content-neutral"). A content-based restriction must meet strict constitutional scrutiny to stand, *i.e.*, the restriction must be "necessary to serve a compelling state interest . . . [and be] narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45. In contrast, reasonable time, place, or manner restrictions on expression can be imposed

---

[10] Although the Supreme Court has never overruled *Chaplinksy*, it has not upheld a fighting words conviction since that decision. *See Erwin Chemerinsky, Constitutional Law* 1002 (3d ed. 2006). The Court has either found laws prohibiting fighting words to be unconstitutionally vague or overbroad or in the case of laws prohibiting *some* fighting words, has invalidated them as impermissible content-based restrictions of speech. *Id.*

9

when a restriction is content-neutral, provided that any restriction is narrowly tailored to serve a significant government interest and leaves open ample alternative channels for communication. *Id.*; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The parties disputed whether the restriction in this case was content-based or content-neutral.

Plaintiffs contended that WMATA restricted their speech "based on the subjective belief that others might object to Plaintiffs' message" and thereby acted purely because of its message. Pls.' Mot. for Prelim. Inj. [Dkt. 2] at 11. There is no doubt that content-based restrictions can rarely pass constitutional review although the language of the Supreme Court has varied over time from flat-out prohibition to a presumption against restriction and a recognition that some government interests may presumably be "sufficiently 'compelling' to support a content-based restriction on speech." *Boos v. Barry*, 485 U.S. 312, 324 (1988). *Compare Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ( "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"), *with R.A.V.*, 505 U.S. at 382 ("Content-based regulations are presumptively invalid."). Further, when a restriction on speech is content-based, the burden is on the government to prove that the restriction is the least restrictive alternative to achieve its compelling interest. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665-68 (2004) (finding that filtering software would be less restrictive and possibly more effective than barriers to adult free speech imposed by the Child Online Protection Act that sought to regulate the Internet). Neither party points to a case concerning a content-based restriction where the Supreme Court concluded that the government had a compelling interest *and* the restriction could be approved because it was sufficiently narrowly tailored.

10

WMATA claimed that its delay of Plaintiffs' ads was content-neutral, based on "situations happening around the world at this time" and "due to world events and a concern for the security of their passengers," without regard to the content of the ads. The argument misreads the Supreme Court's definition of a content-neutral restriction. In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Court described "'content-neutral' speech regulations as those that 'are *justified* without reference to the content of the regulated speech.'" *Id.* at 48 (citation omitted). In *Renton*, the Court concluded that a regulation on the location of adult motion picture theaters was content-neutral because it was aimed at the secondary effects of such theaters – specifically to "prevent crime, protect the city's retail trade, maintain property values, and generally [protect and preserve neighborhoods]" – and was neutral to the content of the films themselves. *Id.* at 48. In the instant situation, WMATA had rational concerns associated with displaying Plaintiffs' ads *because* their content could add fuel to escalating anti-American and terrorist activities, thus endangering the Metro system and its passengers. The direct connection between the content of Plaintiffs' ad and WMATA's fears of an attack on the subway is clearly demonstrated by WMATA's earlier recognition of the First Amendment protections at issue when its General Counsel authorized posting the ads. *See Boos*, 485 U.S. at 321 (concluding that a D.C. statute's restriction on speech was content-based because the "justification focuses *only* on the content of the speech and the direct impact that speech has on its listeners"); *see also Madsen*, 512 U.S. at 763 ("Our principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.'" (quoting *Ward*, 491 U.S. at 791)).

WMATA argued that *Madsen* shows that a restriction can be "content-neutral" even when it is necessary to ascertain the content of a communication in order to enforce a court

11

order.  *Madsen* challenged a court injunction which placed time, place, and manner restrictions on demonstrations by antiabortion protesters outside a health clinic that performed abortions. "[T]he state court imposed restrictions on petitioners incidental to their antiabortion message because they repeatedly violated the court's original order," *id.* at 763, which had enjoined blocking public access to the clinic or physically abusing persons entering or leaving the clinic. *Id.* at 758.  The broadened injunction under review by the Supreme Court addressed petitioners' actions and only incidentally their speech.  Thus, *Madsen* is distinguishable from WMATA's prior restriction on speech.

Because the delay in displaying Plaintiffs' ad constituted a content-based restriction, WMATA must demonstrate that it was "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end."  *Perry*, 460 U.S. at 45; *see also Boos*, 485 U.S. at 321.  In this regard, WMATA bears the same burden of proof that would apply at trial. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). ("[T]he burdens at the preliminary injunction stage track the burdens at trial.").  Accordingly, WMATA must establish that its content-based restriction meets strict scrutiny.  *See Ashcroft*, 542 U.S. at 666.

WMATA posited the safety of its passengers and its employees as the compelling interest which justifies its temporary restriction on Plaintiffs' speech.  Specifically, WMATA cited two ways in which the ad could threaten public safety:  (1) inter-passenger disputes on subway platforms that could result in passengers falling into the tracks or (2) a terrorist attack. Neither of these concerns is directly based on the potential offense felt by a viewer of the ad but, instead, is based on the consequences to the subway system that might occur as a result of that offense.  Without disagreement from Plaintiffs, WMATA noted that "[t]he Metrorail system is

12

an extremely porous system, with multiple entry points, many of which are unmonitored for periods of time throughout the hours of revenue service." *See* Taborn Aff. ¶ 7. Additionally, "its close association with the federal government" makes it a "unique target" for terrorist attacks. *Id.* ¶ 8. And, while Plaintiffs denigrated the seriousness of such warnings, there is no dispute that WMATA received notice from DHS to be wary of anti-American violence in the United States because of the video and that TSA expressed concern regarding posting Plaintiffs' ad on September 24 as scheduled.

    Given the above, the Court easily concludes that WMATA's concern for the safety of its passengers and employees constituted a compelling government interest. Thus, it becomes necessary to address the last element of the analysis and determine whether WMATA's chosen restriction was narrowly drawn to serve this interest. *Perry*, 460 U.S. at 45. "[T]he restriction must be the 'least restrictive means among available, effective alternatives.'" *United States v. Alvarez*, 132 S. Ct. 2537, 2551 (2012) (quoting *Ashcroft*, 542 U.S. at 666). "The First Amendment requires that the Government's chosen restriction on the speech at issue be 'actually necessary' to achieve its interest." *Id.* at 2549 (citation omitted). WMATA argued that "[t]here [were] no less restrictive content-neutral means to prevent the AFDI Ad from inciting violence and endangering the public." Opp'n at 33. The Court disagrees.

    WMATA's concern for passenger safety from inter-passenger disputes recognized the risk that passengers on its subway platforms could fall down into the energized tracks. However, it could serve its compelling interest in the safety of passengers on subway platforms by placing Plaintiffs' ads elsewhere. While, indeed, the contract was for advertising in the illuminated dioramas on subway platforms, a content-neutral and less restrictive answer to

13

concerns about disputes on the platforms would surely have been to put the ads elsewhere in one of WMATA's numerous other advertising venues.

Not insensibly, WMATA noted that its second compelling interest lay in protecting the Metro system generally and its concerns with Plaintiffs' ads extended to the entire system. But WMATA's approach to addressing this concern, albeit compelling, failed to be narrowly drawn. WMATA could have decided to distance itself from Plaintiffs' sentiments with accompanying statements and/or advertisements which conveyed its disagreement and explained its constitutional obligations. Most particularly, WMATA provided no sensible timeframe after which the delay would expire. Initially, WMATA told Plaintiffs that their ads would be postponed until "a future date to be determined." In its papers in court, WMATA modified its position and promised to conduct a reassessment and "run the advertisement beginning on November 1, unless the reassessment demonstrates a verified likelihood of an attack against United States transit systems relating to the video." Tabborn Aff. ¶ 11. Such an open-ended and subjective standard for the delay of Plaintiffs' ad was not the least restrictive means of serving WMATA's compelling interest.

The First Amendment protects obnoxious and offensive speech; some might say that the Amendment's protections are needed more strongly for such speech than otherwise. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." (alteration in original) (internal quotation mark and citation omitted)). WMATA, however, could rest on its compelling safety concerns to limit these protections but *only* to restrict Plaintiffs' speech in the least degree necessary to achieve its purpose. Daily verification

14

through federal government sources of the nature and imminence of any threat would have assured a delay no longer than truly necessary. In its original form, WMATA assumed the unilateral right to decide how much interference it could impose on Plaintiffs' First Amendment rights. In its modified form, WMATA set a comfortable but arbitrary timeline, not tied to the waxing or waning of anti-American sentiment or danger and not based on any objective evaluation of necessity. *See Ashcroft*, 542 U.S. at 666 ("The purpose of the test is to ensure that speech is restricted no further than necessary to achieve the goal, for it is important to ensure that legitimate speech is not chilled or punished.").

Although WMATA has provided the Court with a compelling interest in public safety under the circumstances, it has not used the least restrictive means of serving this interest. Plaintiffs are therefore likely to succeed on the merits of their claim.

### B. Irreparable Harm

Plaintiffs cite *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion), and simply claim victory. *Elrod* proclaimed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373 (Brennan, J.).

> [The D.C. Circuit] has construed *Elrod* to require movants to do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong . . . moving parties must also establish they are or will be engaging in constitutionally protected behavior to demonstrate that the allegedly impermissible government action would chill allowable individual conduct.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006). Whether the plurality opinion in *Elrod* would find close adherents on the Court today, in light of the more recent caselaw cited above, is unclear. *See, e.g.*, *Alvarez*, 132 S. Ct. at 2549 (a restriction on speech that is "actually necessary" and relies on "a direct causal link between the restriction imposed and the injury to be prevented" might be approved); *id.* at 2556-57 (Alito, J., dissenting)

15

("The statute reaches only knowingly false statements about hard facts directly within a speaker's personal knowledge. These lies have no value in and of themselves, and proscribing them does not chill any valuable speech.").

Regardless, Plaintiffs have demonstrated that their "First Amendment interests [were] either threatened or in fact being impaired at the time relief [was] sought." *Nat'l Treas. Emps. Union v. United States*, 927 F.2d 1253, 1254-55 (D.C. Cir. 1991) (internal quotation marks and citation omitted); *see also England*, 454 F.3d at 301 ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed.") (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003)). Because the Court concludes that WMATA did not fashion its restriction narrowly to serve its compelling interest as actually necessary, the Court concludes that Plaintiffs have shown irreparable harm that supports the injunction they seek.

### C. Balance of the Equities & the Public Interest

Plaintiffs argued that WMATA would suffer no harm if the Court granted the preliminary injunction because Plaintiffs' exercise of their constitutional rights could not harm WMATA's interests. As to the public interest, Plaintiffs glibly stated that "it is always in the public interest to prevent the violation of a party's constitutional rights." Pls.' Mot. at 15-16 (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). The public in Washington, D.C., that rides the subway daily might not be so easily persuaded. WMATA presented a compelling concern for the safety of its passengers and its system, from individual disputes with calamitous consequences to a terrorist attack. But its means to protect this interest were not the least restrictive necessary to achieve the goal. The Court must balance Plaintiffs' First Amendment right with WMATA's concern for a possible

16

threat to public safety.  "To assess speech in a public forum some balancing may be necessary, but 'the thumb of the [c]ourt [should] be on the speech side of the scales.'" *Lebron*, 749 F.2d at 898 (alterations in original) (internal quotation marks and citation omitted).  Under the facts before the Court, Plaintiffs' First Amendment right prevails.

## IV.  CONCLUSION

For the reasons stated, the Court granted Plaintiffs' Motion for Preliminary Injunction [Dkt. 2] on October 5, 2012.  *See* [Dkt. 16].  At the parties' request, the Court will grant the Joint Motion for Permanent Injunction and Final Ruling on the Merits [Dkt. 17]; therefore Plaintiffs have waived their equal protection claim.

Date:  October 12, 2012                                  /s/
                                           ROSEMARY M. COLLYER
                                           United States District Judge

17

9th Circuit Case Number(s) | 11-35914 & 11-35931

*********************************************************************

# CERTIFICATE OF SERVICE
When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | Oct. 17, 2012 |.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Venkat Balasubramani

*********************************************************************

# CERTIFICATE OF SERVICE
When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | |.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)