**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SEATTLE MIDEAST AWARENESS CAMPAIGN, a Washington non-profit corporation, *Plaintiff-Appellant*, v. KING COUNTY, a municipal corporation, *Defendant-Appellee.* | No. 11-35914 D.C. No. 2:11-cv-00094-RAJ |
| SEATTLE MIDEAST AWARENESS CAMPAIGN, a Washington non-profit corporation, *Plaintiff-Appellee*, v. KING COUNTY, a municipal corporation, *Defendant-Appellant.* | No. 11-35931 D.C. No. 2:11-cv-00094-RAJ OPINION |

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted
October 3, 2012—Spokane, Washington

Filed March 18, 2015

Before: Alex Kozinski, Morgan Christen,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Watford;
Dissent by Judge Christen

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's summary judgment in favor of King County, and dismissed as moot the County's conditional cross appeal in an action brought pursuant to 42 U.S.C. § 1983 by the Seattle Mideast Awareness Campaign alleging a violation of its First Amendment rights.

The Seattle Mideast Awareness Campaign, a non-profit organization whose goal is to bring attention to Israeli-Palestinian relations, proposed to display an advertisement opposing the United States government's financial support for Israel on King County Metro buses in the Seattle metropolitan area. After initially accepting the ad, the County revoked its approval, concluding that displaying the ad would likely result in vandalism and violence disruptive

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to the bus system.  The panel first held that King County created a limited public forum when it opened the sides of Metro buses to advertising from outside speakers.  The panel then held that the County's decision to reject the ad was both reasonable and viewpoint neutral, and thus did not violate the First Amendment.

Dissenting, Judge Christen stated that in her view the County's policy and practice unmistakably demonstrated an intent to create a designated public forum on its Metro bus exteriors.  Judge Christen would remand for the district court to determine in the first instance whether genuine issues of material fact existed under the appropriate level of scrutiny, i.e., whether the County's safety concerns justified cancellation of the ad.

---

## COUNSEL

Venkat Balasubramani (argued), Focal PLLC, Seattle, Washington; Jeffrey C. Grant, Skellenger Bender, P.S., Seattle, Washington; Sarah A. Dunne, Vanessa T. Hernandez, M. Rose Spidell, La Rond Marie Baker, ACLU of Washington Foundation, Seattle, Washington, for Plaintiffs-Appellants.

Endel R. Kolde (argued), Daniel T. Satterberg, Cynthia S.C. Gannett, Jennifer Ritchie, King County Prosecutor's Office, Seattle, Washington, for Defendant-Appellee.

Steven A. Reisler, Steven A. Reisler, PLLC, Seattle, Washington, for Amicus Curiae National Lawyers Guild-Seattle Chapter.

---

## OPINION

WATFORD, Circuit Judge:

The Seattle Mideast Awareness Campaign (SeaMAC) submitted an advertisement to run on King County Metro buses in the Seattle metropolitan area. After initially accepting the ad, the County revoked its approval, concluding that displaying the ad would likely result in vandalism and violence disruptive to the bus system. We are asked to decide whether the County's action violated SeaMAC's First Amendment rights.

I

King County runs Metro, a public mass transit system serving hundreds of thousands of passengers in and around Seattle each day. Metro's mission is to provide safe and reliable transportation for its customers. Like many public transit agencies, Metro helps finance its operations through an advertising program, which allows advertisers to purchase ad space on the exterior of Metro buses.

The County runs Metro's bus advertising program through a contract with Titan Outdoor LLC. The contract contains a policy restricting advertising content. At the time of the events leading to this appeal, that policy prohibited ads for alcohol and tobacco products; ads for adult movies, video games rated for mature audiences, and other adult products and services; ads promoting illegal activity; depictions of minors or those who appear to be minors engaging in sexual activities; ads containing flashing lights or other features that might undermine safe operation of the buses or distract other drivers; and obscene, deceptive, misleading, or defamatory

material.  The policy also contained two "civility clauses," §§ 6.4(D) and 6.4(E).  Together, these clauses prohibited material that would foreseeably result in disruption of the transportation system or incite a response that threatens public safety.[1]

Metro required Titan to enforce these content restrictions by individually pre-screening each ad.  Titan routinely rejected ads that failed to comply with the restrictions, most commonly the prohibition on ads for alcohol and tobacco products.  In close cases, Titan sought guidance from County officials, who then independently reviewed the proposed ad. Before this case, County officials had invoked § 6.4(D) on only one occasion, when they directed Titan to reject a series of ads with messages such as "NAZI MEDICAL ABUSE COMMITTED FOR 15 YEARS; State Hate Committed By Elected Officials & Doctors."

In late 2010, SeaMAC, a non-profit organization opposed to United States support for Israel, proposed a Metro ad that read:

---

[1] Section 6.4(D) prohibited:  "Any material that is so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system."

Section 6.4(E) prohibited:  "Any material directed at a person or group that is so insulting, degrading or offensive as to be reasonably foreseeable that it will incite or produce imminent lawless action in the form of retaliation, vandalism or other breach of public safety, peace and order."

ISRAELI WAR CRIMES
YOUR TAX DOLLARS AT WORK
www.Stop30Billion-Seattle.org

Titan initially approved the ad, but because it considered the ad "controversial," the company sent a copy to County officials, who also approved the ad.  Those officials in turn forwarded the ad to the King County Executive, who agreed that while the ad was controversial, it did not violate Metro's bus advertising policy.  Titan slated the ad to run on 12 Metro buses for four weeks, beginning in the last week of 2010.  SeaMAC's contract with Titan, however, provided that the ad could still be withdrawn if the County disapproved it.

Before the ad ran, a local television station broadcast a news story about the ad's approval, which provoked an unprecedented, hostile response.  Metro's Call Center, accustomed to managing an average of 50 to 80 emails per day, received 6,000 emails over the span of ten days, almost all of them urging the County to pull the ad.  The messages varied in tenor, but several expressed an intent to vandalize buses or disrupt service.  For example, one message said: "AN ATTY WHO SAYS THE SIGNS ARE PERMITTED UNDER THE FIRST AMENDMENT IS FORCING ME TO CONDUCT VIOLENCE JUST TO PROVE THAT I AM REALLY UPSET AT THESE HORRIBLE WORLD WAR2 KINDS OF HATRED SIGNS."  Another stated, "I think I will organize a group to 'riot' at your bus stops."  Metro's Call Center also received a deluge of angry telephone calls.  One repeat caller promised to block a tunnel to stop buses from running, while another said that "Jews would take physical action" to prevent the ads from going up.

A few days after the story ran, photographs depicting dead or injured bus passengers and damaged buses—the aftermath of apparent terrorist attacks—appeared under the door of the Metro Customer Service Center.  The names of County officials and the phrase "NO TO BUS ADS FOR MUSLIM TERRORISTS" were scrawled across them.  The Metro Deputy Director interpreted these photos as "a threat of harm toward Metro or an expression of outrage over the SeaMAC ad, or both."

Not all of the feedback expressed anger.  Many customers expressed safety concerns, fearing, for example, "racially motivated attacks on Jewish and Israeli riders."  The mother of a 13-year-old boy asked whether her son, who wore a yarmulke and rode the bus home from school several times a week, would be able to ride safely.  A blind woman, who relied on the bus system as her only means of transportation, said she agreed with SeaMAC's "agenda," but wanted the ad pulled so she could travel without fear of violence.  Metro bus drivers also expressed safety concerns.  Some refused to drive buses displaying the ad; others asked the union president to stop the ad because they feared it would put them "in harm's way."

As the uproar mounted, Metro employees became unable to read or listen to each message, much less respond to all of them.  Metro officials tried to identify the most disturbing emails and phone calls for purposes of investigation by law enforcement.    This process brought Metro's internal operations to a halt.  The Call Center had to set aside customer inquiries of the more routine sort, while the Deputy Director could not use her flooded email account to do any other work. Metro Transit Police and the Operations Section of Metro began planning for a potentially violent and

disruptive reaction to SeaMAC's ad, a reaction they anticipated would be targeted at buses and their passengers. That threat wasn't covered by the existing security protocol because, as Metro's Operations Manager stated, it represented "a totally new and different situation that we [had not] confronted before." The bus drivers' concerns added to these operational challenges.

Four days after the news story broke (but before SeaMAC's ad was scheduled to run), two pro-Israel groups—the Horowitz Freedom Center (HFC) and the American Freedom Defense Initiative/Stop Islamization of America (AFDI)—entered the fray by submitting their own ads. The HFC ad read:

PALESTINIAN WAR CRIMES
YOUR TAX DOLLARS AT WORK

One version depicted a burning bus, while the other showed injured, bloody passengers in a damaged bus. The AFDI ads contained seven different images, including one of Adolf Hitler, along with the text:

IN ANY WAR BETWEEN THE CIVILIZED MAN AND
THE SAVAGE, SUPPORT THE CIVILIZED MAN.
Support Israel, Defeat Islamic Jihad

SeaMAC's ad, and the counter-ads, were thus pending before the County at the same time.

Shortly thereafter, the King County Sheriff contacted the King County Executive to advise against running the SeaMAC ad. She worried that "buses, and bus-passengers, were vulnerable to spontaneous, emotion driven attacks, like

thrown rocks or bricks." Seeking advice, the County Executive contacted the United States Attorney for the Western District of Washington, who advised caution in light of the fact that public transit systems were "targets of choice" for terrorists.

After unsuccessfully asking SeaMAC to withdraw its proposed ad, the County Executive withdrew his approval of SeaMAC's ad and, at the same time, rejected the HFC and AFDI ads. The County Executive explained that "the context had changed dramatically" and that all of the pending ads on the Israeli-Palestinian conflict were non-compliant with §§ 6.4(D) and 6.4(E). Metro simultaneously revised its advertising policy to exclude all political or ideological ads from that point forward.

SeaMAC sued the County under 42 U.S.C. § 1983, alleging a violation of its First Amendment rights. The district court denied SeaMAC's motion for a preliminary injunction requiring the County to run its ad, and SeaMAC chose not to take an interlocutory appeal. Following discovery, the district court granted the County's motion for summary judgment, reasoning that the County's exclusion of SeaMAC's ad did not violate the First Amendment because Metro's bus advertising program created a limited public forum and the County's decision to exclude the ad was reasonable and viewpoint neutral.

II

SeaMAC contends it has a First Amendment right to use government property—the sides of Metro buses—to promote its message. To resolve that issue, we must first determine

whether the sides of Metro buses are a forum for public expression and, if so, which type of forum.

The parties agree that Metro's bus advertising program creates a forum of some sort, as the County has opened the sides of Metro buses to speakers other than the government itself. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009). The more difficult question is determining which type of forum the County has created. The Supreme Court has classified forums into three categories: traditional public forums, designated public forums, and limited public forums. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee (ISKCON)*, 505 U.S. 672, 678–79 (1992).[2] In traditional and designated public forums, content-based restrictions on speech are prohibited, unless they satisfy strict scrutiny. *Pleasant Grove*, 555 U.S. at 469–70. In limited public forums, content-based restrictions are permissible, as long as they are reasonable and viewpoint neutral. *See id.* at 470.

Metro's bus advertising program isn't a traditional public forum. That category encompasses places like "streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)

---

[2] We will refer to this last category as "limited public forums," *Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010), although in past cases they've sometimes been labeled "nonpublic" forums. *E.g.*, *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998); *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001). The label doesn't matter, because the same level of First Amendment scrutiny applies to all forums that aren't traditional or designated public forums.

(internal quotation marks omitted).  The question, then, is whether Metro's bus advertising program is a designated public forum.  If not, the rules governing limited public forums apply.

The government creates a designated public forum when it intends to make property that hasn't traditionally been open to assembly and debate "generally available" for "expressive use by the general public or by a particular class of speakers." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998).  The defining characteristic of a designated public forum is that it's open to the same "indiscriminate use," *Perry*, 460 U.S. at 47, and "almost unfettered access," *Forbes*, 523 U.S. at 678, that exist in a traditional public forum.  The principal difference between traditional and designated public forums is that the government may close a designated public forum whenever it chooses, but it may not close a traditional public forum to expressive activity altogether.  *Perry*, 460 U.S. at 45–46.  Otherwise, the two are treated the same:  When the government creates a designated public forum by imbuing its property with the "essential attributes of a traditional public forum," *Pleasant Grove*, 555 U.S. at 469, it is "bound by the same standards as apply in a traditional public forum."  *Perry*, 460 U.S. at 46.

To determine whether the government has imbued its property with the essential attributes of a traditional public forum, we focus on the government's intent.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).  The government does not create a designated public forum through inaction or by permitting only limited discourse.  *Id.*  Instead, the government must intend to grant "general access" to its property for expressive use, either by the general public or by a particular class of speakers.

*Forbes*, 523 U.S. at 679; *see also Widmar v. Vincent*, 454 U.S. 263, 267–68 (1981) (designated public forum created for student groups).  In contrast, when the government intends to grant only "selective access," by imposing either speaker-based or subject-matter limitations, it has created a limited public forum.  *Forbes*, 523 U.S. at 679; *Cornelius*, 473 U.S. at 806.

We rely on several factors to gauge the government's intent.  *Cornelius*, 473 U.S. at 802.  We look first to the terms of any policy the government has adopted to govern access to the forum.  *Id.*  If the government requires speakers seeking access to obtain permission, under pre-established guidelines that impose speaker-based or subject-matter limitations, the government generally intends to create a limited, rather than a designated, public forum.  *Forbes*, 523 U.S. at 679–80; *Cornelius*, 473 U.S. at 804; *Perry*, 460 U.S. at 47.  Granting selective access in that fashion negates any suggestion that the government intends to open its property to the "indiscriminate use by all or part of the general public" necessary to create a designated public forum.  *Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1050 (9th Cir. 2003) (per curiam); *see also Forbes*, 523 U.S. at 679; *Perry*, 460 U.S. at 47.

Two other factors help us ascertain the government's intent.  If the government has adopted a policy governing access to the forum, we examine how that policy has been implemented in practice.  *Cornelius*, 473 U.S. at 802.  If the policy requires speakers to obtain permission under guidelines whose terms are routinely ignored, such that in practice permission is granted "as a matter of course to all who seek [it]," the government may have created a designated public forum.  *Perry*, 460 U.S. at 47.  We also take into

account the nature of the government property at issue. *Cornelius*, 473 U.S. at 802. If the property is "designed for and dedicated to expressive activities," *id.* at 802–03, courts will more readily infer the intent to create a designated public forum. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975) (municipal theater). On the other hand, if the property is used primarily as part of a government-run commercial enterprise, and the expressive activities the government permits are only incidental to that use, that fact tends to support finding a limited public forum. *See ISKCON*, 505 U.S. at 682 (airport terminal); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974) (public transit system).

Applying these three factors here, we think it's clear the County intended to create a limited, rather than a designated, public forum. First, the County adopted a formal policy requiring everyone seeking access to Metro's bus advertising program to obtain permission through a pre-screening process. The policy established fixed guidelines that imposed categorical subject-matter limitations, excluding (for example) ads for alcohol and tobacco products and ads for adult-oriented products and services. Collectively, the policy's exclusions indicate that the County intended to grant only "selective access," rather than "almost unfettered access," to its bus advertising program. *Forbes*, 523 U.S. at 678–79.

Second, the County's implementation of the policy confirms its intent to grant only selective access. The record establishes that the County pre-screened all proposed ads and consistently rejected ads that were non-compliant. No evidence suggests that, notwithstanding the formal terms of its policy, the County granted permission "as a matter of

course to all who seek [it]." *Perry*, 460 U.S. at 47. That fact distinguishes this case from *Hopper v. City of Pasco*, 241 F.3d 1067 (9th Cir. 2001), where we held that the city had created a designated public forum for the display of artwork at Pasco's city hall. There, the city "retained no substantive control over the content of the arts program" and had never previously excluded a work for any reason, even though some of the accepted works didn't comply with the city's policy. *Id.* at 1078. Here, in contrast, the undisputed evidence establishes that the County has consistently rejected proposed ads that fail to comply with the bus advertising program's subject-matter limitations. "By consistently limiting ads it saw as in violation of its policy," the County "evidenced its intent not to create a designated public forum." *Ridley v. Massachusetts Bay Transp. Auth.*, 390 F.3d 65, 78 (1st Cir. 2004); *see also Arizona Life Coal. Inc. v. Stanton*, 515 F.3d 956, 970 (9th Cir. 2008).

When analyzing implementation of the County's access policy at this stage of the analysis, we focus on the County's enforcement of the policy as a whole, not just the specific provision invoked to exclude the ads at issue. We are asking whether the forum as a whole is a designated public forum, not whether § 6.4(D) itself has created one. Thus, that the County had rejected proposed ads under § 6.4(D) on only one prior occasion is not determinative. For forum-classification purposes, the relevant question is whether the County has granted generalized access to the forum as a matter of course by routinely accepting even non-compliant ads, notwithstanding the terms of its access policy. No evidence in the record supports that conclusion here.

Finally, the third factor—the nature of the government property—also supports the conclusion that the County

intended to create a limited public forum. The principal purpose of the bus advertising program is to generate revenue for the bus system. The expressive activities the city permits are therefore "incidental to the provision of public transportation," and "a part of the commercial venture." *Lehman*, 418 U.S. at 303 (plurality opinion). As with any business, when the government is engaged in commerce, "allowing certain expressive activity might harm advertising sales or tarnish business reputation." *Hopper*, 241 F.3d at 1081. For that reason, use of the property as part of a commercial enterprise is generally incompatible with granting the public unfettered access for expressive activities. *See Cornelius*, 473 U.S. at 804. We would therefore be reluctant to infer that the County intended to open the sides of Metro buses to all comers absent clear indications of such an intent. *See id.* We find none here.

We thus hold that Metro's bus advertising program is a limited public forum. We recognize that other courts have held that similar transit advertising programs constitute designated public forums.[3] Some of those courts, in our view, mistakenly concluded that if the government opens a forum and is willing to accept political speech, it has necessarily signaled an intent to create a designated public forum. *See, e.g.*, *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998); *Lebron v. Washington Metro. Area Transit Auth.*, 749 F.2d 893, 896 & n.6 (D.C.

---

[3] *See, e.g.*, *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341 (6th Cir. 1998); *Christ's Bride Ministries, Inc. v. Southeastern Penn. Transp. Auth.*, 148 F.3d 242 (3d Cir. 1998); *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123 (2d Cir. 1998); *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225 (7th Cir. 1985); *Lebron v. Washington Metro. Area Transit Auth.*, 749 F.2d 893 (D.C. Cir. 1984).

Cir. 1984). Neither the First Amendment nor the Supreme Court's public forum precedents impose that categorical rule. Any such rule would undermine the Court's efforts to "encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all." *Forbes*, 523 U.S. at 680. Municipalities faced with the prospect of having to accept virtually all political speech if they accept any—regardless of the level of disruption caused—will simply close the forum to political speech altogether. First Amendment interests would not be furthered by putting municipalities to that all-or-nothing choice. Doing so would "result in less speech, not more"—exactly what the Court's public forum precedents seek to avoid. *Id.*

Our holding that the sides of Metro buses are a limited public forum does not mean the government may impose whatever arbitrary or discriminatory restrictions on speech it desires. As discussed in the next section, for the period in which the government elects to keep open the limited public forum, any subject-matter or speaker-based limitations must still be reasonable and viewpoint neutral.

III

Having concluded that Metro's bus advertising program is a limited public forum, we must next decide whether the subject-matter limitation invoked to exclude SeaMAC's ad is valid. The County justified exclusion of the ad under §§ 6.4(D) and 6.4(E) of its access policy. We conclude that the County's application of § 6.4(D) was reasonable and viewpoint neutral, and therefore have no occasion to address the validity of § 6.4(E).

A

A subject-matter or speaker-based exclusion must meet two requirements to be reasonable in a limited public forum. First, it must be "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806. This requirement focuses on whether the exclusion is consistent with "limiting [the] forum to activities compatible with the intended purpose of the property." *Perry*, 460 U.S. at 49; *see also DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 967 (9th Cir. 1999). Second, exclusions must be based on a standard that is definite and objective. That requirement has been developed most prominently in the context of time, place, and manner restrictions in traditional public forums, *see, e.g.*, *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 132–33 (1992); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969), but it applies with equal force in this context. *See Hopper*, 241 F.3d at 1077.

Section 6.4(D) meets both requirements. It excludes speech that "is so objectionable under contemporary community standards as to be reasonably foreseeable that it will result in harm to, disruption of, or interference with the transportation system." That exclusion is consistent with limiting the bus advertising program to speech that is "compatible with the intended purpose of the property." *Perry*, 460 U.S. at 49. The intended purpose of the property at issue here—Metro buses—is to provide safe and reliable public transportation. Any speech that will foreseeably result in harm to, disruption of, or interference with the transportation system is, by definition, incompatible with the buses' intended purpose. *See Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 979 (9th Cir. 1998). Restrictions on speech that will foreseeably disrupt the intended function

of government property have generally been held reasonable in limited public forums. *See, e.g.*, *ISKCON*, 505 U.S. at 683–84; *United States v. Kokinda*, 497 U.S. 720, 732–33 (1990) (plurality opinion); *Perry*, 460 U.S. at 51–52 & n.12. We see no justification for refusing to apply that general rule here.

The standard established by § 6.4(D) is also sufficiently definite and objective to prevent arbitrary or discriminatory enforcement by County officials. The Supreme Court has held an analogous standard (albeit one developed in a different First Amendment context) sufficiently definite and objective to pass constitutional muster. In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the Court concluded that school officials may exclude student speech if the speech could reasonably lead to "substantial disruption of or material interference with school activities." *Id.* at 514. That standard is constitutionally adequate to limit the discretion of school officials, the Court later held, because "the prohibited disturbances are easily measured by their impact on the normal activities of the school." *Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972). We think the same can be said of § 6.4(D). Because its standard is tied to disruption of or interference with the normal operations of the transit system, § 6.4(D) supplies courts with a sufficiently definite and objective benchmark against which to judge the "disruption" assessments made by County officials.

We acknowledge that, standing alone, § 6.4(D)'s reference to material that is "objectionable under contemporary community standards" would be too vague and subjective to be constitutionally applied. But, as we observed in *Hopper*, "community standards of decency" may play a

role in the regulation of limited public forums, so long as such standards are "reduced to objective criteria set out in advance." 241 F.3d at 1080. Section 6.4(D)'s ultimate criterion is an objective one: reasonably foreseeable harm to, disruption of, or interference with the transportation system. Thus, we are not left with the specter of a "standardless standard" whose application will be immune from meaningful judicial review. *Id.*

SeaMAC contends that the County's application of § 6.4(D) is unconstitutional because SeaMAC's proposed ad does not actually violate § 6.4(D). In particular, SeaMAC argues that the threat of disruption posed by its ad was merely "speculative," and that the County's attempts to organize a law enforcement response plan indicated any threat could have been "neutralized." We must independently review the record, without deference to the threat assessment made by County officials, to determine whether it "show[s] that the asserted risks were real." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 967 (9th Cir. 2002), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

We agree with the district court that the threat of disruption here was real rather than speculative. The County identified three types of potential disruption, each of which is supported by the record: (1) vandalism, violence, or other acts endangering passengers and preventing the buses from running; (2) reduced ridership because of public fear of such endangerment; and (3) substantial resource diversion from Metro's day-to-day operations. As discussed earlier, the County received numerous threats to vandalize or block Metro buses, which were sufficiently credible to cause Metro to seek the advice of law enforcement. In addition, riders and

drivers threatened not to ride or drive, citing legitimate safety concerns generated by the negative reaction to SeaMAC's proposed ad. And Metro had to divert substantial resources away from its normal day-to-day operations in order to address those safety concerns. Taken together, we think these facts establish that, if permitted to run, SeaMAC's ad would foreseeably have resulted in "harm to, disruption of, or interference with the transportation system," as § 6.4(D) requires.[4]

The record does not support SeaMAC's alternative contention that the threat of disruption could have been neutralized by implementation of a law enforcement response plan. But even if SeaMAC were right on that score, it would not change the outcome. We do not apply a least restrictive means test in this context. *See Sammartano*, 303 F.3d at 967. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. We believe the County's decision to reject SeaMAC's ad was indeed reasonable, given the serious threat of disruption running the ad would have posed.

SeaMAC argues that there are material factual disputes as to the seriousness of the disruption threat, but that argument

---

[4] That the anticipated disruption had not actually materialized by the time the County acted is irrelevant. Section 6.4(D) requires only a "reasonably foreseeable" threat of disruption, a standard that is constitutionally permissible in this context. The government may not manufacture a fear of disruption as a pretext to censor speech it dislikes. But where the threat of disruption is real, the government "need not wait until havoc is wreaked" before excluding potentially disruptive speech from a limited public forum. *Cornelius*, 473 U.S. at 810; *see also Perry*, 460 U.S. at 52 n.12.

misapprehends the summary judgment standard. All agree as to the existence and content of the calls and emails the County received and the operational burdens they imposed. The disputes that exist relate not to the facts, but to the legal conclusions to be drawn from those facts. *See Ridley*, 390 F.3d at 71. The district court correctly concluded that the County's exclusion of SeaMAC's proposed ad was reasonable as a matter of law.

B

In addition to being reasonable, the government's exclusion of speech from a limited public forum must be viewpoint neutral. *Pleasant Grove*, 555 U.S. at 470. On its face, at least, § 6.4(D) is viewpoint neutral: It excludes all ads—whatever their viewpoint—that may foreseeably result in harm to, disruption of, or interference with the transportation system. But that does not foreclose SeaMAC's claim that the County applied § 6.4(D) in a viewpoint-discriminatory manner. *See Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1158 (9th Cir. 2007). Prevailing on this as-applied claim requires evidence that the government intended to "suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46; *see also Cornelius*, 473 U.S. at 806. After carefully reviewing the record, we conclude that no reasonable jury could find that County officials rejected SeaMAC's ad because they opposed SeaMAC's views on the Israeli-Palestinian conflict.

We begin by recapping the sequence of events that led to the County's rejection of SeaMAC's ad. A local news broadcast about SeaMAC's proposed ad sparked an intense controversy that became the subject of international attention.

This materially increased the risk of physical violence and consequent harm to Metro buses and their passengers. Four days after the publicity surrounding SeaMAC's proposed ad began, two pro-Israel groups—HFC and AFDI—proposed inflammatory counter-ads of their own promoting the opposite viewpoint of SeaMAC's ad. Faced with the choice between protecting the bus system and displaying competing ads on a conflict that has provoked deadly violence, the County simultaneously rejected *all* pending ads on the Israeli-Palestinian conflict pursuant to § 6.4(D). As the County Executive explained, he rejected all the ads "at the same time" because, in his view, the counter-ads were "at least as likely to elicit a response that would result in harm to our transit system as the SeaMAC ad." In effect, the County decided that, given the threat of disruption posed to the transit system, the County could not safely run ads on either side of the Israeli-Palestinian conflict.

The County's decision to reject SeaMAC's ad as part of a single, blanket decision to reject all submitted ads on the Israeli-Palestinian conflict negates any reasonable inference of viewpoint discrimination. To be sure, excluding all speech on a particular subject—whatever the viewpoint expressed— is content discrimination, but it's not viewpoint discrimination. Content discrimination is generally forbidden in a traditional or designated public forum, but it's permissible in a limited public forum, which is what we are dealing with here. *Kokinda*, 497 U.S. at 735 (plurality opinion); *Cornelius*, 473 U.S. at 809–10; *Perry*, 460 U.S. at 52. In a limited public forum, the government may impose content-based restrictions on speech as a "means of 'insuring peace'" and "avoiding controversy that would disrupt" the business of the forum. *Cornelius*, 473 U.S. at 809–10. That is all the County did here.

The "heckler's veto" concerns raised by the dissent would be troubling in a traditional or designated public forum, but they do not carry the same weight in a limited public forum. Excluding speech based on "an anticipated disorderly or violent reaction of the audience" is a form of content discrimination, generally forbidden in a traditional or designated public forum. *Rosenbaum*, 484 F.3d at 1158. In a limited public forum, however, what's forbidden is viewpoint discrimination, not content discrimination. That does not mean "heckler's veto" concerns have no relevance in a limited public forum: A claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view. That might be the case, for example, where the asserted fears of a hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed.

As we have explained, in this case the County's fears were real and substantial, and the County rejected speech from opposing sides of the Israeli-Palestinian conflict. In addition, Metro had previously run ads with the same viewpoint as SeaMAC's ad, when doing so had not presented a reasonably foreseeable threat of disruption. These facts confirm that the County's asserted fear of disruption was not used as a mere pretext for discriminating against SeaMAC because of the point of view it wished to express.

Because the County simultaneously rejected all of the proposed ads on the Israeli-Palestinian conflict—from opposing viewpoints—no reasonable jury could find that it engaged in viewpoint discrimination. The record instead supports a viewpoint-neutral content-based limitation, which the County imposed after scrupulously considering whether

it could "have this public discussion take place in a way that didn't present the dangers [it was] seeing."

\* \* \*

King County created a limited public forum when it opened the sides of Metro buses to advertising from outside speakers. The County's decision to reject SeaMAC's ad was both reasonable and viewpoint neutral, and thus did not violate the First Amendment. We affirm the district court's entry of summary judgment in the County's favor, and dismiss the County's conditional cross-appeal as moot.

**AFFIRMED in part; DISMISSED in part**.

CHRISTEN, Circuit Judge, dissenting:

The majority and I part ways at the starting line. In my view, the district court erred by concluding that King County created only a limited public forum. The County's policy and practice unmistakably demonstrate an intent to create a designated public forum on its Metro bus exteriors. Accordingly, the First Amendment requires that the County's decision to restrict SeaMAC's speech must be necessary to serve a compelling state interest and narrowly drawn; in other words, it must survive strict scrutiny. This is not to pre-judge the outcome of the case. The safety of public transit systems is of paramount importance, and it may be that credible threats created a compelling state interest. But it also may be that the County inappropriately bowed to a "heckler's veto" and suppressed speech that should have been protected. To faithfully apply our precedent to the actual facts established

by the record, we should remand for the district court to determine in the first instance whether genuine issues of material fact exist under the appropriate level of scrutiny, i.e., whether the County's safety concerns justified cancellation of the ad.

The outcome of this dispute hinges on whether the County created a designated public forum or a limited public forum. The essential question in differentiating between the types of fora is what the government intended at the time it opened the forum, not when it closed it. We must consider the government's policy and practice to glean its intent. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).

## I. Metro's policy establishes the County's intent to create a designated public forum.

A policy that makes government property "generally available to a certain class of speakers" signals an intent to create a designated public forum, whereas a policy that "reserve[s] eligibility for access . . . to a particular class of speakers, whose members must then, as individuals, obtain permission" signals an intent to create a limited public forum. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998) (internal quotation marks omitted). The operative inquiry in this case is not, as the majority suggests, whether Metro's policy makes its buses generally available to all advertisements, but rather whether it makes its buses generally available to noncommercial, political advertisements. *See id.* at 680 ("[W]ith the exception of traditional public fora, the government retains the choice of whether to designate its property as a forum for specified classes of speakers.").

Although Metro's policy required all proposed ads to be screened, Metro had no standards, written or otherwise, to guide application of the subjective restriction on "objectionable" and "offensive" content contained in its "civility clauses." This fact alone strongly suggests that the County created a designated public forum. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1077 (9th Cir. 2001) ("Standards for inclusion and exclusion in a limited public forum must be unambiguous and definite . . . ." (alteration and internal quotation marks omitted)). Metro's civility clauses are so broad and permit so much official discretion that they cannot validly serve a "selective" function for purposes of forum analysis. *See Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (government scheme regulating competing uses of a public forum "may not delegate overly broad licensing discretion to a government official"); *Planned Parenthood Ass'n/Chi. Area v. Chi. Transit Auth.*, 767 F.2d 1225, 1230 (7th Cir. 1985) ("We question whether a regulation of speech that has as its touchstone a government official's subjective view that the speech is 'controversial' could ever pass constitutional muster."). What is even more troubling is that Metro's guidelines actually *invite* a heckler's veto by expressly authorizing the censorship of speech whenever it is "reasonably foreseeable" that there will be strong objections.[1]

---

[1] In this case, many of the most vehement objections appear to have been expressed anonymously over the telephone or Internet. It requires little risk or effort to express threats and vitriol through such faceless and frequently traceless communications. To quote the popular Seattle hip-hop artist Macklemore: "Have you read the YouTube comments lately?"—it's easy to hide "behind the keys of a message board" or similarly anonymous medium. I do not discount the possibility that Metro received credible threats, but whether the threats were credible is best left

The majority emphasizes that SeaMAC's ad and the counter ads were "pending before the County at the same time" and "rejected . . . 'at the same time.'" To the contrary, the record is crystal clear that SeaMAC's ad was approved by Titan, Metro officials, and the King County Executive. It was only after SeaMAC's ad had been accepted and objections were received that the County reversed its decision and refused to run SeaMAC's ad. When it made that decision, it also decided to reject the counter ads proffered in response to SeaMAC's ad.

The County reversed its initial approval of SeaMAC's ad because of continued negative publicity and angry responses. When the controversy began, the Metro Transit Police reviewed SeaMAC's ad and settled on a "mid-range" plan to address any security issues it might cause. Metro's general manager concurred in the police proposal, stating that it "looks like a good plan of action." Only when the controversy failed to die down after a few days did the County change its tune. Whether the County had compelling reasons for reversing itself remains an open question.

Metro's contract with Titan permitted Titan to sell ad space for almost any ad of a controversial or political nature, thereby demonstrating an intent to grant general, not selective, access. *See Forbes*, 523 U.S. at 679. Metro's patently subjective policy with respect to such ads—the subjective nature of which was clearly evidenced in the acceptance and subsequent rejection of SeaMAC's ad—distinguishes this case from other transit agency cases addressing clear policies excluding political, religious, or

---

to law enforcement authorities; it is not relevant to what type of forum Metro created.

noncommercial advertising. *See, e.g.*, *Lehman v. City of Shaker Heights*, 418 U.S. 298, 299–300 (1974) (ban on political advertising); *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 890–92 (6th Cir. 2012) (same); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976–78 (9th Cir. 1998) (ban on noncommercial advertising). The majority's holding impermissibly allows the County to create a designated public forum for purposes of selling ad space, and then engage in discretionary, content-driven evaluation of speech on an *ad hoc* basis by invoking its infinitely amorphous "civility clauses."

## II.  Metro's consistent application of the policy establishes the County's intent to create a designated public forum.

Even if Metro's policy could be described as demonstrating an intent to create a limited forum, controlling case law would still require us to determine whether, *in practice*, Metro consistently enforced its civility clauses. *See Hopper*, 241 F.3d at 1075 ("[A]n abstract policy statement purporting to restrict access to a forum is not enough. What matters is what the government actually does—specifically, whether it consistently enforces the restrictions on use of the forum that it adopted."). The history of Metro's actual practices undeniably reveals an intent to create a designated public forum.

Metro's advertising program project manager, who has worked for the County since 1985, declared that it was not "a goal of the [advertising program] to create an open forum for public debate," but she tellingly acknowledged that Metro "has always accepted noncommercial advertising, including

candidates for elected office, ballot measures, and 'cause' advertising." *See United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1998) ("[A] governmental entity may not avoid First Amendment scrutiny simply by declaring that it is not creating a public forum . . . ."). The advertising program manager defined a "public issue" ("cause") advertisement as one that "conveys . . . a particularized message of a social, religious, ideological or philosophical nature," "lacks a commercial purpose," and therefore "is primarily *public* communication" (emphasis added). The advertising program manager also acknowledged that Metro "accepted noncommercial advertising *generally*" (emphasis added). For example, in 2009 Metro ran a pro-atheism ad ("YES, VIRGINIA . . . THERE IS NO GOD") that generated a large number of comments.

Metro's actual history of accepting ads for a variety of political subjects, whether controversial or not, demonstrates that the County created a designated public forum. *See DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 967 (9th Cir. 1999) (distinguishing school district's practice of excluding political, religious, or controversial public issue advertising from cases where "the city or transit authority controlling the bus sign advertisements historically accepted advertisements on a wide variety of subjects"); *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 130 (2d Cir. 1998) ("Allowing political speech . . . evidences a general intent to open a space for discourse . . . ."); *Planned Parenthood*, 767 F.2d at 1232 (transit agency's history of accepting political ads and wide variety of controversial public issue ads indicated intent to create public forum). In addition to its longstanding practice of generally accepting "cause" advertising, Metro approved three prior controversial

ads specifically relating to the Middle East conflict. One ad, sponsored by the Arab American Community Coalition, stated "SAVE GAZA!" Another stated, "END SIEGE OF GAZA!" A third ad, sponsored by the Jewish Federation of Greater Seattle, stated "THOUSANDS HAVE FALLEN IN PURSUIT OF PEACE, Remember Israel's soldiers and victims of terror. Join us in a moment of Silence on April 28 at 11:00 am." The County's attempt to distinguish the other ads related to the Middle East controversy boils down to the fact that the previous ads did not spark public outcry. If this is the most salient distinction, then it is plain that Metro's civility clauses amount to a memorialization of a heckler's veto and a content-driven suppression of speech.

The majority observes that Titan rejected proposed ads that did not comply with the contract. But the record does not support the majority's assertion that such rejection was "routine," and when ads were rejected, it was usually based on the policy's separate and specific restriction on alcohol and tobacco content. Despite its supposedly selective screening process, it appears that Metro had rejected only one set of ads under the civility clauses prior to this case.

In 2009, pursuant to the civility clauses, Metro directed Titan to reject a proposed series of ads submitted by "Citizens for Home Safety." These ads included language like "HATE CRIMES COMMITTED BY CULTS ARE DESTROYING THE USA" and "NAZI MEDICAL ABUSE COMMITTED FOR 15 YEARS: State Hate Committed by Elected Officials & Doctors." The sponsors of this set of ads ended up withdrawing their application before it was formally denied. There is no evidence of Metro ever rejecting any other ad under the civility clauses in the 30-plus-year history of its advertising program. On the County's motion for summary

judgment, the district court should have weighed this single example against the ads Metro did accept, drawing all appropriate inferences in SeaMAC's favor. Consideration of these ads tips the balance sharply toward the conclusion that the County created a designated public forum.

The argument that Metro's advertising policy was consistently applied is also severely undermined by the undisputed facts leading up to the cancellation of the SeaMAC ad. Metro's advertising program manager initially approved the ad. It was then forwarded to Metro's General Manager, who also approved it as consistent with Metro's policy. Finally, the ad was sent to the King County Executive, who "recognized that [the ad] was potentially offensive to some of the community," but "didn't feel that it rose to the level of violating [Metro's civility] policy." In other words, it was approved at all levels in the County.

The County adhered to its opinion that the ad was compliant with Metro's policy for a period of time even after a local television news station ran a story about the ad that provoked complaints from the public. Only when the heckling became louder did the County reverse itself. Notably, the reversal came after the Metro Transit Police had reviewed the ad and adopted a mid-range security plan it considered sufficient to handle any potential disruptions.[2]

---

[2] The majority asserts the potential disruption "wasn't covered by the existing security protocol because, as Metro's Operations Manager stated, it represented 'a totally new and different situation that we [had not] confronted before.'" But Metro's Operation Manager made this statement in the course of explaining that Metro did not have any pre-existing "security plan for dealing with a disruption that had to do with a public demonstration of some sort that had to do with what was on a bus." Metro

32 SEATTLE MIDEAST AWARENESS CAMPAIGN V. KING CNTY.

One of the virtues of a consistently-applied rule is knowing how it will be applied in the future. If SeaMAC's ad had actually run afoul of a consistently applied policy, as the majority opines, surely it would not have made it past three separate gatekeepers.

Perhaps recognizing that there is no actual track record of consistent application of the civility clauses, the majority argues that the court should "focus on the County's enforcement of the policy as a whole, not just the specific provision invoked to exclude the ads at issue." But the other policy restrictions were narrow and specific, and applying them did not require the County to look beyond the content of the ad. They prohibited the promotion or depiction of subjects like alcohol and tobacco, adult entertainment or services, sexual or excretory activities, and material that is false or defamatory. Allowing the County to piggyback its ambiguous disruption and civility standards on its consistent rejection of alcohol and tobacco ads opens a back door to official arbitrariness and a heckler's veto. With regard to the civility clauses, the only consistent practice demonstrated by the record in this case is Metro's historically consistent practice of allowing virtually any political ad. This well-established pattern "trump[s] the general rule that no public forum is created when the government requires speakers to obtain permission before engaging in expressive activity in the forum." *Hopper*, 241 F.3d at 1077 (discussing *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 252–55 (3d Cir. 1998)).

---

crafted a plan specifically for SeaMAC's ad, which Metro's Operations Manager believed was sufficient to handle any potential disruptions.

The Third Circuit's opinion in *Christ's Bride* is particularly instructive. There, a transit agency removed a poster that declared "Women Who Choose Abortion Suffer More & Deadlier Breast Cancer" after it received numerous complaints, including a letter from the Assistant Secretary of Health in the U.S. Department of Health and Human Services stating that the ad was misleading and inaccurate. 148 F.3d at 245–46. The transit authority's policy restricted "libelous, slanderous, or obscene advertising," and reserved the right to remove any advertising material that was later deemed "material[ly] objectionable." *Id.* at 250–51. The transit agency claimed it had not created a public forum because its written policy retained for it the sole discretion to reject or remove ads it found objectionable. *Id.* at 251. But the Third Circuit begged to differ, noting the transit authority had accepted "a broad range of advertisements for display," including two prior ads favoring reproductive rights. *Id.* at 251–52. Additionally, though the main purpose of the advertising program in *Christ's Bride* was to generate revenue, the record showed a secondary goal of "promoting 'awareness' of social issues and 'providing a catalyst for change.'" *Id.* at 249. Given the transit authority's "practice of permitting virtually unlimited access to the forum," the Third Circuit ruled the transit authority had created a designated public forum. *Id.* at 252.

This case closely parallels *Christ's Bride*. Like the transit authority there, Metro's "written policies . . . specifically provide for the exclusion of only a very narrow category of ads," and Metro's "goals of generating revenues through the sale of ad space" and its "practice of permitting virtually unlimited access to the forum" plainly establish that the County created a designated public forum. *Id.* After litigation was initiated, Metro's General Manager declared

that "[i]t has never been a part of Metro's mission to provide a forum for public debate, especially on non-transit issues," but the record also includes a February 2009 email from a Titan representative that speaks volumes about the historic application of the policy. The representative was one of a handful of individuals responsible for responding to the controversy. The email, on which Metro's advertising program manager was copied, succinctly explains that Metro's restrictions "are there to allow the freedom and opportunity for *all* organizations and associations either political or non-profit to benefit from using transit as a form of advertising their 'cause'" (emphasis added). Post-litigation declarations aside, Metro's history of actually allowing virtually unfettered access to anyone willing to purchase advertising space on its bus exteriors establishes that the County intended to open its government property to public discourse, without the specific restrictions constitutive of a limited public forum.

## III.   The nature of the forum does not compel a contrary conclusion.

The purpose of a public bus system is to provide an efficient and orderly means of public transportation; unlike a public park, buses are not necessarily the type of government property traditionally used for expressive activity. But according to Metro's advertising program manager, the predominant purpose of the advertising program Metro chose to create was to "generate revenue for Metro," and Metro decided to accept "noncommercial advertising, including candidates for elected office, ballot measures, and 'cause' advertising." *See N.Y. Magazine*, 136 F.3d at 130 (holding that because MTA generally accepted both commercial and political speech, the outside of MTA buses was a designated

SEATTLE MIDEAST AWARENESS CAMPAIGN V. KING CNTY. 35

public forum).[3]  There is nothing about selling ad space on the exterior of Metro buses that is inconsistent with the traditional use of Metro's buses.  Unlike judicial or municipal buildings where expressive activity could interfere with courtrooms or security, *see, e.g.*, *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 966 (9th Cir. 2002), the record here contains no evidence that allowing expressive activity interfered with Metro's ability to operate as a transit authority.  In fact, it appears Metro was able to maximize its ability to generate revenue to benefit the transit system by opening up its advertising program to noncommercial advertising.

I agree with the majority that the First Amendment does not require a "categorical rule" designating a public forum wherever the government has permitted some political speech.  The County could have allowed political campaign advertising but not "cause" advertising, as many other transit agencies have chosen to do.  But when a government entity

---

[3] In *American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority*, 898 F. Supp. 2d 73 (D.D.C. 2012), the plaintiff contracted with the transit authority to display a similar ad to the counter-ad at issue here that said: "In any war between the civilized man and the savage, support the civilized man.  Support Israel.  Defeat Jihad." *Id.* at 75.  The transit authority indefinitely postponed the ad after a video disgracing the prophet Mohammed led to anti-American violence in several countries. *Id.* at 77.  The district court noted that the D.C. Circuit previously held that the transit authority had converted its subway stations into public fora by accepting other political advertising.  *Id.* at 79 n.6 (citing *Lebron v. Wash . Metro. Area Transit Auth.*, 749 F.2d 893, 896 (D.C. Cir. 1984)).  The district court, applying strict scrutiny, concluded that the transit authority's concerns of passenger and employee safety were compelling, but the transit authority's failure to consider alternatives "plus the open-ended and purely subjective duration of its postponement were not narrowly tailored as required."  *Id.* at 76.

decides to permit a "wide array of political and public-issue speech," including controversial political advertising, it cannot escape the conclusion that it has opened the forum for such speech generally, and it may not close the forum, after the fact, to justify a content-based rejection of speech.  *See United Food*, 163 F.3d at 355.

The majority's view seems to be that the government may "elect[] to keep open" a designated public forum or a limited public forum for as long as it sees fit, and close such a forum "whenever it chooses."  I agree that outside of traditional public fora, the government may choose not to permit certain categories of speech on its property, but it must make that choice up front.  The court's opinion suggests the government may open and shut a forum, willy-nilly, in response to public uproar—a particularly dangerous precedent in light of modern technology.  Emails, text messages, and tweets can zing through the airwaves to and from countless devices in a matter of seconds, generating scores of impetuous responses just as fast.  Given today's modern and often anonymous communication technology, public outcry can be frequent and fleeting.  Granting the government license to close a forum it previously made open in response to such outcry confers broad power on hecklers to stamp out protected speech they find objectionable.

The First Amendment by no means puts the government in a straightjacket; an essential aspect of the designated public forum is that the government may adopt specific, consistently-applied limitations, such as permitting only commercial ads.  But properly applied, First Amendment doctrine plays a fundamental role in restraining the government from picking and choosing which speech is "uncivil," or from succumbing to a heckler's veto.  This was

SEATTLE MIDEAST AWARENESS CAMPAIGN V. KING CNTY. 37

the logic behind well-reasoned decisions from other circuits like *N.Y. Magazine*, *Planned Parenthood*, and *Christ's Bride*, with which this court professes accord, *see Children of the Rosary*, 154 F.3d at 978, but from which the majority opinion now distances itself.

Viewing the evidence in the light most favorable to SeaMAC, it is clear that even if Metro initially intended to limit access to its bus exteriors, it abandoned that intent by allowing ads on controversial subjects "as a 'matter of course.'" *Christ's Bride*, 148 F.3d at 254. Because we should remand for the district court apply strict scrutiny in the first instance, I respectfully dissent.